FILED

CLERK U.S.

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name ___Carpenter___    ___Ricky___    ___A.___
         (Last)              (First)        (Initial)

Prisoner Number ___B95921___

Institutional Address ___San Quentin State Prison, San Quentin, CA 94964___

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**WHA**

___Ricky A. Carpenter___
Full Name of Petitioner

**CV 08 1199**

Case No (To be provided by the clerk of court)

vs. California State Prison

___WARDEN ORNOSKI___         PETITION FOR A WRIT OF HABEAS CORPUS
Name of Respondent
(Warden or jailor)

Read Comments Carefully Before Filling In

## When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

1

petition will likely be transferred to the district court for the district that includes the institution where you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

     You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

     If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition? *A Parole denial from a Term to Life Sentence*

    (a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

*Santa Clara County Superior Court*      *San Jose, CA*
Court                                     Location

    (b)   Case number, if known   *# 68207*
    (c)   Date and terms of sentence *7 Years to Life*
    (d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) *Yes*   No

Where? *San Quentin State Prison, San Quentin CA 94964*
    (Name of Institution)                       (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

_____

_____

*This Petition is for the denial of Parole*

3.    Did you have any of the following?

Arraignment: Yes **X** No ___ Preliminary Hearing: Yes **X** No ___ Motion to Suppress: Yes ___ No **X**

3

4.    How did you plead?

Guilty _____ Not Guilty **X** _____ Nolo Contendere _____

Any other plea (specify) **Ŋ/A** _____ ' _____

5.    If you went to trial, what kind of trial did you have?

Jury **X** Judge alone _____ Judge alone on a transcript _____

6.    Did you testify at your trial?   Yes __ No **X**

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes **X**         No __
(b)    Preliminary hearing             Yes **✕**         No __
(c)    Time of plea   Yes **✕**         No __
(d)    Trial   Yes **X**         No __
(e)    Sentencing   Yes **X**         No __
(f)    Appeal   Yes **✕**         No __
(g)    Other post-conviction proceeding   Yes **X**         No __

8.    Did you appeal your conviction?   Yes **X** No __

(a)    If you did, to what court(s) did you appeal?

| | | | (Year) | (Result) |
|---|---|---|---|---|
| Court of Appeal | Yes **X** | No __ | **1979** | **Denied** |
| Supreme Court of California | Yes **X** | No __ | **1979** | **- Denied** |
| Any other court | Yes __ | No **X** | | |

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                                              Yes __ No **X**

(c)    Was there an opinion?         Yes **X** No .

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                                              Yes .         No **X**

4

If you did, give the name of the court and the result:

n/A

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?        Yes        No X

Except State Exhaustion of this Petition

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

Note* See Exhibits D-F for State Proceedings on this Petition.

    (a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court _____ Superior Court of Santa Clara County

Type of Proceeding __Habeas Corpus__

Grounds raised (Be brief but specific):

a.    Unfair Parole Causineration Hearing / Due Process, Liberty Interest

b.    facts presented

c.    information presented

d.    Evidence presented

Result __Denied__      Date of Result __4-27-07__

II.    Name of Court __CA Court of Appeals, 1st District__

Type of Proceeding __Habeas Corpus__

Grounds raised (Be brief but specific):

a.    Unfair Parole Causineration Hearing, Due Process; Liberty Interest

b.    facts presented

c.    information presented

d.    Evidence presented

Result __Denied__      Date of Result __7-9-07__

III.    Name of Court __Supreme Court of California__

Type of Proceeding _____ Petition for Review

Grounds raised (Be brief but specific):

a.  Unfair Parole Consideration Hearing, Due Process; Liberty Interest

b.  Facts presented

c.  information presented

d.  Evidence presented

Result Denied _____ Date of Result 1-16-08

(b)  Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes __ No X

_____

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: The Board of Prison Terms (BPT) is continuing to

deny parole through the sole use of the committing offense & ___ (Con't 8a)

Supporting Facts: The record will show that the BPT abused their discretion in making findings not supported by the record. I did not get a fair hearing. By the actions, stated in the above grounds, show they manipulated all of the evidence supporting a finding (Con't 8a

Claim Two: The BPT failed to "Actually" consider all of the relevant reliable information in the proper manner per the ___ (Con't 8b)

Supporting Facts: The BPT merely went through the motions without "Actually" considering all of the information. This consideration should really go beyond just stating that you did so. The BPT has abused its discretion in claiming that the committing ___ (Con't 8b)

Claim Three: The BPT violated my Constitutional Rights in it's reliance on the "Some-Evidence" Quantum of Evidence Doctrine (Con't 8c

Supporting Facts: When all of the evidence is examined, the BPT used the Above, as the sole evidence, factors to make a finding of unsuitability. Although the authority to do so has been upheld under the CA Supreme Court's Rosencrantz decision, it also violates (Con't 8c

* Note: Other Claims And Conclusion on page 8d...

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

N/A

Ground 1 Continued:

prison Conduct without real Evidence that I am A current "Unreasonable Risk to Public Safety" that is supported by the record; manipulating the facts of the hearing through lies, Distortion, and ommission resulting in a finding of unsuitability.

a. Supporting facts Continued:

Constitutionally protected Due Process and Liberty Interest rights and illustrates that the BPT has Abused their discretion and did not conduct a fair hearing. The BPT is using "Boiler-Plate" issues, not supported by and Clouding the real issue. The BPT wants to rely solely on the Committing offense and prior non Criminal Conduct as Allowed under the State Supreme Court but is having a difficult time getting around the Liberty Interest Rights granted under the 9th Circuit, so they have to Cloud the issue and record.

b. Supporting cases, rules or other authority continued:

State and Federal Due Process: Liberty Interest + Equal Protection, CA Penal Code, CA Code of Regulations, Supt. v. Hill, In Re George Scott, In Re Rosencrantz, In Re Liza Brown, Buckley v. Terhune, Biggs v. Terhune   334 F3d 910/914 (9th Cir 2003)

8Q

Ground 2 Continued:

Mental Health and Counselor Reports of Risk Assessment, P.C. 3042
Notices Supporting or not opposing parole, prison conduct & Rehabilitation,
Etc.. Beyond the committing offense & prior Non-Criminal conduct, there is
no, supported by the record, current Risk to the Public if released on parole.
a. Supporting facts Continued:

Counselor Evaluations and Risk Assessments, work, behavior, self Help
groups, parole plans, Etc.. The weighing process, not standardized, is an
Equal Protection violation. Even though the BPT acknowledged the positive,
it is just as obvious they were not "actually" considering them as factors
of suitability. The BPT did not "actually" consider me Eligible for parole
& that Parole (according to the intent and spirit of the process; PC 3041(b)) should
be granted unless I am a current unreasonable risk to public safety. They
instead substituted their "boiler-plate" grounds for denial for an "Actual"
determination that is both supported by the record and within the intent
& spirit of the process.

b. Supporting Cases, rules or other authority Continued:
State & Federal Due Process; Liberty Interest & Equal Protection,
CA Penal Code, CA Code of Regulations, Supt v. Hill, In Re George Scott,
In Re Rosencrantz, In Re Liza Brown, Buckley v. Terhune,
Biggs v. Terhune 334 F3d 910/914 (9th Cir 2003)

Ground 3 Continued:

Used the Committing offense, prior Conduct (to Incarceration) & prior prison
non-criminal conduct to make a finding that I was an unreasonable
risk to public safety if released on parole

a. Supporting facts Continued:

violates my Liberty Interest and the Quantum of Evidence must be increased
to at least substantive Evidence (defined as enough to convince a reasonable
person). The Some Evidence (as introduced under _Hill_ & used for the Parole
hearing for the 1st time in _Powell_) Doctrine should not apply to a parole hearing
because the conditions present in Hill's disciplinary process are not present
in a Parole hearing; Prison violence Control v. Liberty Interest. In this
parole hearing situation, there is no violent prison to control & the Liberty
Interest is much greater so a stricter Quantum of Evidence is warranted.
The BPT has had greater than _10_ years to study me and all Evidence
supports A finding that I am an Average or less Risk to the PUBLIC SAFETY
if released on parole (this is much less than the "Unreasonable Risk"
requirement).

b. Supporting cases, rules or other authority Continued:
State & Federal Due Process; Liberty Interest & Equal Protection
CA Penal Code, CA Code of Regulations, Supt. v. Hill, In Re George Scott
In Re Rosencrantz, In Re Liza Brown, Buckley v. Terhune,
Biggs v. Terhune 334 F3d 910/914 (9th Cir. 2003)

8c

Conclusion Sheet:

Because of "all" of the Above grounds that I believe that the hearing was not fair nor unbias (or impartial). The Respondent's have violated my Federal & State Constitutional Right to Due Process; Liberty Interest / Equal Protection & have acted against the intent & Spirit of the Access. The BPT; manipulated the facts of this, and all, hearings through lies, distortion & ommission, they failed to "Actually" consider Anything beyond their use of the committing offense; pre-conviction conduct, the use of non-criminal prison conduct & a perceived need or requirement of prison programs, not ordered by the Mental Health Dept.

The use of these factors was inappropriate (Quantum of Evidence) when applied to the "Some Evidence Doctrine" to render a finding that they Above make me an unreasonable risk to public safety. This has and continues to violates my rights and it is requested by this Petitioner that this Court grants Motion for Appointment of Counsel, orders Evidentiary Hearing and grants Habeas Relief.

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

State & Federal Right (Constitutional) to Due Process, Equal Protection/ Liberty Interest CA Penal Code, CA Code of Regulations, S.pt. v. Hill, IN RE GEORGE SCOTT, In Re Rosencrantz, In Re Liza Brown, Buckley v. Terhune, Biggs v. Terhune 334 F3d 910/ 914 (9th Cir 2003)

Do you have an attorney for this petition?    Yes ___ No X

If you do, give the name and address of your attorney:

Another inmate has helpen me with this Petition

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on  2-24-08
Date

Signature of Petitioner

( rev. 5/96)

9

This petition concerns:

- [ ] A conviction                    ☒ Parole
- [ ] A sentence                      [ ] Credits
- [ ] Jail or prison conditions       [ ] Prison discipline
- ☒ Other (specify):   Parole Hearing Denial

1. Your name:   Ricky A. Carpenter

2. Where are you incarcerated?   San Quentin State Prison

3. Why are you in custody?  ☒ Criminal Conviction    [ ] Civil Commitment

Answer subdivisions a. through i. to the best of your ability.

a. State reasons for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   1st Degree Murder

b. Penal or other code sections:   PC 187

c. Name and location of sentencing or committing court:   Santa Clara County Superior Court
   San Jose, CA.

d. Case number:   # 68207

e. Date convicted or committed:   8/10/1978

f. Date sentenced:   8/17/1978

g. Length of sentence:   7 years to Life

h. When do you expect to be released?   Unknown; Lifer

i. Were you represented by counsel in the trial court?  ☒ Yes.  [ ] No.  If yes, state the attorney's name and address:

   Paul Mansfield, San Jose, CA

4. What was the LAST plea you entered? (check one)
   ☒ Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?
   ☒ Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See Attached pages 1 through 8 for Grounds: 1, 2, and 3

INSERT A through INSERT C

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts u| which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did o| failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

**PETITION FOR WRIT OF HABEAS CORPUS**

Did you appeal from the conviction, sentence, or commitment? Yes. No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

_Court of Appeal_

b. Result: _Denied_      c. Date of decision: _1979_

d. Case number or citation of opinion, if known: _Unknown_

e. Issues raised: (1) _Ineffectiveness of Counsel_

   (2) _Circumstances of Case_

   (3) _Evidence presented_

f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_State Defender's Office_

Did you seek review in the California Supreme Court? ☒ Yes. ☐ No. If yes, give the following information:

a. Result: _Denied_      b. Date of decision: _1979_

c. Case number or citation of opinion, if known: _Unknown_

d. Issues raised: (1) _Same as Above_

   (2) _Same as above_

   (3) _Same as above_

). If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_This appeal concerns the denial of parole at a Suitability hearing_

. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See In re Muszalski (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_BPT Administrative Review Process Repealed on 5/1/2004_

b. Did you seek the highest level of administrative review available? ☒ Yes. ☐ No.
Attach documents that show you have exhausted your administrative remedies.

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

n/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

N/A

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

not on this petition.

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

N/A

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

n/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3/6/07  2/24/08                    ▶ _____ (SIGNATURE OF PETITIONER)

MC-275 (Rev. January 1, 1999)                PETITION FOR WRIT OF HABEAS CORPUS                Page six of six

## Ground 1

> IN VIOLATION OF STATE AND FEDERAL DUE PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") IS CONTINUING TO DENY PAROLE THROUGH THE SOLE USE OF THE COMMITTING OFFENSE AND PRIOR NON-CRIMINAL/PRISON CONDUCT WITHOUT REAL EVIDENCE THAT PETITIONER IS A CURRENT "UNREASONABLE THREAT TO PUBLIC SAFETY," THAT IS SUPPORTED BY THE RECORD, MANIPULATING THE FACTS OF THE HEARING THROUGH RUMORS, WHIM, AND CAPRICE, DISTORTION, AND OMISSION OF EVIDENCE, RESULTING IN A FINDING OF UNSUITABILITY.

Ricky A. Carpenter ("Petitioner") is serving a seven to life for a conviction of first-degree murder committed on January 15, 1978. Petitioner appeared before the Board of Parole Hearings on September 21, 2006, and received a three year denial for parole. Petitioner's Minimum Eligible Parole Date is set at November 30, 1985. That decision is the basis for this petition for writ of habeas corpus.

The record will show that the Board abused their discretion in making findings that are not supported by the record. Petitioner did not get a fair and impartial hearing. By the actions, stated in the grounds above, the Board manipulated all the evidence supporting a finding of suitability (See record), while their manipulations are not because they are relying solely on the committing offense and prior non-criminal conduct. These factors violate Petitioner's constitutional protected Due Process and Liberty Interest rights and illustrate that the Board has abused their discretion and did not conduct a fair hearing. The Board is using "boiler-plate" issues, elements, and language, which were either not found true by the jury, unconstitutionally vague, not supported by the evidence and law, and that are clouding the real issue. The Board wants to rely solely on the controlling offense and prior non-criminal conduct as allowed under the California Supreme Court in the In re Rosenkrantz, 29 Cal.4th 616, but is having a difficult time getting around the Liberty Interest Rights granted under the Ninth Circuit, so they have to cloud the issue and record. (See e.g., Cal. Penal Code § 3041(a)

1.

and (b); § 190.2, § 190.4; Cal. Codes of Regs. tit. 15; Cunningham v. California 549 U.S. ___ (2007); Superintendent v. Hill, 472 U.S. 455; In re Scott (2005) 133 Cal.App.4th 573; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 915; In re Elkins (2006) 144 Cal.App.4th 475; and In re Weider (2006) 145 Cal.App.4th 579; Fourteenth Amendment of the United States Constitution.)

For the foregoing reasons, the Court should grant the petition and order the Board to set a parole date that conforms with the above stated law. In the event that Petitioner has gone beyond what the Matrix guidelines provides for his case, Petitioner should receive credit for his parole term.

· · INSERT B

## Ground 2

IN VIOLATION OF STATE AND FEDERAL EQUAL PROTECTION AND DUE
PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") FAILED TO
"ACTUALLY" CONSIDER ALL OF THE RELEVANT RELIABLE INFORMATION
IN THE PROPER MANNER PURSUANT TO CAL. CODE OF REG. TIT. 15
("CCR-15") § 2402(b); MENTAL HEALTH AND COUNSELOR REPORTS
OF RISK ASSESSMENT, CAL. PENAL CODE § 3402 NOTICE SUPPORTING
OR NOT OPPOSING PAROLE, PRISON CONDUCT AND REHABILITATION,
ETC.. BEYOND THE COMMITTING OFFENSE (AND PRIORS) NON-CRIMINAL
CONDUCT, THERE IS NO SUPPORT BY THE RECORD THAT PETITIONER
IS A **CURRENT** UNREASONABLE THREAT TO THE PUBLIC IF RELEASED
ON PAROLE.

On September 21, 2006, the record demonstrates how the Board of Parole

Hearings ("Board") merely went through the motions without "actually"

considering all the information. This consideration should really go beyond

just stating that the Board did so. The Board abused its discretion in

claiming that the committing offense and prior non-criminal prison conduct

and prior to the incarceration conduct, which are all unchangeable factors,

that would outweigh all of the factors supporting parole: e.g., Mental Health

and Counselor Evaluations and Risk Assessments, work assignment performance,

self-help groups, parole plans, etc... The weighing process, not standardized,

is an Equal Protection violation. Even though the Board acknowledged the

positive, it is just as obvious they were not "actually" considering them

as factors of suitability. The Board did not "Actually" consider Petitioner's

eligible for parole and that parole (according to the intent and spirit of

the process described in Cal. Penal Code § 3041(b)) should be granted unless

Petitioner is a **current unreasonable** risk to public safety. The Board instead

substituted their "boiler-plate" grounds for denial for an "Actual"

determination that is supported by the record and within the intent and spirit

of the process. (See. e.g., Penal Code § 3041(a) and (b); § 190.2, § 190.4;

Cal. Codes of Regs. tit. 15; Cunningham v. California 549 U.S. ___(2007);

Superintendent v. Hill, 472 U.S. 455; In re Scott (2005) 133 Cal.App.4th

573; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 915; In re Elkins (2006)

144 Cal.App.4th 475; and <u>In re Weider</u> (2006) 145 Cal.App.4th 579; Fourteenth Amendment of the United States Constitution Equal Protection and Due Process Clause.)

For the foregoing reasons, the Court should grant the petition and order the Board to set a parole date that conforms with the above stated law. In the event that Petitioner has gone beyond what the Matrix guidelines provides for his case, Petitioner should receive credit for his parole term. In the alternative, the Court should appoint counsel, hold an evidentiary hearing, while order the Board to produce records of all "Seven Years to Life" prisoners' decisions. This discovery will show that the Board uses "boiler-plate" language that is unconstitutionally vague, were not present or found true by a jury, and represent a "No-Parole Policy" for those convicted of murder.

INSERT C

## Ground 3

THE BOARD OF PAROLE HEARINGS ("BOARD") VIOLATED PETITIONER'S
STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS IN
ITS RELIANCE ON THE "SOME EVIDENCE" QUANTUM OF EVIDENCE
DOCTRINE WHEN IT USED THE COMMITTING OFFENSE, PRIOR-CONDUCT
(TO INCARCERATION) AND PRIOR NON-CRIMINAL CONDUCT TO MAKE
A FINDING THAT PETITIONER WAS AN UNREASONABLE RISK TO PUBLIC
SAFETY IF RELEASED ON PAROLE.

When all the evidence is examined, it will show that on September

21, 2006, the record demonstrates how the Board of Parole Hearings ("Board")

used the above as the sole evidence, factors to make a finding of

unsuitability. Although the authority to do so has been upheld under

California Supreme Court's Rosenkrantz decision, it also violates the Liberty

Interest ruling in the Ninth Circuit Biggs v. Terhune decision. The "Some

Evidence" Doctrine therefore violates Petitioner's Liberty Interest and the

Quantum of Evidence must be increased to at least "substantive-evidence"

(defined as enough to convince a reasonable person). The "Some Evidence"

(under Superintendent v. Hill, 472 U.S. 455 ("Hill"), that was introduced

for the first time during "In re Powell" parole hearing having been used

ever since) Doctrine should not apply in a parole suitability hearing because

the argument posed during Hill is not the same in a parole hearing as it

was in a disciplinary hearing: the Superintendent had a violent prison to

control and Hill's Liberty Interest was very small.

In Hill, the Court held that due process requires a prison disciplinary

decision be supported by some evidence. "In a variety of contexts, the Court

has recognized that a governmental decision resulting in the loss of any

important liberty interest violates due process if the decision is no supported

by any evidence." Id. at 455. Indeed, the general rule is that review of agency

decisions, including those made by a quasi-judicial officers, is for

substantial evidence. (See e.g., Evans v. Charter, 110 F.3d 1480, 1483 (9th

Cir. 1997) (review of ALJ findings); Young v. Sullivan, 911 F.2d 180, 183

5.

(9th Cir. 1990) (same.).

The state and federal courts have tended to assume that the "some evidence" standard in Hill is the standard that applies to parole decisions. Petitioner contends that is wrong. The usual standard is substantial evidence. Hill developed an exception for prison disciplinary hearings, and exception premised on the unique circumstances of prison discipline. No U.S. Supreme Court case, and certainly nothing in Hill, suggest that the "some evidence" standard is appropriate for, or would satisfy due process in, parole matters.

The requirements of due process are flexible and depends on balancing of the interest affected by the relevant government actions. (See, e.g., Cafeteria Workers v. McElroy, 367 U.S. 866, 895 (1961).) In Hill, the Supreme Court balanced a prisoner's interest in good time credit against "the distinctive setting of a prison, where disciplinary proceeding 'take place in a closed, tightly controlled environment.'" 472 U.S. at 454. The Court rejected the prison's argument that no particular quantum of evidence should be required in disciplinary proceedings. Nevertheless, the Court held that because "[p]rison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances," a less, rather than more, stringent quantum of evidence satisfied due process. Id. at 455-56.

The Due process analysis called for, however, weighs substantially differently, on both ends, in the parole setting context. First, the prisoner's interest is greater. In the prison disciplinary context, the prisoner stands to lose some days of good time credit. Because that will delay his release by that many days, his interest is great; but the decision will not control whether he ever regains his liberty. Parole Board Hearing denials are

significantly different. A denial of a parole date does not just delay a prisoner's release by a set number of years; it takes away all the good time credit earned toward a set prison term, leaving the very real possibility that the prisoner will spend many years in prison way beyond his Minimum Eligible Parole Date and the terms set forth in the Board's own Matrix guidelines, and perhaps being release only after age has made it almost impossible for him to gain a quality life, or dying in prison. Thus, the prisoner's side of the due process balancing is substantially weightier than it is in a disciplinary hearing.

"The 'some evidence' standard sends a message to prison inmates as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation. This message runs contrary to fundamental principles of criminal law in the United States." Carrillo v. Fabian 701 N.W.2d, 763; 2005 Minn. LEXIS 424.

In the final analysis, it may not be necessary for this Court to determine the quantum of evidence necessary to reverse a parole date, for even under the "some evidence" standard, the evidence before the Board does not support the Board's finding that Petitioner is a current threat to public safety. It is important to note, however, that even under the "some evidence" rule, the evidence must bear "some indicia of reliability." Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904.

Under California law, a parole date must be set unless the panel determines that the "gravity of the current or convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offense is such that consideration of public safety requires a more lengthy period of incarceration...." Cal. Penal Code § 3041(b). The panel must determine "whether the life prisoner is suitable for release on parole," and whether

INSERT C (Ground 3 cont.)

"the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15 ("CCR-15") § 2402(a). The panel must consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole. Id. as § 2402(b)-(d).

There is no question that the only basis for finding a life prisoner unsuitable for parole under California law is that he presents a current threat to public safety. There is no evidence that supports such a finding.

For the foregoing reasons, the Court should grant the petition and order the Board to use the proper standard set forth n its own regulation which calls for a "preponderance of the evidence," or "substantial evidence."

Exhibits - USDC
# TABLE of Contents

A - Mental Health Reports

B - Correctional Counselor Reports

C - Parole Hearing Transcripts

D - Superior Court Documents

E - Appeals Court Documents

F - CA Supreme Court Documents

G - U.S. District Court Documents (for future Use)

Exhibit - A

# PSYCHOSOCIAL EVALUATION
# FOR THE BOARD OF PRISON TERMS
# SEPTEMBER 2006 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

I.  <u>Identifying Information:</u>    Mr. Carpenter is a 47 year old, Caucasian male who is serving a Life sentence for Murder (P187) committed on 1-15-78. The report is based on a review of the inmate's central files, medical record and a face-to-face interview conducted in the staff offices of San Quentin State Prison. Mr. Carpenter was informed of the limits of confidentiality in that information provided would be included in a report to the Board of Prison Terms. Mr. Carpenter stated that he understood this and was able to demonstrate an understanding of the purpose of the interview. He denied any need for assistance or for any adaptive aides and stated that he was fully able to participate in the interview. Only Mr. Carpenter and the examiner were present at the interview.

Mr. Carpenter's developmental history, family history, psychosocial development and sexual orientation, military history, educational history, employment and income history, and substance abuse history have been thoroughly reviewed and presented in previous reports and will not be repeated here. The reader is referred to the July 9, 2001 report by Dr. Ishida for this information.

II. <u>Plans if Granted Release</u>:
A. Housing:
Mr. Carpenter would prefer to parole to Washington state where his sister and brother-in-law would be able to assist him with a car, a job and a condominium residence.

If required to parole to his county of last residence, he would be able to live with an aunt and uncle.

B. Employment:
In Washington State, Mr. Carpenter would be able to work as a forklift operator or office worker. In Santa Clara County, he has not been able to secure any offers of employment although he has extensive skills as a carpenter and cabinetmaker.

C. Social Support/Services:

Mr. Carpenter would rely primarily on family for social support. He is also committed to continuing his participation in NA. He has applied to residential programs for recovering substance abusers including Victory Outreach, Alliance and Ala-non but has not received a confirmation of acceptance into any program. Mr. Carpenter recognizes that his crime may be a deterrent to being considered by many programs.

## CLINICAL ASSESSMENT

III. Current Mental Status/Treatment Needs:

Mr. Carpenter presented as a pleasant, sincere soft-spoken man. He appeared to be his stated age. He was well-groomed with somewhat longish hair, and dressed in standard CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. He was able to identify the current governor and U.S. President. He was able to think abstractly. His thought was coherent, linear and logical with no evidence of thought disorder. He had no symptoms of perceptual distortions or delusional thought. His intellectual functioning appeared to be in the average to above average range. Attention, concentration and memory appeared to be within normal limits. He was able to think abstractly and to place common items into appropriate categories. Speech, flow of thought and affect were all within normal range. Mood was mildly depressed and he became tearful several times when discussing his commitment offense. He denied any suicidal or homicidal ideation. His judgment appeared to be sound for most situations. He stated that he would call the fire department and then see if he could help if he was the first one to discover a fire in a crowded building. He demonstrated capacity for insight into his offense.

### A. CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:        303.90 Alcohol Dependence (in remission is a controlled environment)
               304.80 Polysubstance Dependence (in remission in a controlled environment)

AXIS II:       301.9 Personality Disorder, NOS (avoidant, dependent, antisocial features), improving

AXIS III:      None related to mental health

AXIS IV:       Stressors: Life Sentence

AXIS V:        GAF = 78

**B:    Current Level of Care:** General Population, not in MHSDS
**C:    Treatment Activities:** None for mental health reasons.    Mr. Carpenter participates in educational, vocational, and self-help activities
**D:    Medications:** None for mental health treatment
         **E. Prognosis:** Based on history and Mr. Carpenter's present clinical presentation, he remains at risk for relapse into alcohol or drug use in a less restricted environment. His gains

in overcoming maladaptive personality traits are likely to be maintain in a structured, supervised environment or as long as Mr. Carpenter is able to set and achieve positive goals for work and self-improvement.

## IV. Review of Life Crime:

### A. Inmate's Version of Offense

Mr. Carpenter's account of the life crime does not differ from previous accounts or from the account contained in reports found in his C-file. He acknowledges that he single-handedly caused the death of his neighbor by stabbing her after he had rendered her unconscious. He confessed to the police after he was arrested and agreed to take a polygraph examination.

### B. Relevance of Mental Condition to Crime

While Mr. Carpenter does not have a mental illness or severe mental disorder, he does have maladaptive personality traits that represent an enduring pattern of behavior and inner experience, that deviate markedly from mainstream culture and impact his interpersonal functioning, affectivity, and impulse control. While this pattern has been of long duration and pervasive across a range of situations, the maladaptive traits have significantly improved in Mr. Carpenter. These maladaptive traits prevented Mr. Carpenter from learning to cope adaptively with stress and from completing the developmental tasks expected of adolescents. His inability to meet these challenges paired with his dependence on drugs and alcohol were directly related to his motivation for committing the crime, as well as his inability to resist the homicidal impulse.

### C. Inmate's Level of Insight and Remorse

Mr. Carpenter takes full responsibility for the crime. He was under the influence of alcohol and marijuana at the time, but does not believe that his use was the primary causal factor in the crime. He was in a state of agitation as his mother was no longer as compliant in responding to his attempts to continue living an irresponsible life while she provided for him. He feared losing this arrangement that required no effort from him to achieve or become responsible. His use of drugs and alcohol were tolerated and he became dependent on them. When his neighbor became a threat to his dependency needs, he displaced the anger he felt toward his mother on her and killed her over a minor provocation that occurred earlier in the day.

Mr. Carpenter is not only remorseful and sad about having committed the crime, he seems to feel a deep sense of shame about the way he performed in all aspects of his life. He suffers daily as he remembers clearly what he did, and shoulders responsibility for the commission of the crime.

### D. Causative Factors

Mr. Carpenter was part of a very dysfunctional family system that tolerated rageful behavior, violence, irresponsibility, verbal and physical abuse, manipulation, and the use of illegal substances. This affected not only Mr. Carpenter values, but his personality and character formation.

### V. Assessment of Dangerousness:

The following is a risk assessment and not intended to predict future dangerousness with complete accuracy. A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior. Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

Mr. Carpenter was evaluated using two measures of risk for factors related to criminal behavior, and violent recidivism. On the PCL-R, a measure of psychopathy, Mr. Carpenter scored at the 48th percentile for male offenders. He had a T score of 51.8, which places him at the mean for male offenders. The mean T score is 50. He received a score on the Violence Risk Assessment Guide (VRAG) that is associated with a probability of 0.55 of violent recidivism over a 7-year period, if released from custody. This score is based largely on static factors in Mr. Carpenter's case that cannot be changed. The only contributing factors that can be changed are whether he meets the criteria for a personality disorder, and his score on the Hare Psychopathy Checklist (PCL-R). The other factors are related to Mr. Carpenter early adjustment and criminal history. It should be noted that the stated probability is based on Mr. Carpenter's similarity to other offenders whose rates of recidivism have been measured. As behavior is multi-factorial it is not possible to predict the future behavior of any individual with certainty. Some individuals with low probability scores reoffend, while others with high probability scores never reoffend.

### A. Violence History:

Mr. Carpenter stated that he was not ever a victim of physical or sexual abuse as a child. He observed violence between the adults in his life. His uncle and his girlfriend used to assault each other. His mother and his grandmother also had physical fights that Mr. Carpenter observed. The conflicts between Mr. Carpenter's mother and his stepfather were primarily verbal with his mother as the aggressor. He stated that his stepfather would try to leave the house when his mother would begin her verbal tirades, but that sometimes he would just explode and hit her. The physical assaults would occur approximately once a week.

Mr. Carpenter first observed serious physical injury when he was six years old and saw a girl hit by a car. He played with BB guns as a child, but never owned a gun. He got into fights with friends in elementary school, but was never suspended or disciplined. He considered himself to avoid violence in general.

### B. In a Controlled Environment:

Mr. Carpenter received one write up for a rules violation since his last Board appearance. He received a CDC115 on 7-1-05 for not showing up for a medical ducat. He stated that he had been told that he could return the next day for the laboratory appointment. The 115 states that Mr. Carpenter acknowledged that he went to breakfast instead of going directly to the appointment as scheduled. The laboratory test required a period of fasting before the test.

CARPENTER, Ricky Allen B-95921                                    August 24, 2006

In 1997, he was found guilty of Conspiracy to Extort $1,500 from another inmate by means of threat of force and violence. The offense reportedly occurred in regard to a drug debt. He has no other record of institutional violence or aggression.

Mr. Carpenter has been attending NA since his last appearance before the Board. Mr. Carpenter has also participated in the San Quentin college program with a high grade point average. He has also participated in Kairos, Creative Conflict Resolution, and IMPACT. If he remains abstinent from alcohol and drugs, and continues to participate in positive programming he would be expected to be at low risk of violence in a controlled setting.

### If Released to the Community:

As Mr. Carpenter has been incarcerated for all of his adult life, he would be likely to face considerable challenges in adapting to life in the community. He has gained skills and a level of education that would make him employable and provide him with the potential to be a productive citizen. This assumes that he would be successful in maintaining abstinence from alcohol and drug use while in the community. It would be important for Mr. Carpenter is gain acceptance by members of society who are responsible citizens and who did not rely on the use of substances for coping with challenges and stress.

Mr. Carpenter describes himself as "an addictive personality. He realizes that he is prone to relapse and must actively work against that possibility constantly. He is committed to following a 12-step program such as Narcotics Anonymous. He has come to understand the contribution of his family relationships to his development and his crime. He continues to have a fairly negative self-image in spite of recent accomplishments, such as successful college coursework and proficient skills as a carpenter. He is a lead man at PIA and has opportunities to teach other workers carpentry and production. These experiences of responsibility and helping others to learn have been very positive in allowing Mr. Carpenter to develop a more positive self-image. He states, "I like who I am now, what I am capable of."

There was no indication of anger, hostility or poor impulse in Mr. Carpenter's clinical presentation. Mr. Carpenter appeared to be a mildly depressed individual who suffers from a dearth of positive experiences in his life. Work is very important to him in that it provides him with validation of his competence and value to others. His positive educational achievements are also an important source of self esteem. It would be important for Mr. Carpenter to have the structure and social support necessary to maintain this level of positive functioning in the community. Given his vulnerability for relapse into substance abuse, a comprehensive, supportive program might be necessary to maintain these gains.

### VI. Clinician Comments and Summary:

Mr. Carpenter is a greatly improved individual in that he has found ways to make a positive contribution to the San Quentin community in spite of his history of personal shortcomings and irresponsible behavior. He has persisted in obtaining a college degree and solid vocational skills.

CARPENTER, Ricky Allen  B-95921                                                    August 24, 2006

Mr. Carpenter's early socialization in a dysfunctional family, his lack of positive role models, and violent crime have resulted in a negative self-concept that Mr. Carpenter works hard to overcome. While he has made impressive improvements, his sense of self-worth remains rather fragile. Part of this comes from his honest self-acceptance of his role in the crime. He would benefit from participation in a victim-offender intervention, while incarcerated, provided the program is run in a manner that would offer him adequate emotional support.

Mr. Carpenter's mildly depressed mood seems to be situational, related to his incarceration and limited social support, as well as a feature of his personality disorder. He did not exhibit symptoms related to major depressive disorder, other than low self-esteem, and a sad affect when discussing his crime. While follow up mental health treatment is not warranted at this time, Mr. Carpenter would benefit from continued participation in skill building and self-help activities. As Mr. Carpenter develops his record of positive achievements, his risk of violent recidivism would continue to lessen.

While has become a much stronger individual than he was at the time of his crime, or even earlier in his incarceration, Mr. Carpenter remains at risk for relapse into the use of alcohol or drugs in a less structured setting. He would benefit from paroling to a program that has experience with polysubstance abusers who have committed violent crimes. Any use of alcohol or drugs could result in an impairment of judgment and lessened impulse control.

_Michel L. Inaba Ph D_                               _2-25-06_
Michel Lynn Inaba, Ph.D.                                    Date
Contract Psychologist

Exhibit- B

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## APRIL 2006 CALENDAR

### I.    COMMITMENT FACTORS:

#### A.    Life Crime:

Count one: Murder in the first degree, PC187 with the use of a weapon (knife), PC12022 (b). Count two: Petty theft, PC484. Case number 68207 in the County of Santa Clara. Sentence: Count one-7 years to life, as to PC12022 (b) one year imposed and stayed until completion of sentence; Count two-sentenced to time already served of 187 days. Minimum Eligible Parole Date: 01130/85. Victim: Evelyn Bentley. age 57. Received by the California Department of Corrections (CDC) on 08/10/78.

##### 1.    Offense Summary:

On January 16, 1978, Santa Clara Sheriffs Deputies responded to a residence, as the lights were on and the front door was ajar. Deputies discovered the body of Evelyn Bentley clad in pajamas and a dressing gown, lying on her back on the floor. Her upper garments were soaked in blood as was the rug under her head and the hard wood floor. There was a kitchen (butcher's) knife lying by Bentley's right shoulder with the blade covered in blood.

When Deputies interviewed Ricky Carpenter, he related that following his mother's departure at about 8:00 p.m., he suddenly decided to kill Bentley. He disliked her because as she approved of the separation of his. mother and stepfather. Carpenter walked over to the Bentley residence and knocked on the front door explaining that he needed to use the telephone as his was out of order. Bentley unlocked the door, allowing Carpenter to enter. Carpenter followed Bentley to the master bedroom where the telephone was located. Carpenter then stuck Bentley in the face with his fist causing her to fall to the floor. When Bentley began to struggle, Carpenter tripped her, choked her into unconsciousness, picked up a butcher's knife from the kitchen and stabbed her several times in the chest. Carpenter attempted to suffocate Bentley with a small area rug on the floor, leaving the knife imbedded in her chest. When Carpenter's attempts to kill Bentley in this matter proved unsuccessful, he pulled the knife out of her chest, removed the area rug from her face and stabbed her through the right side of the neck causing her death.

##### 2.    Prisoner's Version:

Carpenter stated that he murdered Bentley as a means of striking out against his mother. He states she was just there and did not deserve what happened to her. Carpenter stated that Bentley knew more about him and the things he was doing, than his own family did because her house was situated with a clear view of the entrance to his room. He stated that Bentley knew that he was a

CSP-SQ

teenage alcoholic and drug user and that she received the brunt of his misplaced anger and frustration. He reiterates that she did nothing to deserve what happened to her, makes no excuses for his actions and accepts full responsibility for his actions.

B.   **Aggravating/Mitigating Circumstances:**

   1.   **Aggravating Circumstances:**

      a) Bentley was vulnerable due to her age.
      b) Carpenter had a relationship of confidence and trust with Bentley as they were neighbors and acquainted with one another.
      c) Carpenter had the opportunity to cease but continued with the crime.
      d) The murder was senseless and served to purpose.
      e) The victim was stabbed repeatedly.
      f) Carpenter used a knife in the commission of the murder.
      g) Carpenter was under the influence of drugs and alcohol at the time of the murder.
      h) The nature of the crime was extremely vicious.

   2.   **Mitigating Circumstances:**

      a) Carpenter has a minimal history of criminal behavior.
      b) The murder was committed during a brief period of extreme mental trauma.

II.   **PRECONVICTION FACTORS:**

A.   **Juvenile Record:**

| Date | Charge | Disposition |
|---|---|---|
| 01/17/75 | Burglary | 6 months probation |
| 07/04/75 | Possession of a destructive devise (firecrackers) | Dismissed 10/04/75 |

B.   **Adult Convictions and Arrests:**

The instant offense is Carpenter's only arrest/conviction as an adult.

C   **Personal Factors:**

The most significant factor, which may lead to explain Carpenter's involvement in the life crime seems to stem from the anger he held towards his mother, at the time, based on the deterioration of their relationship. They had a close relationship until she expressed her disapproval of his lifestyle, which included the use of alcohol and drugs and dropping out of school. As confrontations with his mother increased so did his anger, however, he could not express this anger to his mother due to his affection for her. This displaced anger ultimately culminated in the death of Bentley.

CSP-SQ

## III. POSTCONVICTION FACTORS:

### A. Special Accommodations/Disability:

None noted or requested.

### B. Custody History:

Carpenter was received by CDC on 08/1 0/78. He was processed through the Northern Reception Center at the California Medical Facility (CMF) and was placed at the Deuel Vocational Institution (DVI) on 09/19/78. He was transferred back to CMF on 08/17/82 for a Category 'T' program. Subsequent placements were to the California Men's Colony-East (CMC-E) on 10/24/87. to CMF on 06/02/00, to DVI on 12/27/90, to CMC-E on 03/26/92, to DVI on 06/25/92 and finally to San Quentin (SQ) on 03/29/93. Transfers were non-adverse in nature and Carpenter seemed to make an acceptable adjustment to each move. Carpenter has maintained Medium A custody throughout most of his incarceration. Carpenters classification score was reduced to 0 in 1988. Carpenter was placed in Administrative Segregation (Ad Seg) at CMF on 10/12/90 based upon the discovery of gambling paraphernalia in his assigned living quarters. He was released from Ad Seg on 10/16/90, retention in Ad Seg was deemed not required. He was next placed in Ad Seg at SQ on 03/14/97 pending investigation that he conspired to commit extortion for money and battery against another inmate. Carpenter was released to the general population at SQ on 05/07/97. Carpenter has held a wide array of positions including numerous positions within the Prison Industry Authority (PIA), positions within the laundry including lead-man tailor and maintenance mechanic and numerous positions on the yard including yard lead-man. He has been commended numerous times for his wood working skills and has held many 'special assignments'. Carpenter is currently assigned to PIA as a machinist in the wood room. Work supervisor reports and educational reports have been consistently average to exceptional. Carpenter's case was heard before the Board of Prison Terms (BPT) on 10/28/96. Carpenter states he did not attend because his attorney was changed. The BPT denied parole for four years and recommended that Carpenter become disciplinary free, upgrade vocationally and educationally, and participate in available self-help and therapy programs. Carpenter appeared before The Board of Prison Terms 2/26/02 the BPT again denied parole for four years and recommended that Carpenter upgrade academically become disciplinary free and participate in Self Help/ Therapy activities. On 3/6/02 Carpenter appeared before Unit Classification Committee (UCC) for his Post Board Review, he continued with his present program. On 9/4/02 Carpenter appeared before the UCC for his annual review, no changes were made to his program. On 8/27/03 Carpenter appeared before the UCC for his annual review, his classification score was changed to 19, the new mandatory minimum score for an inmate serving a life sentence. On 5/24/04 Carpenter was placed in administrative segregation (ad-seg) for safety reasons, he was released from On 7/22/04 after the Investigative Services Unit completed their investigation and determined that Carpenters safety was not in jeopardy, Carpenter

appeared before the UCC for his annual/program review, no changes were made to his program.

## C.    Therapy & Self-Help Activities:

| | |
|---|---|
| 08/12/82 | Category E Group Counseling |
| 10/26/83 | Group and Individual Therapy |
| 05/21/84 | Category T Therapy |
| 02/27/85 | Group and Individual Therapy |
| 01/14/87 | Completed Category T Therapy |
| 03/01/88 | Beginning Stress Management and Relaxation Skills Training |
| 04/22/88 | Assertiveness/ Self Esteem Group |
| 06/04/92 | Completed Category X Therapy |
| 04/07/99 | Self Esteem Enhancement Group |
| 3/1/02 | REACH tutor training |
| 12/26/02 | San Quentin Toy Program |
| 2/16/04 | Kairos Mens Retreat |
| 04/8/05 | Creative Conflict Resolutions |
| 5/23/05 | IMPACT- Relationships (class completed) |
| 6/27/05 | IMPACT Relationship Dynamics (class completed) |
| 8/1/05 | IMPACT Cultivating Successful Relationships (class completed) |
| 9/26/05 | IMPACT Specific Relationships (class completed) |

Carpenter has been an active member of Alcoholics Anonymous since 1991.
Carpenter has been an active member of Narcotics Anonymous since 1998.

### Laudatory Chronos

| | |
|---|---|
| 06/19/84 | Laudatory Chrono written by D. Clark, Chief of Plant Operations- for excellent work bringing 250 bed modulars on line. |
| 08/07/82 | Laudatory chrono written by J. Oshberg, carpenter shop supervisor- commending Carpenter for his excellent attendance, conscientiousness, being a leader and helping others. |
| 07/18/90 | Laudatory chrono written by B. Russell, Carpenter II- for excellent carpenter skills, pleasure to work with, gets along well with inmates and staff and has excellent safety skills. |
| 3/2/06 | Letter of Reference and Appreciation from A. Howell, Superintendent I, Wood Products. Stating that Carpenter is his lead man, handles situations with staff and inmates with tact. Carpenter is positive, an excellent time manager and is goal oriented. |

## D.    Academics:

| | |
|---|---|
| 3/31/82 | Completed Vocational Wood Technology |
| 1985 | Completed GED |
| 05/1/98 | Math Fundamentals (San Quentin College) |
| 05/4/98 | Introduction to Computation (San Quentin College) |

CSP-SQ

| 10/13/98 | Modern American Literature (San Quentin College) |
| 12/17/98 | Art History and Appreciation (San Quentin College) |
| 01/7/99 | Introduction to Literature (San Quentin College) |
| 05/5/99 | American Government (San Quentin College) |
| 05/21/99 | Communications (San Quentin College) |
| 9/21/99 | Modern World of Literature (San Quentin College) |
| 9/28/99 | Computer Literacy (San Quentin College) |
| 10/19/99 | Introduction to Reading and Composition (San Quentin College) |
| 01/11/00 | Ethics (San Quentin College) |
| 01/25/00 | Sociology (San Quentin College) |
| 05/8/00 | Literary Studies of the Bible (San Quentin College) |
| 06/22/00 | The American Experience (San Quentin College) |
| 07/3/00 | Studies in Multi Cultural Literature (San Quentin College) |
| 12/6/01 | Philosophy, Astronomy and Psychology (San Quentin College) |
| 10/16/02 | Indonesian Literature (San Quentin College) |
| 05/7/03 | Algebra |
| 06/24/04 | Psychology, Child Development, Art Appreciation, Theater Improv. (San Quentin College) |

Carpenter earned his Associate of Arts Degree through Patten University.
(He sent his degree home, and is trying to obtain a copy through family and the education department at San Quentin State Prison) His transcripts reflect that he has completed 60 units of college credit.

E.    **Disciplinary History:**

| Date | Document | Charge | Disposition |
|------|----------|--------|-------------|
| 05/06/83 | Serious 115 | Possession of Paraphernalia | 5-days disciplinary detention-suspended for 90-days clean. |
| 10/12/90 | Serious E 115 | Gambling | Guilty-no credit loss. |
| 11/07/94 | Administrative 115 | Possession of Gambling Material | Guilty-Reduced to Administrative. |
| 03/10/97 | Serious B 115 | Possession of Controlled Substance | Placed on random drug testing. |
| 03/14/97 | Serious B 115 | Conspiracy to extort | Counseled regarding behavioral expectations. |
| 07/01/05 | Serious F 115 | Calls and Passes | Guilty- reduced to 128-B. |

Carpenter has two 128-B's for smoking in a state building dated 01/13/099 and 12/23/03.
Carpenter addressed the 7/01/05 115 by stating that he went to leave the building for his ducat, but that the officer would not let him out because of the "Special Feeding Program" he went to breakfast and went to his ducat the next day.

CSP-SQ

## IV.    FUTURE PLANS:

### A.    Residence:

Carpenter plans to reside with his sister, Laura Dimascio, who currently resides in Washington. Laura works for a computer software company (Symantec), which is based in California. She plans to relocate to California when Carpenter is granted parole and assist him in his re adjustment to society.

Laura Dimascio
17200 NE 32 Ave.
Ridgefield, WA 98642
(360) 571-5111

Carpenters aunt, Loretta F. Wilson, sent a support letter dated 03/11/06 stating that she will provide housing, financial support and if needed transportation to and from work. Carpenter's uncle, Peter J. Wilson, sent a support letter dated 3/8/06 indicating that he and his wife are supportive of Carpenters release and they will provide housing and financial support for six months.

Loretta and Peter Wilson
2227 Benton Street
Santa Clara, Ca 95050

Carpenter has sent inquiry letters to nine (9) agencies that provide transitional housing, a copy of this letter and a list the agencies is located in his Central File.

### B.    Employment:

Carpenter plans to seek employment as a carpenter and cabinet-maker. Carpenter has woodworking skills and experience in woodworking; he should have little trouble finding employment in this field based on his experience. There are numerous laudatory chronos in ·his central file, which speak to his skills in woodworking. Carpenter has sent an inquiry letter and a resume to eleven (11) woodworking companies in Santa Clara County. A copy of the letter, resume and list of prospective employers is located in his Central File.  Carpenter states that his sister will also provide employment for him, she will be sending a letter with that information.

## V.    SUMMARY:

A.    Carpenter's incarceration period can be described, for the most part, as conforming. He had some minor problems early on but I believe this can be attributed to his young age (18) when first incarcerated. As to the most recent disciplinary actions, I believe them to be the exception to his programming history rather than the norm. He has earned his GED and his Associate of Arts degree. He should be commended for his efforts in continuing his education. Carpenter is taking the necessary steps to ensure

CSP-SQ

that his transition into society will be successful. Carpenter has sent letters to several programs in search of programs that offer temporary transitional housing and to prospective employers. Carpenter will have family support from his aunt, uncle and sister to ensure that his transition back into society will be successful. Carpenter is continuing his self-improvement programs to ensure that his transition to society will be successful.

B.    Prior to release, Carpenter would benefit by remaining disciplinary free and continuing his participation in Alcoholics or Narcotics Anonymous. Conditions of parole should include participation in one of these programs.

C.    This report is based on a thorough three to four hour review of Carpenter's central file, an hour interview with Carpenter.

D.    Carpenter reviewed his Central File on 3-24-06, and the chrono indicating his file review is located in the Central File.


V. Zanni
Correctional Counselor I


V. Kelley
Correctional Counselor II


C. Belshaw
Correctional Counselor III, C&PR

CSP-SQ

PAGE 7 OF 7

Exhibit - C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS



INMATE
COPY

In the matter of the Life )
Term Parole Consideration )      CDC Number B-95921
Hearing of:               )
                          )
RICKY CARPENTER           )
_____)

CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

SEPTEMBER 21, 2006

PANEL PRESENT:

Linda Shelton, Presiding Commissioner
Joan Thompson, Deputy Commissioner

OTHERS PRESENT:

Ricky Carpenter, Inmate
Johanna Hoffmann, Attorney for Inmate
Ronald Rico, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

    \_\_\_\_\_ No         See Review of Hearing
    \_\_\_\_\_ Yes        Transcript Memorandum

**Kerry Viens   Northern California Court Reporters**

ii

## INDEX

Page

Proceedings ............................................... 1

Case Factors .............................................. 7

Pre-Commitment Factors ................................... 10

Post-Commitment Factors .................................. 19

Parole Plans ............................................. 27

Closing Statements ....................................... 50

Recess ................................................... 68

Decision ................................................. 69

Adjournment .............................................. 79

Transcriber Certification ................................ 80

--oOo--

1

1        **P R O C E E D I N G S**

2        **PRESIDING COMMISSIONER SHELTON:**  Good morning,

3     everyone.  We are here for a subsequent parole

4     consideration hearing for Ricky Carpenter, CDC number B

5     as in boy 95921.  Today's date is September 21st, 2006.

6     The time is about 8:50 a.m., and we are located at San

7     Quentin State Prison.  Mr. Carpenter was received on

8     August 10th, 1978, committed from Santa Clara County.

9     His life term began that same date, August 10th, 1978,

10     and he has a minimum eligible parole date of November

11     30th, 1985.  The controlling offense for which Mr.

12     Carpenter is committed is set forth in case number

13     68207, charging Count 1, violation PC 187, murder in

14     the first degree with a 12022B, use of a weapon, as

15     well, Count 2, PC 484, petty theft.  Mr. Carpenter

16     received a term of seven years to life.  All right.

17     Mr. Carpenter, this hearing is being tape recorded, so

18     we're going to go around the room and introduce

19     ourselves, say our first name, our last name, spell our

20     last name; and, when we get to you, I would like to you

21     add your CDC number.  My name is Linda Shelton, S-H-E-

22     L-T-O-N, Commissioner.

23        **DEPUTY COMMISSIONER THOMPSON:**  My name is Joan

24     Thompson, T-H-O-M-P-S-O-N, Deputy Commissioner.

25        **PRESIDING COMMISSIONER SHELTON:**  Mr. Rico?

26        **DEPUTY DISTRICT ATTORNEY RICO:**  Ronald Rico, R-

27     I-C-O, Deputy District Attorney, Santa Clara County,

1    participating by video conference.

2         **INMATE CARPENTER:** Rick Carpenter, C-A-R-P-E-N-

3    T-E-R, my number is B-95921.

4         **ATTORNEY HOFFMANN:** Johanna Hoffmann, H-O-F-F-M-

5    A-N-N, attorney for Mr. Carpenter.

6         **PRESIDING COMMISSIONER SHELTON:** And we have two

7    officers in the room for security purposes who will not

8    be participating in today's hearing. All right. Mr.

9    Carpenter, you signed BPT form 1073 July 6, '06. That

10   form indicated that you had no disabilities that needed

11   accommodation. As well, you signed a similar form

12   today that's signed accommodation for disabilities

13   outline appearing procedure, and it's marked Exhibit 2.

14   I want to clarify for the record, you're not wearing

15   any glasses, and you don't need any glasses?

16        **INMATE CARPENTER:** No.

17        **PRESIDING COMMISSIONER SHELTON:** Good. And your

18   hearing's okay?

19        **INMATE CARPENTER:** Yes.

20        **PRESIDING COMMISSIONER SHELTON:** And mobility,

21   you walk, sit, stand comfortably for a period of time?

22        **INMATE CARPENTER:** Yeah.

23        **PRESIDING COMMISSIONER SHELTON:** Are you on any

24   medication at all, sir?

25        **INMATE CARPENTER:** No, I'm not.

26        **PRESIDING COMMISSIONER SHELTON:** So it appears

27   to me that you're ready to move forward with this

3

1    hearing?

2         **INMATE CARPENTER:** Yes, I am.

3         **PRESIDING COMMISSIONER SHELTON:** Counsel, would

4    you concur?

5         **ATTORNEY HOFFMANN:** Yes, I would.  Thank you.

6         **PRESIDING COMMISSIONER SHELTON:** All right.

7    Terrific.  Mr. Carpenter, you've been to these hearings

8    before?

9         **INMATE CARPENTER:** Yes.

10        **PRESIDING COMMISSIONER SHELTON:** So, tell me

11   what these hearings are about.  Why are you here?

12        **INMATE CARPENTER:** About my suitability for

13   parole.

14        **PRESIDING COMMISSIONER SHELTON:** Excellent.  I

15   want to go over a couple of rights.  You have certain

16   rights, and these rights include the right to a timely

17   notice of a hearing, the right to review your file, and

18   the right to present relevant documents.  Counsel, have

19   we met your client's rights so far?

20        **ATTORNEY HOFFMANN:** To the best of my knowledge,

21   they have been met.  Thank you.

22        **PRESIDING COMMISSIONER SHELTON:** You also have a

23   right to be heard by an impartial Panel.  And your

24   Panel today would be Commissioner Thompson and myself.

25   Is that all right with you?

26        **INMATE CARPENTER:** Yes, it is.

27        **PRESIDING COMMISSIONER SHELTON:** Okay.  Thank

4

1    you. As well, I wanted to let you know that a couple

2    of years ago the regulations for appealing these

3    hearings changed so, if you need additional information

4    with regards to that, talk with your attorney or you

5    can find out more information at the prison law

6    library. Okay?

7              **INMATE CARPENTER:** Yes.

8              **PRESIDING COMMISSIONER SHELTON:** Now, sir, you

9    are not required to admit or discuss your offense.

10   This Panel does accept as true the findings of the

11   court. Do you understand what that means?

12             **INMATE CARPENTER:** Yes.

13             **PRESIDING COMMISSIONER SHELTON:** Why don't you

14   tell me what that means?

15             **INMATE CARPENTER:** It means that I was found

16   guilty in the court; and, therefore, the Board

17   perceives me as being guilty of my charges.

18             **PRESIDING COMMISSIONER SHELTON:** Yeah. We're

19   not here to retry your case.

20             **INMATE CARPENTER:** No.

21             **PRESIDING COMMISSIONER SHELTON:** Okay. Great.

22   Commissioner, do we have any confidential information?

23             **DEPUTY COMMISSIONER THOMPSON:** Yes, there is

24   confidential information in the file; but, no, it will

25   not be used in this hearing.

26             **PRESIDING COMMISSIONER SHELTON:** Okay. I pass

27   the hearing checklist to Miss Hoffmann. Mr. Rico do

1    you have all the documents necessary to move forward?

2         **DEPUTY DISTRICT ATTORNEY RICO:** Commissioner, I

3    have the checklist that's dated lower right corner

4    8/17/06. I have all of those documents. I'm ready to

5    proceed today.

6         **PRESIDING COMMISSIONER SHELTON:** All right.

7    Thank you, sir. Okay. Are there any additional

8    documents to be submitted?

9         **ATTORNEY HOFFMANN:** The only additional

10   documents that I would like the record to reflect that

11   the District Attorney does not have, as far as I know,

12   it's an updated 2006 psychological evaluation, and a

13   couple of letters of support, which, I believe, the

14   commissioner will thoroughly review during the hearing.

15        **DEPUTY DISTRICT ATTORNEY RICO:** And, thank you,

16   Counsel. I did receive, it looks like a fax, September

17   2006, Psychosocial Assessment dated August 24, '06.

18        **PRESIDING COMMISSIONER SHELTON:** Yes.

19        **ATTORNEY HOFFMANN:** Wonderful.

20        **PRESIDING COMMISSIONER SHELTON:** Good.

21        **DEPUTY DISTRICT ATTORNEY RICO:** That was

22   recently faxed. Thank you.

23        **PRESIDING COMMISSIONER SHELTON:** All right.

24   Thank you, very much.

25        **ATTORNEY HOFFMANN:** Thank you.

26        **PRESIDING COMMISSIONER SHELTON:** Are there any

27   preliminary objections?

1          **ATTORNEY HOFFMANN:**  I would object to the

2     presence of the District Attorney in that I did not

3     receive notice of his presence or participation until I

4     arrived at the prison for hearings yesterday.

5     According to Title 15, section 2030, the prosecutor

6     shall notify the prison within two weeks if he or she

7     plans on attending and that the prisoner's attorney

8     shall be notified of the prosecutor's attendance.  And,

9     as I said before, I didn't receive notice until

10    yesterday.

11         **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner?

12         **PRESIDING COMMISSIONER SHELTON:**  Yes, sir?

13         **DEPUTY DISTRICT ATTORNEY RICO:**  Just for the

14    record, I did notify Sacramento.  I notified the

15    prison.  I generally do not have any identifying

16    information about counsel, so if counsel didn't get

17    notification, her problem is with the prison rather

18    than with me.

19         **PRESIDING COMMISSIONER SHELTON:**  We're aware of

20    that.  We had a similar situation yesterday, and we're

21    trying to straighten out communications, so I

22    appreciate you acknowledging that you did notify

23    Sacramento, and I'm going to overrule counsel's

24    objections with regards to that.  We're trying to

25    straighten out some communication issues.  All right.

26    Will your client be speaking with us today?

27         **ATTORNEY HOFFMANN:**  Yes, he will.

1        **PRESIDING COMMISSIONER SHELTON:**   In all regards?

2        **ATTORNEY HOFFMANN:**   Yes.

3        **INMATE CARPENTER:**   Yes.

4        **PRESIDING COMMISSIONER SHELTON:**   All right, sir.

5    Please raise your right hand.  Do you solemnly swear or

6    affirm that the testimony you give at this hearing will

7    be the truth, the whole truth and nothing but the

8    truth?

9        **INMATE CARPENTER:**   I do.

10       **PRESIDING COMMISSIONER SHELTON:**   All right.

11   We're going to move forward.  I will be discussing with

12   you the offense summary, and your prior record as well

13   as your social history.  I'm going to enter into the

14   record the summary of the offense as taken from the

15   April 2006 Board report; and, when I finish doing that,

16   then I will give you an opportunity to speak to what

17   happened from your perspective.  All right, sir?

18            "On January 16th, 1978, Santa Clara

19            sheriff's deputies responded to a

20            residence as the lights were on and the

21            front door was ajar.  Deputies discovered

22            the body of Evelyn Bentley clad in

23            pajamas and a dressing gown lying on her

24            back on the floor.  Her upper garments

25            were soaked in blood as was the rug under

26            her head and the hardwood floor.  There

27            was a kitchen, in parenthesis butcher's

```
1        knife lying by Bentley's right shoulder
2        with the blade covered in blood.  When
3        deputies interviewed Ricky Carpenter, he
4        related that following his mother's
5        departure at about 8:00 p.m., he suddenly
6        decided to kill Bentley.  He disliked her
7        because she approved of the separation of
8        his mother and step father.  Carpenter
9        walked over to the Bentley residence and
10       knocked on the front door explaining that
11       he needed to use the telephone as his was
12       out of order.  Bentley unlocked the door
13       allowing Carpenter to enter.  Carpenter
14       followed Bentley to the master bedroom
15       where the telephone was located.
16       Carpenter then struck Bentley in the face
17       with his fist, causing her to fall to the
18       floor.  When Bentley began to struggle,
19       Carpenter tripped her, choked her into
20       unconsciousness, picked up a butcher's
21       knife in the kitchen and stabbed her
22       several times in the chest.  Carpenter
23       attempted to suffocate Bentley with a
24       small area rug on the floor, leaving the
25       knife embedded in her chest.  When
26       Carpenter's attempts to kill Bentley in
27       this matter proved unsuccessful, he
```

```
1              pulled the knife out of her chest,
2              removed the area rug from her face, and
3              stabbed her through the right side of the
4              neck, causing her death."
5    All right.  Mr. Carpenter, why don't you tell me what
6    was going on with you that day?
7              INMATE CARPENTER:  I was in an argument earlier
8    that day with my mother, but, to understand, I agree
9    with the facts of the case.  I killed Mrs. Bentley.  I
10   don't believe some of that, it seems like -- it's a
11   terrible crime, and it seems like it's built up to even
12   look terrible.  Some of the facts, I mean, they're
13   small in nature, but I agree with what you just read.
14   To understand, I think, to understand the crime, I
15   mean, you have to understand a little bit about my
16   background, who I was up to that day because that day
17   will never be explainable.  I can't explain why I did
18   that to Mrs. Bentley.  I can only understand where I
19   was in my life, and that took me to that point.  As far
20   as the excuse that I felt that she was a hindrance with
21   my step father and mother as to getting separated.  She
22   had just gotten separated probably a year earlier, and
23   that, let me just back track a little bit.
24             PRESIDING COMMISSIONER SHELTON:  Just take your
25   time.
26             INMATE CARPENTER:  I was born -- can I start
27   from the beginning.  I'll be fast.  I'll try to move
```

1    right along.

2        **PRESIDING COMMISSIONER SHELTON:**  You want to

3    talk about your social history?

4        **INMATE CARPENTER:**  Yes.  Because it is really

5    important to understand my social history to understand

6    the crime.

7        **PRESIDING COMMISSIONER SHELTON:**  Okay.  Well,

8    let's do this.  Let's take a look at your prior record.

9    Talk about your social history and meld all that into

10   leading you up to the spot where you did that.  Okay?

11   Does that sound decent?

12       **INMATE CARPENTER:**  Thank you.

13       **PRESIDING COMMISSIONER SHELTON:**  With regards to

14   prior records, you only have a juvenile record because

15   you were 18 at the time of this offense, correct?

16       **INMATE CARPENTER:**  Yes.

17       **PRESIDING COMMISSIONER SHELTON:**  And basically

18   your juvenile record says you did a burglary in January

19   of '75, and you received six months probation?

20       **INMATE CARPENTER:**  Yes.

21       **PRESIDING COMMISSIONER SHELTON:**  Was that a

22   burglary of a residence?

23       **INMATE CARPENTER:**  Yes.

24       **PRESIDING COMMISSIONER SHELTON:**  Then in July

25   '75, you had fire crackers.

26       **INMATE CARPENTER:**  Yes.

27       **PRESIDING COMMISSIONER SHELTON:**  And evidently

1   that was dismissed.  Was there anything else that you

2   got arrested for?

3           **INMATE CARPENTER:**  No.

4           **PRESIDING COMMISSIONER SHELTON:**  Then why don't

5   we talk about you.  I have, with regards to your social

6   history, let's walk through it together.  I want to

7   verify your birth date of August 16th, 1959.

8           **INMATE CARPENTER:**  Yes.

9           **PRESIDING COMMISSIONER SHELTON:**  And where were

10  you born, sir?

11          **INMATE CARPENTER:**  San Jose.

12          **PRESIDING COMMISSIONER SHELTON:**  San Jose?

13          **INMATE CARPENTER:**  Yes.

14          **PRESIDING COMMISSIONER SHELTON:**  Okay.  I'm

15  going to walk you through this a little bit so I have

16  some kind of an outline in my head.  Did you have any

17  brothers and sisters?

18          **INMATE CARPENTER:**  Yes.  I have one brother and

19  one half sister.

20          **PRESIDING COMMISSIONER SHELTON:**  And were they

21  in the household with you growing up?

22          **INMATE CARPENTER:**  No, ma'am.  I'm the oldest of

23  three.  My brother lived with my great aunt when he was

24  born.  At an early age, he went to live with my great

25  aunt.  My sister is ten years younger than me; and,

26  when she was born, I came to live with my step father

27  and mother.  But, prior to that, I was back and forth

1    from my grandparents and my mother.  My mother was
2    really young when she had me.  She had to get married
3    in 1959, a Catholic family, you have to get married.
4    The marriage didn't last.  She was divorced, and I
5    think was an outcast from the family.  My grandparents
6    treated her like the, I will say the --

7         **PRESIDING COMMISSIONER SHELTON:**  The plague?
8         **INMATE CARPENTER:**  Yeah.  Step daughter, you
9    know, the --

10        **PRESIDING COMMISSIONER SHELTON:**  Yeah, Catholic
11   family.

12        **INMATE CARPENTER:**  Yeah.  So she was outcast and
13   didn't have no education, had to take jobs that, well,
14   that an uneducated person.  She was a go go dancer, and
15   different things.  And, from time to time, when she was
16   doing well, I would go live with her, stay with her for
17   short periods of time.  And seeing the life style in
18   which she lived, I was right there.  So that was not
19   very good for a young kid, but I was tossed back and
20   forth.  And, when I would come stay with her, I think
21   out of her own guilt and the way she was treated, she
22   would be real giving to me rather than being a parent
23   and nurturing me that she should, it was easier to give
24   me $5, send me on my way, show her love that way.  When
25   finally I did go live with -- my sister was born, and I
26   lived with my step father and my sister and my mom.
27   She took on a good job as a postal worker, and it was

1    the way a family should be, the way I seen a family

2    should be through my eyes, my friends' families. So I

3    was happy. I was happy and content; but, yet, I had

4    learned that I didn't have to follow the rules. There

5    was no rules. I didn't know the rules. There really

6    was no rules or boundaries set forth around me, and at

7    a younger age, like I said, it was okay because I

8    wasn't in trouble. I wasn't forced to go to school,

9    wasn't made to do my homework, and I learned, I learned

10   a life on the streets, I guess. My education was from

11   the streets. I think that, what finally happened is

12   that I guess she seen, my step father tried to use

13   authority on me, and she wouldn't allow it. She said,

14   'You know, it's not your kid. Let me raise him.' And,

15   so, it was real easy for me, I guess, to manipulate

16   things the way I want.

17          **PRESIDING COMMISSIONER SHELTON:**  Played them

18   against each other?

19          **INMATE CARPENTER:**  Against each other. I was

20   able to, you know, but -- as it came time for me to

21   graduate from school, I wasn't graduating. I couldn't

22   hold a job. I couldn't even read or write. I mean, I

23   had no education at all. The tables had turned. Now,

24   with my mother, there was on me, you know, on me to do

25   something with my life. And that felt like the

26   influence was coming from Mrs. Bentley. It was a

27   new -- it was her new relationship. She befriended

1    Mrs. Bentley and was friends with Mrs. Bentley, and I

2    was using drugs and alcohol, and, you know, and

3    couldn't think clear.  Going back, Mrs. Bentley was

4    probably lonely as I look back on it, and seeking a

5    friend, you know.

6        **PRESIDING COMMISSIONER SHELTON:**  Were you

7    jealous of that relationship between your mom and Mrs.

8    Bentley?

9        **INMATE CARPENTER:**  No.  I felt like -- I felt

10   like they talked about her problems.  My mother had

11   problems at home, and what Mrs. Bentley had been

12   through.  I think that's what they talked about and my

13   mom was feeling that possible separation, they were

14   going to get separated, my step dad and her, and I felt

15   like it was being influenced for her.  I don't think

16   that -- my mom passed away in '97.  They stayed

17   together.  She passed away as married to my step

18   father.  But --

19       **PRESIDING COMMISSIONER SHELTON:**  So you saw Mrs.

20   Bentley meddling into family affairs?

21       **INMATE CARPENTER:**  Yes.

22       **PRESIDING COMMISSIONER SHELTON:**  I know I read

23   somewhere in your file that where her home was, which

24   was across the street from your home, she could watch

25   your comings and goings.

26       **INMATE CARPENTER:**  Actually her house was set,

27   it was next door, but her kitchen was set up turned

1    sideways to where I entered in the garage of my house

2    because my room was right there, and I would enter

3    late, late hours with alcohol, go to the backyard.

4    And, anyone in the world knew, yes, it was Mrs.

5    Bentley.  Mrs. Bentley would be seeing me.

6         **PRESIDING COMMISSIONER SHELTON:**  So you were

7    under the influence of drugs and alcohol that day or

8    night when you killed her?

9         **INMATE CARPENTER:**  Yes.

10        **PRESIDING COMMISSIONER SHELTON:**  What were you

11   on?

12        **INMATE CARPENTER:**  I had taken some valiums and

13   been drinking hard liquor and beer.

14        **PRESIDING COMMISSIONER SHELTON:**  How old were

15   you when you started drinking?

16        **INMATE CARPENTER:**  Regularly, probably around

17   15.

18        **PRESIDING COMMISSIONER SHELTON:**  And you drank

19   whatever you could get your hands on?

20        **INMATE CARPENTER:**  Yes, from under the cabinet,

21   under the sink to whatever I could get.

22        **PRESIDING COMMISSIONER SHELTON:**  What about --

23   how old were you when you started drugs?

24        **INMATE CARPENTER:**  Probably smoked pot -- well,

25   I probably smoked pot for the first time I was like 12

26   or 13.  Growing up, I seen my parents smoking, smoking

27   hash and pot from the age of probably 9.

1          **PRESIDING COMMISSIONER SHELTON:**  Did they give

2     you drugs?

3          **INMATE CARPENTER:**  No.  I didn't want none.  I

4     felt it was wrong, knew it was wrong.  I didn't want

5     any.  But I was always around it.

6          **PRESIDING COMMISSIONER SHELTON:**  But you did use

7     them anyway?

8          **INMATE CARPENTER:**  Yes.  Later on I did

9     because --

10         **PRESIDING COMMISSIONER SHELTON:**  So what kinds

11    of drugs have you tried in your lifetime, so to speak?

12         **INMATE CARPENTER:**  Pretty much everything.

13         **PRESIDING COMMISSIONER SHELTON:**  When was the

14    last time you were under the influence, sir?

15         **INMATE CARPENTER:**  1998.

16         **PRESIDING COMMISSIONER SHELTON:**  What was in

17    '98?

18         **INMATE CARPENTER:**  What was in '98?

19         **PRESIDING COMMISSIONER SHELTON:**  Yeah.

20         **INMATE CARPENTER:**  Probably heroin.  Heroin.

21         **PRESIDING COMMISSIONER SHELTON:**  In here?

22         **INMATE CARPENTER:**  Yes.

23         **PRESIDING COMMISSIONER SHELTON:**  All right.  So

24    you didn't get your high school diploma.  Did you ever

25    get married?

26         **INMATE CARPENTER:**  Yes.

27         **PRESIDING COMMISSIONER SHELTON:**  When?

1      **INMATE CARPENTER:**  In 1979 I was married.

2      **PRESIDING COMMISSIONER SHELTON:**  So you got

3    married right after you came in here?

4      **INMATE CARPENTER:**  Yes.

5      **PRESIDING COMMISSIONER SHELTON:**  Are you married

6    now?

7      **INMATE CARPENTER:**  No.  I was divorced in '86.

8      **PRESIDING COMMISSIONER SHELTON:**  So how many

9    times have you been married?

10     **INMATE CARPENTER:**  One.

11     **PRESIDING COMMISSIONER SHELTON:**  Okay.  You were

12   married from '79 to '86.  Do you have any children?

13     **INMATE CARPENTER:**  No.  Excuse me.  You said I

14   never got my high school diploma.  I have got my high

15   school diploma since.

16     **PRESIDING COMMISSIONER SHELTON:**  Inside?

17     **INMATE CARPENTER:**  Yes.

18     **PRESIDING COMMISSIONER SHELTON:**  But not, you

19   never got it outside?

20     **INMATE CARPENTER:**  No.

21     **PRESIDING COMMISSIONER SHELTON:**  Okay.  Who

22   comes and visits you here?

23     **INMATE CARPENTER:**  My aunt and uncle, and my

24   aunt is my mom's sister and her husband.  My mom's

25   brother, my uncle, my sister and her husband.

26     **PRESIDING COMMISSIONER SHELTON:**  This would be

27   your half sister that you mentioned earlier?

1         **INMATE CARPENTER:** Yes.

2         **PRESIDING COMMISSIONER SHELTON:** Do you have

3    contact with anybody else via phone or letters or

4    anything?

5         **INMATE CARPENTER:** I have letters from some

6    great aunts, my godmother.

7         **PRESIDING COMMISSIONER SHELTON:** Okay. Anything

8    you wanted to add about the offense at this time? I

9    mean, there's all kinds of analogies like you killed

10   Mrs. Bentley instead of killing your mom and all of

11   that. Tell me what your feelings are on that.

12        **INMATE CARPENTER:** No, I mean, my mom -- my

13   relationship with my mother was one of a love-hate

14   relationship. I have never felt that I wanted to kill

15   my mother or hurt my mother. I mean, it's a senseless

16   crime, and, for that, I take responsibility regardless

17   of trying to justify it or come to some understanding

18   inside as to what happened and what was happening with

19   me. I still take full responsibility.

20        **PRESIDING COMMISSIONER SHELTON:** Is there

21   anything you would like to add about your social

22   history that we haven't talked about? It sounds like

23   you had not a very happy childhood. You dropped out of

24   school, started living a street life style, used drugs,

25   alcohol, and ended up here?

26        **INMATE CARPENTER:** Yes, pretty much it.

27        **PRESIDING COMMISSIONER SHELTON:** Okay. Anything

 1   else you would like to add at this point before we move

 2   onto --

 3           **INMATE CARPENTER:**  No.

 4           **PRESIDING COMMISSIONER SHELTON:**  Okay.  We're

 5   going to move onto post-conviction factors with

 6   Commissioner Thompson, and she's going to talk with you

 7   about your -- what you've been doing in here.  Okay.

 8           **DEPUTY COMMISSIONER THOMPSON:**  Okay.  Good

 9   morning.

10           **INMATE CARPENTER:**  Good morning.

11           **DEPUTY COMMISSIONER THOMPSON:**  We're looking at

12   the period of February the 26th, 2002, to today,

13   September 21st, 2006.  You've been housed at San

14   Quentin State Prison.  Your classification score is the

15   mandatory 19 for people with a life sentence.  You were

16   usually found in the general population, but you did

17   have a period in Administrative Segregation from May

18   24, 2004 to July the 2nd, 2004, when there was

19   apparently some personal jeopardy issue that they

20   investigated?

21           **INMATE CARPENTER:**  What was the dates, please?

22           **DEPUTY COMMISSIONER THOMPSON:**  It said May the

23   24th, 2004, to July the 22nd, 2004.

24           **INMATE CARPENTER:**  No.  Excuse me.  I was placed

25   there, yes, for two days.

26           **DEPUTY COMMISSIONER THOMPSON:**  Two days?

27           **INMATE CARPENTER:**  I was only there two days and

1    (inaudible) let me out.  They said they had nothing to

2    substantiate that I was in danger.

3         **DEPUTY COMMISSIONER THOMPSON:**  That was why they

4    let you out?  Yeah, that's true, there was an issue

5    where you had -- well, what they recorded, let's just

6    say, you went in on May the 24th, 2004, because of a

7    personal safety issue and were released thereafter when

8    they found there was no basis for it?

9         **INMATE CARPENTER:**  Yes.  It was only 48 hours.

10        **DEPUTY COMMISSIONER THOMPSON:**  Okay.  And you

11   essentially returned to the general population and a

12   Medium-A custody status; is that correct?

13        **INMATE CARPENTER:**  Yes.

14        **DEPUTY COMMISSIONER THOMPSON:**  Okay.  Now,

15   disciplinaries, you have a total of 11 since you

16   entered the system, and the last was March the 14th of

17   1997, and you have four 128's, the last of which was

18   July the 1st, 2005.  Does that correspond with your --

19   some of them are very, very old, but --

20        **INMATE CARPENTER:**  Yes.

21        **DEPUTY COMMISSIONER THOMPSON:**  That's what's in

22   the C-File.

23        **INMATE CARPENTER:**  Yeah.  I don't - oh, yeah,

24   I'm not sure of the number being correct.

25        **ATTORNEY HOFFMANN:**  Can you just repeat what you

26   said the last 128 was?

27        **DEPUTY COMMISSIONER THOMPSON:**  The last 128 was

1    July the 1st, 2005, and he only has four in total

2    128's.

3         **ATTORNEY HOFFMANN:** Okay. Thank you. My

4    records didn't indicate that July 1st was initially a

5    115 which was reduced.

6         **DEPUTY COMMISSIONER THOMPSON:** And was reduced,

7    right.

8         **ATTORNEY HOFFMANN:** And it didn't show that. So

9    thank you for noticing.

10        **DEPUTY COMMISSIONER THOMPSON:** Okay. And then

11   academically, you've completed your GED in 1985, while

12   were you in the system, or at least that's --

13        **INMATE CARPENTER:** Yes. I got it early, yes.

14        **DEPUTY COMMISSIONER THOMPSON:** And then you

15   apparently have achieved an AA degree was well through

16   the San Quentin prison college from Patten University,

17   and did you get that in July of '04 --

18        **INMATE CARPENTER:** Yes.

19        **DEPUTY COMMISSIONER THOMPSON:** Okay. So you

20   have that and congratulations. Your performance

21   reports are average to excellent in the education

22   program. In the work or vocational training, you've

23   been working in the Prison Industry Authority

24   apparently largely since you've been incarcerated, and

25   you've had various positions. You've been in the

26   laundry, you've been lead man tailor, you have been

27   maintenance mechanic in the wood room, and I believe

1     that may be your present assignment.

2          **INMATE CARPENTER:**  Yes, ma'am, I'm in the wood
3     room.

4          **DEPUTY COMMISSIONER THOMPSON:**  And that
5     continues to date.  And your performance reports range
6     from average to exceptional, and particularly in the
7     woodworking and wood related matters, they say you're
8     very skilled.  And then in self-help, you've been in
9     Alcoholics Anonymous attender since 1991 and Narcotics
10    Anonymous since 1998, and you have also participated, I
11    believe it's pronounced Cairos.

12         **INMATE CARPENTER:**  Yes.

13         **DEPUTY COMMISSIONER THOMPSON:**  Creative Conflict
14    Resolution and then in a program called IMPACT?

15         **INMATE CARPENTER:**  Yes.

16         **DEPUTY COMMISSIONER THOMPSON:**  And there you
17    completed relationship class, dynamics, relationship
18    dynamics and cultivating successful relationships, and
19    specifics of relationships, all four of those were in
20    that IMPACT and all were completed successfully.
21    You've received four laudatory chronos, the last of
22    which was March the 2nd of this year, 2006, from the
23    woodwork supervisor who sees you as having exceptional
24    skills, working at a journeyman level and able to
25    instruct others in the area or help them out when they
26    hit a problem that they can't deal with.  That's very
27    favorable.  Psych treatment, none is shown.  And your

1    Board report of April of '06 views your disciplinaries

2    as being due to your immaturity upon entering into the

3    system you were only 18 when you came to prison, and

4    what disciplinaries you have the writer felt were just

5    because of your age and your situation.  You're now

6    more mature and taking the necessary steps to

7    transition to the community.  Did I leave anything out

8    or do you want to amend anything?

9             **INMATE CARPENTER:**  No.

10            **PRESIDING COMMISSIONER SHELTON:**  I have a

11   question.  Did you receive a certification in a

12   vocation with the woodworking?

13            **INMATE CARPENTER:**  Yes.  And, actually, the GED

14   is from 1979, at which I'm after I did that, I went

15   into mill and cabinet through the vocational institute

16   and graduated in '82.

17            **DEPUTY COMMISSIONER THOMPSON:**  Yes.  I'm sorry I

18   wrote it on the back of the page, and it is he has his

19   certification for proficiency in all phases of mill

20   work and also machinist all phases.  Regrettably I put

21   it on the back of the piece of paper, and I hadn't

22   turned it over.

23            **PRESIDING COMMISSIONER SHELTON:**  Not a problem.

24            **ATTORNEY HOFFMANN:**  Can I just add to that that

25   certificate dated March 14th of 2006, indicates that he

26   has over 11,900 hours doing the woodworking.  That's a

27   pretty significant amount of time.

1      **DEPUTY COMMISSIONER THOMPSON:** Yes, it is. And
2   then we have your psychological evaluation which was
3   completed August the 24th, 2006, and they go back
4   through your commitment offense and like the many
5   things you've been discussing there a psychologist's
6   point of view. This report was prepared by a Michael
7   Inaba, I believe it is, who is a doctor not contacts,
8   contract.

9      **PRESIDING COMMISSIONER SHELTON:** Psychologist.
10   He's a contract psychologist.

11      **DEPUTY COMMISSIONER THOMPSON:** Oh, meaning hired
12   outside, so that's a new. Okay. All right. On the
13   diagnostic and statistic, they said that on Axis I,
14   which relates to mental disorder, that you're an
15   alcohol dependent in remission in a controlled
16   environment and polysubstance dependence in remission
17   in a controlled environment. On Axis II, which deals
18   more with emotional problems, they say personality
19   disorder not otherwise specified, avoidant dependant
20   anti-social features in an improving situation.
21   Physically, they say there is nothing related to your
22   mental health. On Axis IV which is stressors in your
23   life, it is your life sentence, your incarceration.
24   And on your Global Assessment of Functioning, you
25   attained a score of 78, which is rather good. And then
26   the final -- they see you as more mature and moving
27   toward stability and his closing statement is he has

1   become a more -- a much stronger individual than he was

2   at the time of his crime or events earlier in his

3   incarceration remains at risk for relapse into the use

4   of alcohol or drugs in a less structured setting.  He

5   would benefit from paroling to a program.  I don't know

6   about a program having experience, but a program where

7   he would receive support and follow-up on these areas,

8   and anything there that you want to comment on?

9          **INMATE CARPENTER:**  I'd like to comment on a

10  couple things.  I would like to also just to back up to

11  the 115's you spoke of, I would like to speak to the

12  last two and only because one of the -- the last 115 I

13  got that would be in this period since my last hearing

14  was for refusing medical treatment.  What happened

15  there is like I went to the doctor and they put me in

16  for a blood test, which is a fasting blood test that I

17  had to go over there in the morning before breakfast.

18  When I proceeded to go to the hospital, movement had

19  been frozen because they were feeding the protective

20  custody inmates, special program they call it.  And

21  there was like 600 of them, and they would not let me

22  proceed to the hospital.  They said you can't go.  So I

23  thought I did the responsible thing.  I went onto eat,

24  I went to work, and when I got back from -- I contacted

25  the hospital, and we made an arrangement for me to go

26  the following Monday morning, and I went and gave blood

27  on Monday.  Because the hospital had just been in a

1   change of management, everyone who failed to go to a
2   ducket received a 115, and I just wanted to make that
3   clear that that's what happened.
4         **PRESIDING COMMISSIONER SHELTON:**  That was in the
5   one in July of '05?
6         **ATTORNEY HOFFMANN:**  Which has been dropped to a
7   128.
8         **DEPUTY COMMISSIONER THOMPSON:**  It was reduced to
9   a 128.
10        **PRESIDING COMMISSIONER SHELTON:**  Right.  It was
11   reduced to a 128.
12        **DEPUTY COMMISSIONER THOMPSON:**  Which is like a
13   guidance counseling, don't do it again.
14        **PRESIDING COMMISSIONER SHELTON:**  Yes.  I
15   understand, and then did you want to speak to the 115
16   before that as well?
17        **INMATE CARPENTER:**  Yeah.  I'd like to speak also
18   to in the report, my last 115, serious 115 was the
19   extortion or attempted extortion and that about
20   violence they talk about.  And I admit -- I was
21   involved in drugs.  I was involved with people that
22   used drugs, and what had happened here is this is
23   individual, which I'm sure that if we used confidential
24   information, was in drug debt, was in debt to people,
25   and him and his cellee came to me for support to ask if
26   I could help them out, buy them some time to pay their
27   bill, and when I seen that they just continuing to use

1    drugs to people they owed, I said, you know, I can't

2    help you. You know, you're not paying your bill. So I

3    guess they felt betrayed that I didn't, I didn't --

4    they said I tried to extort money. These individuals

5    had no money. There was no money to extort. They owed

6    the money that they're saying I was trying to extort.

7    He owed other individuals, and all I did was try to buy

8    him some time, and I'm, I'm guilty of being stupid, and

9    using drugs. You know, when I shouldn't have been.

10         **DEPUTY COMMISSIONER THOMPSON:** Yeah, I think

11   your explanation as they recorded, it was he's so far

12   in debt, what money would I get from him or something

13   to that effect.

14         **INMATE CARPENTER:** Yes.

15         **DEPUTY COMMISSIONER THOMPSON:** In response to

16   your saying you had reportedly trying to extort money

17   from him. That's true. That's what's in the file.

18         **PRESIDING COMMISSIONER SHELTON:** Okay.

19         **DEPUTY COMMISSIONER THOMPSON:** If that's it

20   concerning the post-conviction, nothing else you want

21   to address in this section?

22         **INMATE CARPENTER:** Nothing of interest.

23         **DEPUTY COMMISSIONER THOMPSON:** Okay. Well, then

24   I'll return it to the chair.

25         **PRESIDING COMMISSIONER SHELTON:** Let's talk

26   about parole plans and support letters. We're going to

27   cover all of that. According to this, you want to live

1    with your sister, who currently lives in Washington and

2    works for a computer software company, and the report

3    says she plans to move to California.

4        **INMATE CARPENTER:**  Right now she works for

5    Semantic, which is a company based in Silicone Valley

6    in Sunnyvale, and she's in such a position that if

7    necessary, she could relocate to California temporarily

8    while I was on parole if that was -- she lives in

9    Washington now.  Most of work is down out of her house.

10        **PRESIDING COMMISSIONER SHELTON:**  Okay.  As an

11   alternate, your aunt, Loretta Wilson said that she

12   would be willing to provide housing and support and

13   transportation?

14        **INMATE CARPENTER:**  Yes.

15        **PRESIDING COMMISSIONER SHELTON:**  And we'll get

16   to those letters.  And they live, yeah, in Santa Clara.

17   With regards to employment, it says you plan to seek

18   employment as a carpenter and or cabinet maker.  We've

19   ascertained that you've got woodworking skills and

20   experience, and as well, the commissioner mentioned you

21   have laudatory chronos with regard to that.  And

22   evidently, you've been sending out letters and a

23   resume.

24        **INMATE CARPENTER:**  Yes.  I sent out resumes.  In

25   fact, right here I have copies, and a cover letter of

26   a -- these are letters I sent to programs seeking to

27   get in, and I only received one response stating that I

1    was not acceptable to their program due to the violence

2    and many of the programs, there is many programs.

3            **PRESIDING COMMISSIONER SHELTON:**  So you sent

4    letters --

5            **INMATE CARPENTER:**  To all them people.

6            **PRESIDING COMMISSIONER SHELTON:**  Okay.  These

7    are like help agencies, Agape, Alliance, Gap, City Team

8    Ministries.

9            **INMATE CARPENTER:**  Yes.  I also sent out

10   resumes, my job resumes to different employers.

11           **PRESIDING COMMISSIONER SHELTON:**  And this would

12   be your resume?

13           **INMATE CARPENTER:**  That might be the cover

14   letter to them.

15           **PRESIDING COMMISSIONER SHELTON:**  This is you're

16   looking for your transitional housing letter.

17           **INMATE CARPENTER:**  Yeah.  Yeah.

18           **PRESIDING COMMISSIONER SHELTON:**  And then I have

19   a list, for the order of, of 11 places, prospective

20   employers that you sent letters to.

21           **INMATE CARPENTER:**  Yes.

22           **PRESIDING COMMISSIONER SHELTON:**  Did you receive

23   a response from any of these 11?

24           **INMATE CARPENTER:**  No.

25           **PRESIDING COMMISSIONER SHELTON:**  All right.

26           **INMATE CARPENTER:**  This was my resume if you

27   would like it.

30

1       **PRESIDING COMMISSIONER SHELTON:**  I would like to
2   take a look at it.

3       **INMATE CARPENTER:**  And the offer letter.

4       **PRESIDING COMMISSIONER SHELTON:**  I'll look at it
5   during our recess, and I'll make sure you get all this
6   back, all right, sir?

7       **INMATE CARPENTER:**  Uh-huh.

8       **PRESIDING COMMISSIONER SHELTON:**  Let's take a
9   look at your support letters.  You'll have to bear with
10  me, some of these I have like 35 copies of one letter.
11  So I tried to mark them when I went through the file
12  earlier.  We do have a letter from your aunt and your
13  uncle verifying that nothing has changed since their
14  last letter which they wrote two days before they wrote
15  this letter.

16      **INMATE CARPENTER:**  Yeah.

17      **PRESIDING COMMISSIONER SHELTON:**  In that letter
18  they're talking about that, they talk about your
19  background et cetera.  What I try to do with letters is
20  indicate whether they're support letters, housing or
21  employment.  And, in fact, this letter, your aunt and
22  your uncle are offering housing for you.  Then there's
23  a letter received from A. Howell, Superintendent 1,
24  your supervisor in the wood.

25      **DEPUTY COMMISSIONER THOMPSON:**  That was the
26  laudatory chrono most recently received.

27      **PRESIDING COMMISSIONER SHELTON:**  Okay.  That is

 1   a letter of reference and appreciation, talking about

 2   the good work that you do.  That's a duplicate.  I have

 3   duplicates here of letters.  I think that's all I have

 4   is the aunt and the uncle here.

 5        **ATTORNEY HOFFMANN:**  Okay.

 6        **PRESIDING COMMISSIONER SHELTON:**  And then I

 7   know, Counsel, you had some.  Are we needing to flip

 8   over the tape?

 9        **DEPUTY COMMISSIONER THOMPSON:**  We've got about 5

10   or 10 minutes left.

11        **PRESIDING COMMISSIONER SHELTON:**  I've received a

12   letter from step mom.

13        **ATTORNEY HOFFMANN:**  Step father.

14        **PRESIDING COMMISSIONER SHELTON:**  Step father,

15   John DeMassio.

16        **INMATE CARPENTER:** DeMassio

17        **PRESIDING COMMISSIONER SHELTON:**  Is that the one

18   who was living with your mom?

19        **INMATE CARPENTER:**  Yes.

20        **PRESIDING COMMISSIONER SHELTON:**  And this letter

21   is -- said he would offer support.  He feels the best

22   place for to you go to with would be Vancouver,

23   Washington, with your sister.  If you are paroled in

24   the Bay Area, he said he would try to help you.  I will

25   return these to you so you can make copies of these to

26   put into your file.  This other letter is a letter from

27   Laura Balkin, your sister.

1          **INMATE CARPENTER:** My sister.

2          **PRESIDING COMMISSIONER SHELTON:** And she is

3 writing -- she talks about your rehabilitation, your

4 growth and accomplishments, the fact that you guys are

5 close.  They prefer that you parole to Washington where

6 they live and they have a rental property evidently a

7 three-bedroom, two-bath condo that you're welcome to

8 live in for free or a reduced rent or in their home.

9 So this is a residence.  Also in regards to employment

10 in Washington.  Her husband owns a business called

11 Resource Info Systems, and you could work as a scanning

12 and indexing specialist.  Do you have any idea what

13 that is?

14          **INMATE CARPENTER:** No, I don't.

15          **PRESIDING COMMISSIONER SHELTON:** Neither do I.

16          **DEPUTY COMMISSIONER THOMPSON:** I think we used

17 to call it stock clerk.

18          **PRESIDING COMMISSIONER SHELTON:** Could be.  The

19 position would pay a starting rate of $15 an hour.

20 Another employment opportunity potentially would be

21 working in a warehouse at $12 an hour.  Also, I guess,

22 they have properties, rental properties that you could

23 do some maintenance work on as well.  With regards to

24 transportation, they have a vehicle for your use.  And

25 they have a church lined up for you to attend.  If

26 you're paroled to the Bay Area, she's willing to pay

27 for an apartment for you to live in and she said that

1    she would travel down to stay for days or weeks,

2    whatever, to help. So that's a wonderfully strong

3    commitment from your sister. Did I miss -- I'll return

4    these to you. Did I miss anymore letters of support?

5    More letters. This would be your sister's husband?

6         **INMATE CARPENTER:** Yes. Grant.

7         **PRESIDING COMMISSIONER SHELTON:** Yes, Grant

8    Balkin. Basically, he reiterates --

9         **ATTORNEY HOFFMANN:** There's one additional job

10   offer, I think, at the bottom of his. It's at the

11   bottom one there. Just in the carpentry industry,

12   there's another job and some mill work.

13        **PRESIDING COMMISSIONER SHELTON:** Okay. That

14   would be out of state. And then Arthur Lapis?

15        **INMATE CARPENTER:** Yes, a friend of my sister's.

16        **PRESIDING COMMISSIONER SHELTON:** Is this a

17   gentleman that you've met?

18        **INMATE CARPENTER:** No, I haven't met him.

19        **PRESIDING COMMISSIONER SHELTON:** He offers work

20   as well in Oregon, warehouse type work starting at $12

21   an hour. As I said, I'll return those to you too.

22        **ATTORNEY HOFFMANN:** The only other thing that I

23   want to add about the letters of support is that

24   Loretta and Pete Wilson offer at least six months of

25   residence, transportation and assistance with

26   employment, and it's my understanding is that the goal

27   of that is to support Mr. Carpenter if he's released to

1    Santa Clara County while he's obtaining an interstate

2    transfer to make it up to Oregon to live with his

3    sister.

4          **PRESIDING COMMISSIONER SHELTON:**  Okay.  Great.

5    All right.  Sir, is there anything else you'd like to

6    add with regard to parole plans?

7          **INMATE CARPENTER:**  No.  You covered them.  It's

8    obvious that my family does strong support.  I mean, I

9    have a large group of individuals, but I have a solid

10   group.  They're really committed to helping me, and,

11   you know, I'm thankful of that.

12         **PRESIDING COMMISSIONER SHELTON:**  I can see that.

13   I think before we go into the next portion of this

14   hearing, we'll stop and turn over the tapes.  The next

15   portion is questions.  So go ahead.  Let's turn over

16   the tapes now.

17         **DEPUTY COMMISSIONER THOMPSON:**  You appear to be

18   on tape.

19         **PRESIDING COMMISSIONER SHELTON:**  There's always

20   that disclaimer.  You appear to be on tape.  All right.

21   This portion of the hearing next has to do with

22   questions.  That means the commissioner and I can ask

23   you questions as well as Mr. Rico and Miss Hoffmann,

24   and then we will go into closing statements, and you

25   will be allowed to make the last closing statement

26   today.  I've been asking you questions all along.  I

27   guess my one question would be is how do you feel about

1   your victim in this situation?  I haven't gotten a true
2   sense from you about what's going on there.
3       **INMATE CARPENTER:**  I feel terrible.  I mean,
4   it's something that, you know, I live with every day,
5   and that may sound cliché or something, but it's, I
6   mean, I'm aware of Mrs. Bentley every day.  I'm aware
7   of what I cost her, what I took from her and her
8   family, her family that had been coming to these
9   hearings for quite some time.  I understand.
10      **PRESIDING COMMISSIONER SHELTON:**  I would assume
11  they were not in support of parole?
12      **INMATE CARPENTER:**  No.  And I felt bad because I
13  have a hard time talking about it anyway, and then they
14  would be present in the room, which even made it more
15  difficult because here I am, you know, I took their
16  mother, their grandmother from them, and I wanted to
17  plead for my life, you know, for my release, and it's
18  not real easy.  It's not, I almost felt like I don't
19  deserve it.  I don't have it coming.  So, I'm totally
20  aware of that.  I mean, that's something that I could
21  be released ten years from now and, yet, I'm going to
22  carry that.  It might be five years.  It might be
23  today, but I'm going to carry that with me always, you
24  know, what I did.  So --
25      **PRESIDING COMMISSIONER SHELTON:**  Okay.  Thank
26  you.  I have no more questions at this time.
27  Commissioner, do you have any?

1      **DEPUTY COMMISSIONER THOMPSON:**  No, I don't think

2    so, thank you.

3      **PRESIDING COMMISSIONER SHELTON:**  Mr. Rico?

4      **DEPUTY DISTRICT ATTORNEY RICO:**  Yes,

5    Commissioner, I have some questions.  And again I will

6    address them to the chair?

7      **PRESIDING COMMISSIONER SHELTON:**  Yes.

8      **DEPUTY DISTRICT ATTORNEY RICO:**  How much does

9    Mr. Carpenter believe that either alcohol or drugs

10   contributed to his commission of the life crime?

11     **PRESIDING COMMISSIONER SHELTON:**  And direct your

12   answers to me.

13     **INMATE CARPENTER:**  I believe that they are a

14   major part of committing the crime because I had

15   started using drugs and alcohol at such an early age

16   that I was unable to probably develop mentally like I

17   should have.  I was held back as a result of the

18   alcohol and drug use, and I don't believe, the DA is

19   familiar, you know, very familiar with this crime, and

20   I don't think that someone not, who was not under the

21   use of drugs or alcohol could commit such a crime.

22     **DEPUTY DISTRICT ATTORNEY RICO:**  And I was

23   looking back at the probation report and for Mr.

24   Carpenter's and his counselor's benefit as well as the

25   Panel, I'm looking at -- I'm trying to find a page

26   number here.  It's a poor quality, but it's under

27   defendant's statement in the probation report a few

1    pages into it.  And it indicates that Mr. Carpenter had

2    said that his alcohol usage had increased until the

3    year before the crime when he was consuming two to

4    three six packs of beer per day, becoming intoxicated

5    on the average of four times per week; is that

6    accurate?

7         **INMATE CARPENTER:**  To the best of my knowledge,

8    yes.

9         **DEPUTY DISTRICT ATTORNEY RICO:**  And it goes on

10   to indicate that for the two years prior to the life

11   crime, you'd been smoking an average three or four

12   marijuana cigarettes per day and since age 16 had been

13   sporadically using amphetamines; is that also accurate?

14        **INMATE CARPENTER:**  Yes.

15        **DEPUTY DISTRICT ATTORNEY RICO:**  And as I look up

16   above on that same page, it says when requested

17   regarding whether or not he had consumed any drugs or

18   alcoholic beverages on the day of the murder, the

19   defendant advised he had ingested three valium pills

20   and had consumed about a six pack or two six packs of

21   beer that day with friends becoming slightly

22   intoxicated.  Does Mr. Carpenter remember is that how

23   he explained it or does that sound right?

24        **INMATE CARPENTER:**  I'm sure in the testimony

25   that that was brought up, and I believe, though, that

26   isn't my testimony.  You know, I want to say that, you

27   know, I committed this crime, and I feel bad for it,

38

```
 1    but there was a moment when I was arrested, before I
 2    was arrested, I took a lie detector test and failed
 3    miserably and knew that I would, but, you know, but
 4    still, here's this kid who's an alcoholic, who's a drug
 5    addict and who's uneducated, and for a fleeting moment,
 6    I'm -- how am I going to get out of here.  That was
 7    going through my mind.  How am I going to get out of
 8    this situation I'm in, you know, and so there might
 9    have been some, you know embellishment into how much I
10    drank and what happened.
11         DEPUTY DISTRICT ATTORNEY RICO:  I guess what I'm
12    asking is the crime took place on Super Bowl Sunday;
13    isn't that true?
14         INMATE CARPENTER:  Yes, sir.  Yes.
15         DEPUTY DISTRICT ATTORNEY RICO:  And earlier that
16    day I see a note here that Mr. Carpenter had been
17    watching the Super Bowl game with his friends and
18    drinking; is that accurate?
19         INMATE CARPENTER:  Yes.
20         DEPUTY DISTRICT ATTORNEY RICO:  So when there
21    was the reference here that I read about maybe drinking
22    about taking three valium pills and then maybe drinking
23    one or maybe even two six packs is what Mr. Carpenter's
24    indicating is that maybe he embellished a little bit on
25    how much he actually drank that day.
26         INMATE CARPENTER:  Yes, yes.  You know, because,
27    when questioned, when my friends see it, I went to a
```

1   Super Bowl party. It was more or less a Super Bowl
2   party where alcohol and food, and you know, it carries
3   on. I drank all day. I took the pills before I left
4   the house and then I drank all day. There was hard
5   liquor also. You know, a lot of my defense, you know,
6   basically before trial admitted guilt and my lawyer
7   used the defense of diminished capacity, so, now, the
8   counter was that I wasn't high, I wasn't drunk, you
9   know, to go ahead and just blow that diminished
10  capacity out of the water that, you know, he drinks
11  regularly, he really wasn't that drunk. So, sir, I
12  don't know exactly what it is you're asking.

13      **DEPUTY DISTRICT ATTORNEY RICO:** Let me just
14  rephrase it. I guess what I'm going is this, and I'm
15  not trying to trick Mr. Carpenter or do anything, it
16  looks like Mr. Carpenter, and he's explained very well
17  his background and his feelings and all of that, but
18  it's Super Bowl Sunday. He's watching the Super Bowl
19  game with friends. He's drinking, and at some point he
20  takes three valiums. And the life crime, which takes
21  place later, shows a lot of anger, and I'm wondering if
22  Mr. Carpenter has anything to suggest when this anger
23  came up, why on a day when he's sitting drinking with
24  friends watching the Super Bowl game suddenly that's
25  over and he goes off and all of this anger comes out
26  and he kills the victim. Can he put any of that in
27  context? That's what I'm asking.

1    **PRESIDING COMMISSIONER SHELTON:** Do you

2    understand the question?

3    **INMATE CARPENTER:** Yes. You know, I believe, in

4    some of these reports you looked at, that that morning

5    had I got up, my mother was in her rare form that she

6    was in always, yelling and screaming trying to get my

7    sister up and the phone rang. We were in the middle of

8    an argument hollering and it was Mrs. Bentley on the

9    phone. And, so, to make a connection to the rage,

10    where the rage came from, I believe it that was a good

11    beginning point right there.

12    **PRESIDING COMMISSIONER SHELTON:** Well, I'm going

13    to follow-up on that a little bit too because I have

14    the same question in my mind. If you're kind of laid

15    back having a good time at a Super Bowl party, after

16    the party what triggered you wanting to go to her

17    house? Was there another trigger in there? I mean,

18    from morning --

19    **INMATE CARPENTER:** Not that I'm aware of.

20    **PRESIDING COMMISSIONER SHELTON:** You're -- you

21    just got up and decided to go do it?

22    **INMATE CARPENTER:** It was like -- I'd been angry

23    at her. As I said throughout, throughout my childhood

24    when I moved to this house, I mean, this was like the

25    answer to how I wanted things to be and upon moving in

26    there, I mean, I was only like 12 years old. I hadn't

27    started using drugs. For the most part, I was a quiet,

1   good kid.  And my first encounter with Mrs. Bentley was

2   accusing me of throwing olives at her wall of her

3   house.  She had a big olive tree, and this was, and not

4   to say, you know, I've never tried to justify what

5   happened, but I'm just saying that these are the things

6   that I recall of Mrs. Bentley in my mind.

7         **PRESIDING COMMISSIONER SHELTON:**  I understand.

8         **INMATE CARPENTER:**  Of always accusing me.

9         **DEPUTY DISTRICT ATTORNEY RICO:**  I guess what

10  I've been trying to get at here is how much alcohol or

11  drugs could have been a trigger here, and does Mr.

12  Carpenter have anything else to say on that other than

13  what he's already said?

14        **INMATE CARPENTER:**  It was a lot, and, you know,

15  with my personality, and it's too many, too, it's

16  something I can't have.  I believe that the reason why

17  I used alcohol and drugs was because I couldn't

18  communicate.  I couldn't function normally, and this

19  was something I used to numb myself.

20        **DEPUTY DISTRICT ATTORNEY RICO:**  And if I might,

21  shifting to a couple of things.  The most recent Board

22  report as well as -- the recent Board report says at

23  Page 4 of 7 that Mr. Carpenter has been an active

24  member of Alcoholics Anonymous since 1991 and has been

25  an active member of Narcotics Anonymous since 1998.

26  That's what that says.  But I look at the July 9th,

27  2001, psych eval at Page 4, and that says during the

```
 1    course of incarceration, Mr. Carpenter has
 2    intermittently attended both Narcotics Anonymous one
 3    quarter ending on 3/20/98 and 1/18/01 to 4/18/01, and
 4    Alcoholics Anonymous and then it gives some dates.  He
 5    did not participate in the 12-step program.  He stated
 6    I went back to using in '95 but stopped using in '98.
 7    I recognize that's an '01 report.  But on the one hand,
 8    the most current Board report says he's been
 9    continually involved and as recently as '01 it says it
10    was intermittent.  Could Mr. Carpenter speak to the
11    extent of his involvement in recent years in AA and NA?
12           INMATE CARPENTER:  In AA, I do not attend AA.  I
13    attend NA, and I feel that you are right in that it was
14    sporadic in the '90's.  Since '98, since I quit using
15    and turned my life around, I attend meetings weekly.
16    Sometime it's every other week.  And maybe not a good
17    excuse or for lack of better word, it isn't even an
18    excuse.  I wasn't attending the meetings when I was
19    going to college classes.  I felt that going to college
20    and getting my education and understanding and being
21    able to communicate was something that why I used drugs
22    and alcohol, and I realized, that, you know, I need
23    both of them.  I needed the education, but I also
24    needed to attend the meetings.  And the meetings are
25    something that I do regularly still.  In fact, I didn't
26    submit, but I have the latest chronos from this
27    quarter's NA meetings right here.
```

1          **PRESIDING COMMISSIONER SHELTON:**  Okay.  My

2     question to follow-up with Mr. Rico's would be you

3     are -- when was the last time you attended AA?

4          **INMATE CARPENTER:**  It's been probably three

5     years.  I've turned it -- I go to NA meetings, and

6     they're basically the same.

7          **PRESIDING COMMISSIONER SHELTON:**  And so how long

8     have you been attended NA consistently, I mean, at

9     least twice a month for how long?

10          **INMATE CARPENTER:**  Oh, the last several years,

11    three years.

12          **PRESIDING COMMISSIONER SHELTON:**  The last three

13    years?

14          **INMATE CARPENTER:**  Yes.

15          **PRESIDING COMMISSIONER SHELTON:**  Okay.  Does

16    that answer your question, Mr. Rico?

17          **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.  And

18    also I look at the most current psych, the new psych

19    and it says at Page 5, Mr. Carpenter describes himself

20    as an addictive personality.  He realizes that he is

21    prone to relapse and must actively work against that

22    possibility constantly.  But looking back at the July

23    9th, '01 report at Page 4, at that interview, he

24    indicated that he feels no need to drink and thinks

25    that he can maintain sobriety without support of such

26    organizations as AA or NA, and it says both his

27    parents, uncle and brother all have history's of

1    substance abuse.  So my question is, is this a recent
2    insight on his part that he does need AA or NA on the
3    outside to avoid the possibility of relapse?

4         **INMATE CARPENTER:**  I don't think it's a recent
5    discovery.  That's something that I've been aware of
6    for a long time, that I did have a substance abuse
7    problem, that I have an addictive personality.  I think
8    my statement in '01 was kind of taken out of contents,
9    you know, I'm trying to keep, walk a fine line here
10   with going to the meetings but also doing some other
11   things that my personality needs that will benefit me,
12   for one is school.  I was going to school, and I felt
13   that, that's where the statement comes from.  I was
14   going to school which was helping me understand myself
15   better and giving me the things I needed there.  And,
16   therefore, it was felt like I slighted AA or NA as
17   something I needed, and that's the furthest thing from
18   the truth.  The 12-step program is something that I'm
19   going to have to carry with me forever.

20        **DEPUTY DISTRICT ATTORNEY RICO:**  And two last
21   questions:  Has Mr. Carpenter, and I know that parole
22   plans are a little bit still in formation as to whether
23   he'd live with his sister in Washington or she would
24   relocate or the aunt, has Mr. Carpenter explored
25   possible locations of treatment programs such as NA or
26   AA in any of the areas that he may go to live if he is
27   released?

1       **INMATE CARPENTER:**  Well, it's obvious, that I'm
2   unfamiliar with Washington, but I know where some AA
3   and NA facilities are in Santa Clara County, one being
4   right at the Valley Medical Center, so I do know where
5   to reach out to a meeting if paroled.

6       **DEPUTY DISTRICT ATTORNEY RICO:**  And the last
7   question would be -- I didn't mean to interpret.  Did
8   Mr. --

9       **INMATE CARPENTER:**  No.  I'm done.

10      **DEPUTY DISTRICT ATTORNEY RICO:**  And the last
11  question would be how does Mr. Carpenter feel about the
12  author of the most current psych assessment statement
13  that Mr. Carpenter would benefit from paroling to a
14  program that has experience with polysubstance abusers
15  who have committed violent crimes.  And I don't know if
16  he's talking about someplace like Delancey Street or
17  some similar program.  How does Mr. Carpenter feel
18  about that?

19      **INMATE CARPENTER:**  You know what, I greatly, you
20  know, accept that.  I think that is great because for
21  this reason.  I gave the commissioner a list of
22  organizations that I've written asking for transitional
23  housing and getting in a program, but I also feel that
24  someone who has done the time I did, who has committed
25  the crime I did, who was involved in alcohol and drugs,
26  not only can a program help me, but I can help the
27  program.  And I that, you know, I would openly be

1    willing to do that.

2         **DEPUTY DISTRICT ATTORNEY RICO:**   Thank you.   I

3    have nothing further.

4         **PRESIDING COMMISSIONER SHELTON:**   Thank you, Mr.

5    Rico.   Miss Hoffmann, do you have any questions?

6         **ATTORNEY HOFFMANN:**   I do.   Thank you.   Mr.

7    Carpenter, did you know how to read and write when you

8    came to prison?

9         **INMATE CARPENTER:**   Barely.   Just enough to get

10   by, to write my name.

11        **ATTORNEY HOFFMANN:**   Okay.   And within a year of

12   arriving, you obtained your GED, correct?

13        **INMATE CARPENTER:**   Yes.

14        **ATTORNEY HOFFMANN:**   And shortly thereafter you

15   began college courses?

16        **INMATE CARPENTER:**   College began in '97.

17        **ATTORNEY HOFFMANN:**   Okay.   What types of classes

18   have you taken?

19        **INMATE CARPENTER:**   Sociology, history, English,

20   basic, the basics for an AA degree.

21        **ATTORNEY HOFFMANN:**   What was your GPA when you

22   got your AA degree?   Do you remember?

23        **INMATE CARPENTER:**   I think it was 3.75.

24        **ATTORNEY HOFFMANN:**   What has your education done

25   for you?

26        **INMATE CARPENTER:**   It's helped me in my

27   personality and to realize that, I mean, for the

1    longest time, I felt useless.  You know, and it's

2    obviously that, you know, it showed me that I am a

3    capable person.  I am worthy of myself and not a loser,

4    but it's helped me to communicate, open up.

5         **ATTORNEY HOFFMANN:**  So you'd say you've gained

6    self-esteem also going to school?

7         **INMATE CARPENTER:**  Yes.

8         **ATTORNEY HOFFMANN:**  Okay.  Have you -- sorry.

9    Before I get into that, are any of the other groups

10   that you have participated in while you've been in

11   prison also dealing with substance abuse issues aside

12   from AA and NA?

13        **INMATE CARPENTER:**  Basically all of them.  The

14   IMPACT, the IMPACT group, which deals with -- IMPACT,

15   I'm not sure if the Panel is aware of, it's an acronym

16   for Incarcerated Men Putting Away Childish Things.

17   And, it's basically, the program was started by other

18   inmates suffering from like other inmates are, and we

19   developed this program together, you know, and it's an

20   ongoing program, and we deal with all those issues of

21   substance abuse, violence.

22        **ATTORNEY HOFFMANN:**  What does that group do

23   specifically to deal with substance abuse issues?

24        **INMATE CARPENTER:**  Talk about it and show how

25   you were when you drank and we talk about it and how to

26   avoid it.

27        **ATTORNEY HOFFMANN:**  All right.  Are there any

48

1    other groups other than IMPACT that deals with

2    substance abuse issues as well?

3         **INMATE CARPENTER:** Cairos, Cairo is a Christian

4    based group that is a fellowship, and also through

5    there you find strength and you realize that you are

6    important, you know, and they deal with all your

7    issues.

8         **ATTORNEY HOFFMANN:** And would you say that, do

9    you follow the 12 steps in your daily life?

10        **INMATE CARPENTER:** Yes.

11        **ATTORNEY HOFFMANN:** And would you say that going

12   to AA and NA alone would ensure you remain sober when

13   you're released, or do you think that there are going

14   to be other factors?

15        **INMATE CARPENTER:** Well, I think NA and AA will

16   help me remain sober, but, yes, there's definitely got

17   to be other factors.  I don't think that an NA meeting

18   is entirely, would be fulfilling to someone.  There has

19   to be more to someone's life.

20        **ATTORNEY HOFFMANN:** Like what?

21        **INMATE CARPENTER:** Family, friends, family, job.

22        **ATTORNEY HOFFMANN:** Do you want to continue your

23   education when you get out?

24        **INMATE CARPENTER:** Yes.

25        **ATTORNEY HOFFMANN:** I know that it was difficult

26   for you before when we talked about your victim, and I

27   was hoping that while were you still upset about it, we

1   could get to the questions, but now you've kind of

2   gotten over it and we're going to have to come back to

3   it for a bit, so I'll try and keep it as brief as

4   possible.  But, you mentioned that they used to come to

5   your hearings, the victim's family.

6        **INMATE CARPENTER:**  Yes.

7        **ATTORNEY HOFFMANN:**  And how did you feel when

8   they were here?

9        **INMATE CARPENTER:**  Terrible, terrible, because I

10   wanted to reach out to them, but yet I couldn't.  I

11   mean, it's something, I can't.  I'm unable to do.  I

12   don't know if it was appropriate or not now, but I

13   wanted to stop their pain and didn't know how, don't

14   know how, and the pain, I don't want the pain to be

15   passed on generation to generation, which it has in

16   this case.  There was several generations of people

17   that were there, and I felt horrible.

18        **ATTORNEY HOFFMANN:**  Have you thought about what

19   you could say to them if you could speak with them

20   directly?

21        **INMATE CARPENTER:**  Many times.  And, you know,

22   no words can speak to what I did.  No words can make it

23   any better.  No words could make them feel better.

24   Sometimes, I think it's just easier that for everything

25   that's been wrong in their life, they feel I'm to blame

26   for and sometimes it's easier just to accept that and

27   to be willing to be the one.

 1           **ATTORNEY HOFFMANN:**  I have no further questions.
 2           **PRESIDING COMMISSIONER SHELTON:**  All right.
 3     Thank you.  All right.  We are going to go into closing
 4     statements.  First Mr. Rico will have an opportunity to
 5     speak followed by your attorney, and then you will have
 6     an opportunity.  Mr. Rico?
 7           **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,
 8     Commissioner.  I think that this hearing has well
 9     documented the commission of the life crime.  I
10     recognize that Mr. Carpenter was only 18 at the time
11     that he committed the crime.  The victim was, was much
12     older, and vulnerable in comparison.  The crime itself
13     involved extreme violence, anger.  The victim was
14     stabbed seven times, with some of those wounds to the
15     depth of five plus inches, and it would appear, and I
16     think it's without question, I understand Mr. Carpenter
17     when he's indicating his own attempts to gain some
18     insight into the crime.  And I see that in current
19     assessments there was some reference, I think the
20     phrase was that he had the capacity to gain insight
21     into the offense, and I think that's true because I
22     think that he has done an admirable job today
23     explaining what he thinks led up to it in terms of his
24     background.  And I think that it's clear that there was
25     a lot of dysfunction in the family, and perhaps he was
26     the product of a broken or dysfunctional family, and
27     maybe it's not appropriate to rate that family on a

1    scale of 1 to 10. There have been worse; there have

2    been better. But I don't think that the life crime is

3    all due to that. It's not due to one thing. Perhaps

4    that background contributed to it. We have a young man

5    who was allowed to be permissive and engage in drinking

6    and drug use and other things living on the streets and

7    then perhaps started to rebel when his mother tried to

8    rein him in a bit after these patterns were already

9    developed. But we have the life crime apparently being

10    committed with the uncontrollable anger and violence,

11    perhaps fuelled by the alcohol and the drugs. And,

12    now, as Mr. Carpenter sits there, he's 47, and quite

13    frankly, I've been quite impressed when he has talked

14    earlier today about his insight as to what got him to

15    where he is today, looking back on that, trying to

16    assess it. One thing was a little bit troubling, I

17    thought, is that when specific questions were asked

18    about what triggered it that day, you're sitting there

19    at a Super Bowl game, your watching it with friends,

20    kicking back, drinking, and then the game's over and

21    you go out and you do this horrible crime. He seemed

22    to want to talk about the victim and how bad she'd been

23    to him from when he was 12, and he's going back in time

24    to that relationship talking about the throwing of

25    olives and other things that didn't have anything to do

26    with that moment in time when he killed her. So, when

27    I look at his time in prison, it seems as recent as

```
1    1998, and he seems to have been quite candid about

2    that, that he was under the influence of heroin, in

3    prison, in 1998, and that's about ate years ago.  Then

4    something happened, and he seems to have decided that

5    I'm not going to drink anymore.  I'm not going to use

6    drugs anymore, and I have no case that he has.  He

7    indicates that he's been clean since then.  And, in the

8    most current psych eval, he's indicating that he

9    recognizes he has an addictive personality and he needs

10   to remain involved in programs to prevent any relapse,

11   but I guess I'm kind of concerned that as recently as

12   2001, as recently as 2001, according to the author of

13   that July 9th, 2001 psych assessment, at the interview,

14   in order to prepare that report, Mr. Carpenter told the

15   author that he felt no need to drink and thought he

16   could maintain sobriety without support of such

17   organizations as AA or NA, in spite of the family

18   history.  And, I guess what troubles me a little bit is

19   not that he's in denial that he's an alcoholic or a

20   drug user but perhaps it's the old phrase if wishes

21   were horses or the road to fill in the blank paved with

22   good intentions.  Mr. Carpenter believes he's got no

23   need to drink now, no feeling that he needs to take

24   drugs and therefore it's not going to be a problem.

25   But it's been decades since he's been out on the

26   streets.  He was 18 then; he's 47 now, and to go back

27   out, there's going to be a lot of stressors.  Even the
```

```
 1    author of the most current psych eval says that he is
 2    at risk for relapse, and I think the exact phraseology
 3    in that report, the psych assessment says that while he
 4    has become a much stronger individual than he was at
 5    the time of the crime or even earlier in his
 6    incarceration, Mr. Carpenter remains at risk for
 7    relapse into the use of alcohol or drugs in a less
 8    structured setting, and the outside world, I submit, is
 9    certainly a less structured setting, and then the
10    author goes onto say he would benefit from paroling to
11    a program that has experience with polysubstance
12    abusers who have committed violent crimes.  Any use of
13    alcohol or drugs could result in an impairment of
14    judgment and lessened impulse control.  And, perhaps,
15    then, he would go full circle to what he's done before.
16    So I think that Mr. Carpenter, who has been very
17    impressive today in his presentation and has done a lot
18    of things that he should be greatly commended for.  I
19    mean, coming into prison not even able to read or write
20    and doing what he's done is awesome, and to make a
21    decision that he's not going to use drugs, not going to
22    use alcohol, doesn't want to do that, to indicate as he
23    has, and I believe it's been heart felt that he
24    indicates the remorse that he has for the victim.  But
25    I think the weakness is in terms of -- and it's good
26    that there's family support on the outside for him, but
27    the weakness is, and he made efforts to find jobs by
```

1   sending out resumes, but once he gets out, he needs all
2   of the ducks lined up in a row, and he needs more time
3   to remain substance free and away from that. He hasn't
4   been clean that long. So that's my concern here, and I
5   think that until the substance abuse issue, the alcohol
6   addiction, until sufficient distance is gained and he
7   shows that his gains are permanent, that the view
8   expressed by the psych report author that he remains at
9   risk for relapse is very real and that means that he
10  would still present a substantial risk. So that's, I
11  guess, where I draw the line and I look at this, and I
12  indicate at the present time, I don't believe that he
13  is yet ready to be returned to the outside world, that
14  less structured setting because he's not yet strong
15  enough, and I would submit on that in terms of the
16  period of denial. I know he's been getting four-year
17  denials for the last several. I have no position as to
18  the amount of time, but I don't believe that he is yet
19  ready for release. Thank you.

20  **PRESIDING COMMISSIONER SHELTON:** Thank you, sir.
21  Miss Hoffmann?

22  **ATTORNEY HOFFMANN:** Thank you. I'm going to
23  begin just by going over a bit of what the District
24  Attorney focused on during his line of questioning. I
25  believe that his closing statement was relatively
26  supportive, and I do largely agree with it. He was
27  reviewing the probation officer's report and looking at

```
 1   Mr. Carpenter's drug and alcohol history dating back to
 2   when he was just a teenager, which was, at this point,
 3   over 30 years ago.  His statements and questions seemed
 4   to bring out the negative factors of the case, and it
 5   was my impression, and I don't want this to be held
 6   against Mr. Carpenter, because he may not have felt the
 7   same thing, but it seemed like the district attorney
 8   was trying to catch Mr. Carpenter in a lie and get him
 9   to say that he had maybe had one beer instead of seven
10   beers or 12 beers instead of five beers.  You know, Mr.
11   Carpenter isn't here today because of what he had to
12   drink.  He's here today because he murdered someone and
13   he has been very candid and honest with everyone about
14   that today.  He takes full responsibility for taking
15   the life of Miss Bentley, and whether or not he lied to
16   the police at the time he was arrested because he was
17   scared or immature or whatever the circumstances, he
18   takes responsibility today, and he has done that for
19   decades.  If the District Attorney or if the
20   commissioners are interested in knowing where Mr.
21   Carpenter's anger came from when he left the Super Bowl
22   party, we may never know, and I think the picture that
23   the district attorney tried to paint of Mr. Carpenter,
24   you know, being out, relaxing, at a Super Bowl party
25   may not have been the reality of what was going on that
26   day.  He may have left and gone to that party to take a
27   break or he may have left with the intention of getting
```

1   drunk because he was already angry with Miss Bentley.
2   We don't know those circumstances, and we can all sit
3   here and try and imagine what occurred that day almost
4   30 years ago, and it's impossible to figure out, and
5   Mr. Carpenter can do his best to try and remember and
6   may or may not.  The triggering event that led him to
7   go from a Super Bowl party where he was drinking and
8   doing drugs admittedly with his friends may have been
9   seeing Miss Bentley's house.  She lived right next door
10  to him.  He could have been fine when he was at the
11  party, walked home, saw her house, and got angry again.
12  We don't know.  And we're not here to make, again,
13  we're not here to retry the case and we're not here to
14  figure out the specific circumstances of the commitment
15  offense justify continuing to keep Mr. Carpenter in
16  prison.  What we're looking at is whether or not the
17  man who is sitting here before us is suitable for
18  release and a threat to public safety today.  The
19  consistency of his attendance in substance abuse
20  programs since he has been in prison has been
21  consistent since 1998.  It may have been sporadic in
22  the '90's, and he admits that and he explains that his
23  absence from AA and NA meetings specifically during
24  that time because he was attending college, and the
25  district attorney focused on a statement about Mr.
26  Carpenter's, but he realizes that he's prone to relapse
27  and must actively work against that possibility

1    constantly.  I think looking at working against that

2    possibility as only attending AA and NA meetings is a

3    little bit short sighted, and I think Mr. Carpenter has

4    a greater understanding of what he needs to do in order

5    to maintain his sobriety.  He has a history of self-

6    esteem issues.  He has leaned (inaudible) and

7    continuing his education and programming and doing

8    things to make him feel the self-worth that he has are

9    very significant, and that those things are going to

10   help him maintain his sobriety.  Making himself, you

11   know, a person that he is proud of is very -- is a

12   primary thing to ensure his future sobriety and I think

13   that Mr. Carpenter is the best to judge at that.  So,

14   if he chooses to attend educational classes or IMPACT

15   verses AA or NA, or Cairos verses AA or NA, I think

16   that he is the best judge of determining what his needs

17   are to ensure his sobriety.  He is also committed to AA

18   and NA and has been since 1998.  I have personally

19   spoken with his sister on a number of occasions.  She

20   is very supportive.  She calls me and e-mails me

21   regularly to check in and find out if there's anything

22   more that she can do to support him.  If there's

23   anything that I think that you might want to see to

24   make sure that you know that she is 110 percent behind

25   him, she has found AA and NA meetings near her home in

26   Washington.  They're there.  Pete and Loretta Wilson

27   have also found the locations of meetings and times of

```
 1    meetings for Mr. Carpenter to attend upon his release.
 2    The system is set up.  So, while Mr. Carpenter may be
 3    at a risk for relapse, as I think everyone with a
 4    serious substance abuse history is at a constant risk
 5    of relapse.  The district attorney wanted to see Mr.
 6    Carpenter's gain as permanent.  We may never get there.
 7    His gains may never been seen as permanent.  I know
 8    people who have been sober for 20, 25 years who are
 9    still at a risk for relapse.  Everyone can chose and
10    make a decision to use again.  Mr. Carpenter has shown
11    that he is dedicated to maintaining his sobriety and he
12    has a very, very strong and impressive support network
13    upon his release to make sure that he continues to
14    maintain that.  In terms of the psychologist's request
15    that he or I won't necessarily call it a request, but
16    statement that Mr. Carpenter would benefit from
17    paroling to a program, Mr. Carpenter has done
18    everything that he can to try and find a program.  He
19    has written to a number of them, including Victory
20    Outreach, Alliance, and Al-Anon, but has not received a
21    confirmation or acceptance into these programs.  He,
22    you know, he recognizes the benefit of a program both
23    for himself and for other people.  I think his
24    experience is unique in that he was locked up at a very
25    young age and he expressed his interest in sharing that
26    experience with others in a program.  Interest in
27    helping others, and I think that is a huge
```

1  accomplishment for someone who came into prison with no
2  self-esteem, with no self-worth who is now sitting here
3  telling the commissioners that he would love the
4  opportunity to speak to others about his experience and
5  make sure that they don't end up following in his
6  footsteps.  In terms of what I think the primary focus
7  of this hearing is today is Mr. Carpenter's assessment
8  of dangerousness.  The 2006 psych evaluation puts him
9  at the mean for male offenders and also at one point
10  indicates that if he remains abstinent from alcohol and
11  drugs and continues to participate in positive
12  programming, he would be expected to be at a low risk
13  of violence in a controlled setting.  Many of the
14  psychologists don't determine what Mr. Carpenter's risk
15  will be if he is released to the community.  This
16  particular psychologist doesn't indicate if he would be
17  low, average or high if released to the community, but
18  she does say that he has been incarcerated all of his
19  adult life, that he would likely face considerable
20  challenges, which he is very well aware of, in adapting
21  to the community but that he has also gained skills and
22  a level of education that would make him employable and
23  provide him with the potential to be a productive
24  citizen.  She notes the importance of gaining
25  acceptance by members of society who are responsible
26  citizens and who do not rely on the use of substances
27  for coping with challenges and stress, and I think that

60

```
 1    is the exact support network that Mr. Carpenter has
 2    available to him upon his release.  I'm going to go
 3    into reviewing some of the suitability and
 4    unsuitability factors and also the reasons for Mr.
 5    Carpenter's denials in the past.  In 1996, he was found
 6    unsuitable for parole for the commitment offense, his
 7    unstable social history, including previous contact
 8    with law enforcement, alcohol abuse, dropping out of
 9    high school and having no record of employment.  He
10    also, at that point, had failed to upgrade vocationally
11    or educationally while in prison, failed to participate
12    adequately in self-help and therapy and declined to
13    have a psychological evaluation completed in 1996.
14    During his 2004 hearing, he was given a four-year
15    denial because he needs to continue self-help and
16    therapy programs, the commitment offense was carried
17    out in a brutal and cruel, violent manner and he had
18    received two 115's since his last hearing.  Since those
19    previous findings, Mr. Carpenter has made significant
20    gains.  Again, we're not going to be able to change the
21    circumstance of his commitment offense.  Those are
22    facts that we're stuck with -- do you need to turn the
23    tape over?
24          PRESIDING COMMISSIONER SHELTON:  You know, we
25    probably should go ahead.  Why don't we go ahead?
26          DEPUTY COMMISSIONER THOMPSON:  Change it.
27          PRESIDING COMMISSIONER SHELTON:  I think you
```

1    need to put new tapes in.

2         **DEPUTY COMMISSIONER THOMPSON:**  And this is on.

3         **PRESIDING COMMISSIONER SHELTON:**  All right.  It

4    appears we're back on tape.  Go ahead, Miss Hoffmann.

5         **ATTORNEY HOFFMANN:**  Thank you.

6         **PRESIDING COMMISSIONER SHELTON:**  Thank you.

7         **INMATE CARPENTER:**  It's my position that given

8    the gains that Mr. Carpenter has made since his last

9    hearing and I believe since he made a strong commitment

10   to maintaining his sobriety in 1998, that he is

11   currently suitable for parole.  However, I recognize

12   that the Panel may not agree with that finding; and, if

13   that is the case, I would request that the Panel give

14   him a very short-term denial, specifically a one year

15   denial would be ideal in a grant is not given.  I think

16   Mr. Carpenter has shown significant gains, has been

17   able to do a lot in a relatively short period of time.

18   And I think if he came back to the Board in one year,

19   he would be able to show many more significant gains,

20   and I don't think it's necessary to hold him over for

21   any period longer than that.  He's been in prison since

22   1978.  That's almost three decades, and he has almost

23   always followed the recommendation that every Board has

24   given to him.  In terms of the specific suitability

25   factors, one is that the prisoner does not have a

26   juvenile record, which specifically speaks to

27   assaulting others as a juvenile or committing crimes

1    with the potential of personal harm to victims.  Mr.
2    Carpenter has only a juvenile record, only an adult
3    regard in that he was arrested at 18.  His juvenile
4    regard consists of one burglary in 1975 and possession
5    of a destructive device in 1975 as well.  Notably, at
6    1975 arrest for possession of a destructive device was
7    dismissed and therefore was not an actual conviction
8    and that he was arrested for both of these offenses
9    over 30 years ago, neither of them involved assaulting
10   others or were particularly violent in any manner.
11   Since that time, also, he has significantly matured.  I
12   think the district attorney acknowledged that Mr.
13   Carpenter was a teenager at the time of his arrest, and
14   he's now a, for all intents and purposes, a middle aged
15   man.  In terms of stable social history, Mr. Carpenter
16   does have a relatively rocky history, and whether that
17   was a primary contributor to his commitment offense or
18   a secondary issue, is, I think, for the Panel to
19   determine and for Mr. Carpenter to ultimately know.  I
20   believe that many of the factors that go to his social
21   history of being unsuitable are factors that he could
22   not control, and I have an internal memo, I believe
23   that was issued to commissioners and other,
24   commissioners and deputy commissioners in terms of
25   unstable social history being used as a circumstance to
26   use unsuitability, which specifically speaks to the
27   Panel not using experiences of victimization or other

 1   circumstances which could not be controlled by the
 2   prisoner as circumstances which tend to show
 3   unsuitability.  Mr. Carpenter was very young.  It was
 4   primarily during the time of his infancy that his
 5   social history was unstable, so I don't believe that's
 6   a factor that should be held against him.  In terms of
 7   signs of remorse, I believe Mr. Carpenter was very
 8   candid, open, and honest with the Panel today.  He's
 9   been remorseful for the life crime since his initial
10   psychological evaluation was conducted in 1984.  Most
11   recently, he stated, quote, it was a senseless crime.
12   I caused pain and hurt to a lot of people.  It's
13   something I'm ashamed of.  It's something I think about
14   every day.  Mr. Carpenter indicated a strong desire to
15   apologize to his victim and her family, but stated that
16   he has not yet done so because he doesn't feel he has a
17   right to.  He stated, quote, 'I don't feel I have the
18   right to apologize.  How could they ever forgive me?'
19   Mr. Carpenter continued, stating he hoped the victim's
20   family will some day be able to go on with their lives
21   and not pass this hate on to the next generation, a
22   sentiment that was expressed again today during the
23   hearing.  I think his significant insight is readily
24   apparent to everyone in the room today, and he has a
25   deeper understanding at this point of pain that he has
26   caused the victim and the families, and I think that
27   that understanding has a lot to do with the programming

1  and the maturity that Mr. Carpenter has gained since he
2  has been inside. A lot of programs that he has attend
3  and opportunities that he has availed himself of while
4  he has been in prison have gotten him to look at the
5  circumstances that led to the crime as well as the
6  impact that his actions have had, not only on his
7  immediate victim but on their entire family and the
8  community at large. And, I think, his remorse is not
9  simply limited to Miss Bentley. His remorse goes to
10  the entire community and everyone who was impacted.
11  Speaking about the motivation for the crime, I will
12  keep it short because I have already touched on it in
13  response to some of the statements that the district
14  attorney indicated, but, again, I don't think that any
15  motive will really be justifiable for killing another
16  human being, and I think Mr. Carpenter is aware of
17  that. His explanation of the motive and his
18  explanation of the circumstances that happened
19  immediately prior to the crime may sound really trivial
20  and inexplicable at this point, and I just want to
21  refocus the Panel's attention to the fact that he was
22  an 18-year-old boy, so his ability right now at almost
23  50 to look back and try and explain things that may
24  have made sense to him when he was 18 is really
25  difficult, and, at this point, probably don't make
26  sense and aren't logical. And I think he has gained a
27  significant amount of maturity and insight, but, you

 1    know, he is able to sit here today and describe all of

 2    these different factors and who he was at that point,

 3    which is the context in which we need to understand the

 4    commitment offense.  I also just want to point out that

 5    given his increased age, he does have a statistical

 6    reduced probability of recidivism.  His psychological

 7    evaluation from 2006, as I indicated earlier shows a

 8    low risk of future violence.  In terms of his

 9    understanding and plans for the future, he has very

10    stable and very significant plans.  The District

11    Attorney indicated that those are kind of still in the

12    process of being figured out, and I don't think that is

13    the case.  He has two offers to live in his county of

14    commitment.  He has one offer from Pete and Loretta

15    Wilson to live with them for at least six months until

16    he is either to find another place for himself or get

17    an interstate transfer to go live with his sister up in

18    Washington.  That offer of residence also includes

19    assistance with employment opportunities and financial

20    support and transportation while he is living there.

21    Additionally, his sister, Laura Balkin, has offered him

22    a residence in Santa Clara County by paying for an

23    apartment for him while he is living there.  He is

24    realistic in finding support programs such as AA and

25    NA, as I discussed previously in Santa Clara County as

26    well as in Washington.  His sister has offered him

27    multiple places to live in Washington, multiple jobs.

1   I think his parole plans are solid and complete and
2   current right now.  I don't think there's anything more
3   that needs to be done to prepare them.  Mr. Carpenter's
4   institutional behavior may not have been ideal, and I
5   think his counselors and the psychologist speak to his
6   difficulty adjusting during his first years in prison
7   and chalk a lot of that up to his young age.  He was 18
8   years old.  He didn't really recognize the consequences
9   of his actions clearly with the commitment offense and
10  thereafter with some of the disciplinaries that he
11  received in prison.  And I will acknowledge that some
12  of those disciplinaries were received immediately upon
13  arriving in prison, some of them were not received
14  until the '90's, which may not make sense to the Panel,
15  and I think a thorough review of the record shows that
16  during the '90's was a period of time when Mr.
17  Carpenter was using.  He had expressed that he lost
18  hope, that he felt like there was no chance that he --
19  of ever being released from prison, and he began to
20  receive disciplinary violations and continued using
21  drugs.  In '98, he did turn his life around, and he did
22  refocus himself on continuing to program positively and
23  maintain the gains that he has made, and it is with
24  that that I believe that he is currently suitable for
25  parole.  Thank you.

26      **PRESIDING COMMISSIONER SHELTON:**  Are you sure
27  you're done?

1        **ATTORNEY HOFFMANN:**  I am done.  I'm sorry that
2    was so long.

3        **PRESIDING COMMISSIONER SHELTON:**  All right.  Mr.
4    Carpenter, would you like to make a statement?

5        **INMATE CARPENTER:**  Yes, I would.  Excuse me.
6    Several things I'd like to say, and I'll make it brief.
7    But the DA, the District Attorney, you asked whether or
8    not, whether or not I need AA for life or if it's
9    something that I don't need.  It's something that, you
10   know, it's one day at a time for me, and that's what it
11   is.  And it's been eight years.  And eight years to
12   somebody, eight years is a long time.  I mean, eight
13   years isn't yesterday.  Eight years was a long time
14   ago, and we'd all like to go back eight years in our
15   life so eight years is a good bit of time, and I wish
16   there was more under me, more clean time, but this is a
17   crime that happened three decades ago, and it was a
18   long time ago, and the DA has changed more than once.
19   The Board members have changed, the lawyers have
20   changed, the officers behind me have changed.  I'm
21   still here and still talking about it and it's painful.
22   There's nothing I can do because when it comes time to
23   talk, I got to remember what I did.  Now, you know, my
24   aunt will say, remember to tell them this.  And my
25   sister says, remember, you got work skills now and you
26   need to get out now, but what it all comes down to
27   today is about me and Mrs. Bentley, about whether I'm

68

1   suitable for parole, and remembering that I took her

2   life, and I hope that I'm found suitable, and, if not,

3   I hope that I'm only given a year.  Thank you.

4        **PRESIDING COMMISSIONER SHELTON:**  Thank you, sir.

5   We are going to recess for deliberations.  The time is

6   10:30.  Mr. Rico, I'm going to put you on mute, sir.

7        **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,

8   Commissioner.

9                           **R E C E S S**

10                          --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

69

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3       **DEPUTY COMMISSIONER THOMPSON:**  Again we appear

4  to be on tape.

5       **PRESIDING COMMISSIONER SHELTON:**  All right.

6  Good morning, everyone.  We are back in the matter of

7  Ricky Carpenter, CDC number B, as in boy, 95921.

8  Everyone has returned to the room that was here during

9  the hearing as well as Mr. Rico on teleconferencing.

10  The Panel has reviewed all information received and

11  we've relied on the following circumstances in

12  concluding that Mr. Carpenter is not yet suitable for

13  parole and would pose an unreasonable risk of danger to

14  society or threat to public safety if released from

15  prison.  Mr. Carpenter, we gave you a three-year denial

16  this time instead of a four-year denial, and I'm going

17  to go into the particular reasons why, and there are

18  several areas of concern for us, and I think I will,

19  you know, I will be as specific as I can to give you

20  guidance for your next parole hearing.  I do want to

21  start off by saying that we found you to be very

22  sincere and respectful and truthful, and we appreciate

23  that from you, but there's still some areas of concern,

24  especially of areas of dealing with your alcohol and

25  drug addiction and the support and strength that you'll

26  need in that arena to carry you through to a release

27  **RICKY CARPENTER  B-95921    DECISION PAGE 1    9/21/2006**

1    some day.  I have a process that I need to follow
2    through, and I am going to talk about the commitment
3    offense.  We've already referred to it.  I do believe
4    you are remorseful in that area.  I do believe that you
5    need to take a look back on that offense because, for
6    the life of me, I think there's a trigger there
7    somewhere that you need to put your finger on so you
8    know how to control that in the future.  So the offense
9    was carried out in an especially cruel and callous
10    manner.  We've talked about it.  The victim, as far as
11    I'm concerned, was abused and defiled during the course
12    of the offense.  I mean, not only was she choked and
13    strangled and stabbed and suffocated then her throat
14    slit, the offense showed exceptionally callous
15    disregard for human suffering, and I think we've all
16    agreed around the table that there was no excuse for
17    this death.  There was absolutely no reason or
18    motivations.  The conclusions are drawn from the
19    statement of facts that came from the April 2006 Board
20    report that stated on January 16th, 1978, Mr. Carpenter
21    went to Miss Bentley's house with the pretense of using
22    a telephone and then proceeded to strike her in the
23    face, tripped her, choked her, stabbed her, suffocated
24    her, and eventually killed her.  We've been through the
25    details of that adequately.  With regards to your prior
26    record, sir, there is really none of any concern to
27    **RICKY CARPENTER  B-95921    DECISION PAGE 2    9/21/2006**

1    this Panel.  Institutional behavior, I want to indicate
2    that you've received 11, 115's, the last being in '97.
3    You've received four 128's, the last was a reduced 115,
4    and that was in July of '05.  You know, we talked about
5    some of the programming and stuff you've done.  For
6    being in prison for 30 years, I find that you've
7    programmed in a limited manner.  There are so many
8    abundance, there's an abundance of programs in this
9    particular prison that you have not availed yourself
10   of, and I also have a difficult time with you didn't
11   attend AA or NA because you're going to college.  I
12   think you can figure out how to multi task.  I know
13   people that are raising families, going to school,
14   working full time and attending AA and NA, so I think
15   that you need to figure out a way to either commit
16   yourself to either AA or NA or some other ongoing
17   substance abuse program from this day forward until the
18   day you die because you are extraordinarily high risk
19   of relapsing based upon what you've presented us today,
20   what's all been in your record and the fact that you
21   have not been consistent.  Your attendance at AA and NA
22   has been very sporadic.  So I have a concern about
23   that.  So I would have to say you've programmed in a
24   limited manner and you've not sufficiently participated
25   in self-help programs at this time, especially for a
26   man that's been in custody for 30 years.  You should
27   **RICKY CARPENTER  B-95921    DECISION PAGE 3    9/21/2006**

72

1   have reams and reams and reams of certificates and

2   laudatories, all kinds of things.  You've got to jump

3   right head into it, sir.  The psychiatric evaluation

4   was done by Dr. Inaba, I-N-A-B-A, in August of 2006.

5   That psych gave you a Global Assessment Functioning

6   score of 78.  Do you know what that means?  Do you know

7   what a global assessment functioning score is?

8       **INMATE CARPENTER:**  Yes, it's your functioning

9   within your surroundings.

10      **PRESIDING COMMISSIONER SHELTON:**  It's kind of

11  how you would function out with in the community.

12  Well, look at it like a grade in school.  78 is like a

13  C plus.  I'd rather have you in the B plus range of

14  Global Assessment Functioning.  Do you understand what

15  I'm saying?

16      **INMATE CARPENTER:**  Yes.

17      **PRESIDING COMMISSIONER SHELTON:**  As well, the

18  psychological indicates that you're at risk for relapse

19  because of the use of alcohol and drugs.  With a three-

20  year denial, we are recommending a new psychological

21  for you before your next hearing.  I think that the

22  Panel is going to want to see a stronger support in

23  your behalf.  And this gives you three years of

24  distancing yourself from your last heroin use, which

25  you indicated was in '98, and it will give you a longer

26  distance of being clean.  Do you understand?  So you

27  **RICKY CARPENTER  B-95921    DECISION PAGE 4   9/21/2006**

73

1    have an opportunity to improve your assessment at your
2    psychological evaluation. With regards to your parole
3    plans, it appears that your strength is in another
4    state, your strongest support base is in another state.
5    I applaud you for recognizing that paroling to
6    Washington is pretty much an impossibility. You would
7    have to parole in California, do well for a period of
8    time, and then transfer, a request to transfer to
9    Washington. I think your parole plans for doing that
10   are okay, but you can strengthen them in a couple of
11   ways, so I just want to give you a heads up for your
12   next hearing. One is, firm up which residence you want
13   to go to. What would be your primary choice? Do you
14   want to live with your aunt and your uncle and do the
15   six months there? Do you want to continue looking for
16   transition housing? And, I know, sir, I know you've
17   applied to several, and I've been before many, many,
18   lifer hearings and other people seem to have no problem
19   getting into transitional housing. Do you know a name
20   of an organization called Friends Outside?

21          **INMATE CARPENTER:** Yes.

22          **PRESIDING COMMISSIONER SHELTON:** Do you have a
23   way to contact them?

24          **INMATE CARPENTER:** Yes.

25          **PRESIDING COMMISSIONER SHELTON:** Contact them.
26   See if you having them do some of the leg work for you
27   **RICKY CARPENTER  B-95921   DECISION PAGE 5   9/21/2006**

1    out there where they can maybe smooth a pathway for you
2    to get there because that might be an option for you
3    too.  At the very least, the next Board's going to want
4    to see in your file where you're going to attend AA or
5    NA or something like that, where those meetings are,
6    when they're going to be held, how you're going to get
7    there.  Also, line up a sponsor.  You can get a sponsor
8    ahead of time.  You can work with somebody that is
9    willing to sponsor you when you get into the community
10   and they can work with you before you go into the
11   community.  Get a sponsor.  You're going to need one,
12   and you're going to need somebody that's going to be
13   there for you.  Okay.  Before your next parole hearing,
14   make sure that your letters are updated and current
15   especially with regard to residence and employment.
16   Does that make sense?

17        **INMATE CARPENTER:**  Yes.

18        **PRESIDING COMMISSIONER SHELTON:**  With regards to
19   responses to 3042 notices that were sent out, those
20   letters go to agencies that have an interest in your
21   case, and that is why Mr. Rico is here representing
22   Santa Clara County District Attorney's office, and we
23   received no other letters, at least I didn't in my
24   file.  I do want to mention the things that you've been
25   doing well.  You have done an amazing job with your
26   education.  Continue with it.

27   **RICKY CARPENTER  B-95921    DECISION PAGE 6    9/21/2006**

1        **INMATE CARPENTER:**  Yes.

2        **PRESIDING COMMISSIONER SHELTON:**  I mean, that's

3    not an order, that's a suggestion, because obviously

4    it's important to you.  You received your GED in 1979,

5    coming into prison basically illiterate.  On top of

6    that, you started an AA program in '97 and got your AA

7    in July of '04 with a 3.75 grade point average.  That's

8    excellent work.  You need to put as much due diligence

9    into your abstinence from alcohol or drugs.  In my

10   books, eight years is not very long.  It might seem

11   like long to you.  30 years is long, and that's what

12   you've been in here for, but when you look back out of

13   those 30 years and only eight years of them were

14   totally clean, that's not long in the scheme of your

15   incarceration, and you have received two vocations,

16   from what I understand, mill and cabinet and machinist,

17   and you have 11,900 plus hours of time in those arenas.

18   You worked in PIA laundry, lead man, tailor, and you're

19   currently a maintenance mechanic in the wood room?

20       **INMATE CARPENTER:**  No, I'm not.  Lead man in the

21   finish mill.

22       **PRESIDING COMMISSIONER SHELTON:**  Okay.  In the

23   finish mill.  You've participated in the Cairos

24   program.  You've participated in IMPACT.  You've

25   received four laudatory chronos from your woodworking

26   supervisor who says that you are an accomplished woods

27   **RICKY CARPENTER  B-95921   DECISION PAGE 7   9/21/2006**

1  man and operating at the journeyman level, so you
2  should applaud yourself for that as well. And you have
3  had some past, albeit sporadic participation in AA and
4  NA. Unfortunately, we did give you a three-year denial
5  and that means that in a separate decision, this Panel
6  finds that you have been convicted of murder and it is
7  not reasonable to expect that parole will be granted at
8  a hearing during the next three years. First of all,
9  we talked about the offense. I know counsel indicated
10 nothing's going to change the offense. I think what
11 needs to change with regards to that is you revisit the
12 day you killed your victim and find out what was the
13 key that day that pushed your button. I think that's
14 going to be really, really important for you so you
15 know how to defend yourself from that situation again.
16 So we talked about the fact that it was an egregious
17 crime and how it was carried out. I'm not going to
18 revisit that again. I truly, truly believe you are
19 remorseful for that incident. We talked about the fact
20 that -- we talked about your history, regardless of
21 whether or not Miss Hoffmann wants to count that in.
22 You had a terrible childhood, and I'm sorry for that.
23 It shouldn't be a start for anybody, but childhoods do
24 lead to adulthood, and we always have to take a look at
25 what transpires there and keep in mind the strengths
26 and weaknesses of those and not use them as excuses or
27 **RICKY CARPENTER  B-95921    DECISION PAGE 8    9/21/2006**

77

1    crutches, and I'm not saying that you are, but I'm
2    saying you are partly, you partly are what you were
3    back then.  We all are.  Good, bad and ugly.  I
4    appreciate the fact that you have taken as much time to
5    be introspective about that as you have been.
6    Psychological, kind of sits on the fence for you.  78
7    isn't a great GAF score.  I'd like to see it go up, and
8    I'd like to see a new one done on you, which we are
9    requesting, and also it does indicate that you are at
10   risk for relapse into drugs and alcohol.  I think
11   that's probably a good deal of where your focus should
12   be the next few years, on strengthening yourself,
13   distancing yourself from that '98 last use.  And be
14   proud of yourself.  Just continue forward.  I'm just
15   going to give you a real quick summary of review of the
16   notes I took during the course of this hearing.  Number
17   one, you need to distance yourself from that 128,
18   regardless of what it is or how you got it, it's there
19   so you need to distance yourself from that, so
20   basically what I'm saying is no more 115's, and no more
21   128's.  You need to also distance yourself from that
22   last use of heroin in '98.  You've had eight years
23   clean.  In three years you'll have 11 years clean.
24   That sounds a whole lot more impressive.  You need to
25   concentrate on as much self-help as you can, and if you
26   can't participate in a program for whatever reason,
27   **RICKY CARPENTER  B-95921    DECISION PAGE 9   9/21/2006**

1  I know you can read now, read books, and write book
2  reports for us.  It doesn't have to be long.  It can
3  just be half a page of a book report about what you
4  read, how it impacted you, and how you think you can
5  use it in your life.  Because I think Mr. Rico was very
6  right when he said there's going to be so many
7  stressors for you out there.  The changes are
8  incredible, and I would hope that we could arm you with
9  as many tools as possible to make for your success
10  because you're certainly moving in the right direction.
11  I talk to you about shoring up your parole plans by
12  including AA, NA type meetings on a regular basis,
13  locations, times, and get yourself a sponsor, and I
14  think that's pretty much it.  Commissioner, did you
15  want to add anything?

16      **DEPUTY COMMISSIONER THOMPSON:**  That I think he's
17  done very well in trying to advance himself.  He's
18  shown maturity, and I wish him good fortune in the
19  future.

20      **PRESIDING COMMISSIONER SHELTON:**  Good luck to
21  you, sir.  You're on the right path.  Stay on it.

22      **ATTORNEY HOFFMANN:**  Thank you.

23  //
24  //
25  //
26  //

27  **RICKY CARPENTER  B-95921    DECISION PAGE 10    9/21/2006**

79

1        **PRESIDING COMMISSIONER SHELTON:**  All right that

2    concludes this hearing at 11:00 a.m.

3                    **A D J O U R N M E N T**

4                         --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED THREE YEARS.**

24    **THIS DECISION WILL BE FINAL ON:**    JAN 1 9 2007

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **RICKY CARPENTER  B-95921   DECISION PAGE 11   9/21/2006**

80

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KERRY VIENS, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 79, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RICKY CARPENTER, CDC No. B-95921, on SEPTEMBER 21, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 4, 2006 at Sacramento County, California.

*Kerry L. Viens*

_____
Kerry Viens
Transcriber
**Northern California Court Reporters**

Exhibit - D

1

2

3 **SUPERIOR COURT OF CALIFORNIA**

4 **COUNTY OF SANTA CLARA**

5

FILED

APR 2 4 2007

KIRI TORPE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
By _____ Deputy

6

7 In re                                         No.: 68207

8      RICKY CARPENTER,

9 On Habeas Corpus                              ORDER

10

11      The California Supreme Court, in *In re Dannenberg* (2005) 34

12 Cal.4th 1061, finding the Parole Board's procedures lawful because

13 the Board is constrained by a framework within which to exercise

14 discretion, stated: "the regulations do set detailed standards, and

15 criteria for determining whether a murderer with an indeterminate

16 life sentence is suitable for parole." (*Dannenberg* at p. 1080.  See

17 also page 1096, footnote 16: "the Board must apply detailed standards

18 when evaluating whether an individual inmate is unsuitable for parole

19 on public safety grounds.")  In this case, because there is 'some

20 evidence' the motive for the crime is inexplicable or very trivial,

21 the crime itself appears to show unsuitability under the "detailed

22 standards."  The habeas petition is DENIED.

23

24 DATED: ___23 Apr___, 2007                     _____

PAUL BERNAL

25                                               JUDGE OF THE SUPERIOR COURT

26 cc:  Petitioner
     Attorney General

27      Research(3-8A)
     CJIC

28

1

| THE SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SANTA CLARA<br><br>Petitioner:<br>    RICKY CARPENTER<br><br>In re: People v. Ricky Carpenter | **(ENDORSED)**<br>**FILED**<br>APR 2 4 2007<br>KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of CA County of Santa Clara<br>BY ___Jennifer E. Vigna___ DEPUTY |
| --- | --- |
| PROOF OF SERVICE BY MAIL OF:<br>ORDER ON HABEAS CORPUS | CASE NUMBER:<br>68207 |

CLERK'S CERTIFICATE OF MAILING: I certify that I am not a party to this case and that a true copy of this document was mailed first class postage fully prepaid in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on <u>04-24-07.</u> I declare under penalty of perjury that the foregoing is true and correct.

KIRI TORRE, Chief Executive Officer/Clerk           By ___Jennifer E. Vigna___  Clerk
                                                                            Jennifer E. Vigna

Ricky Carpenter, Petitioner
CDC #B-95921
San Quentin State Prison
San Quentin, CA 94974

Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

Research
*Placed in inter-office box

CJIC
*Placed in inter-office box

Exhibit. E



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

In re RICKY CARPENTER,

on Habeas Corpus.

H031553
(Santa Clara County
Super. Ct. No. 68207)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Mihara, Acting P.J., and McAdams, J., participated in this decision.)

Dated ___**JUL 9 - 2007**___    _____**MIHARA, J.**_____ Acting P.J.

Exhibit -F

S154843

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re RICKY A. CARPENTER on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

JAN **1 6** 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

Exhibit-G (for future Use)

Ricky A. Carpenter
B95921 / 2N14L
San Quentin, CA 94974



RECEIVED
FEB 27 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED
FEB 28 2008
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Office of the Clerk
United States District Court
Northern District of California
450 Golden Gate Ave
San Francisco, CA 94102

