1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  AMBER N. WIPFLER, State Bar No. 238484
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5721
     Fax:  (415) 703-5843
8    Email:  Amber.Wipfler@doj.ca.gov

9  Attorneys for Respondent Warden R.L. Ayers

10

11             IN THE UNITED STATES DISTRICT COURT

12         FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                 SAN FRANCISCO DIVISION

14

15  **RICKY A. CARPENTER,**                        C 08-1199 WHA

                                    Petitioner,   **ANSWER TO THE ORDER TO
16                                                SHOW CAUSE; MEMORANDUM
                                                 OF POINTS AND AUTHORITIES**
17         v.

                                                 Judge:  The Honorable William Alsup
18  **Warden ORNOSKI,**

                                    Respondent.
19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2                                                                                                    **Page**

3  INTRODUCTION                                                                                          1

4  ANSWER TO THE ORDER TO SHOW CAUSE                                                                      2

5  MEMORANDUM OF POINTS AND AUTHORITIES                                                                   8

6  ARGUMENT                                                                                               8

7          THE STATE COURTS' DENIALS OF PETITIONER'S HABEAS
           CLAIMS WERE NOT CONTRARY TO OR AN UNREASONABLE
8          APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW,
           NOR BASED ON AN UNREASONABLE DETERMINATION OF
9          THE FACTS.                                                                                     8

10         A.    The State Court Decisions Were Not Contrary to or an Unreasonable
                 Interpretation of Clearly Established Supreme Court Law.                                 8

11
                 1.    Petitioner received all process due under the only United States
12                     Supreme Court law addressing due process in the context of parole
                       suitability.                                                                       9
13
                 2.    The Ninth Circuit's some-evidence test is not clearly established
14                     Supreme Court law.                                                                 9

15               3.    Even if the some-evidence standard was clearly established federal
                       law in the parole context, the standard was correctly applied by the
16                     state courts.                                                                     13

17               4.    The Board may rely on static factors to deny parole.                              14

18               5.    The Board engaged in individualized consideration and considered all
                       relevant, reliable evidence before it.                                           15
19
           B.    The State Court Decisions Upholding the Board's Parole Denial Were
20               Based on a Reasonable Interpretation of the Facts.                                      16

21
     CONCLUSION                                                                                          16
22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2                                                                            **Page**

3  **Cases**

4
5  *Bd. of Pardons v. Allen*
   482 U.S. 369 (1987                                                           5

6  *Benny  v. U.S. Parole Comm'n*
   295 F.3d 977 (9th Cir. 2002)                                                 7
7
8  *Biggs v. Terhune*
   334 F.3d 910 (9th Cir. 2003)                                                14

9  *Carey v. Musladin*
   ___ U.S. ___, 127 S. Ct. 649 (2006)                                 6, 9-11, 14
10
11 *Crater v. Galaza*
   491 F.3d 119 (9th Cir. 2007)                                             11, 14

12 *Foote v. Del Papa*
   492 F.3d 1026 (9th Cir. 2007)                                            11, 15
13
14 *Gagnon v. Scarpelli*
   411 U.S. 778 (1973)                                                          11

15 *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*
   442 U.S. 1 (1979)                                               5-6, 9, 11-12, 16
16
17 *In re Dannenberg*
   34 Cal. 4th 1061 (2005)                                                       5

18 *In re Lawrence*
   150 Cal. App. 4th 1511 (2007)                                                14
19
20 *In re Rosenkrantz*
   29 Cal. 4th 616 (2002)                                                        7

21 *Irons v. Carey*
   505 F.3d 846 (2007)                                                    9, 11, 15
22
   *Jancsek v Or. Bd. of Parole*
23 833 F.2d 1389 (9th Cir. 1987)                                                11

24 *Johnson v. Zerbst*
   304 U.S. 458 (1938)                                                          15
25
26 *Juan H. v. Allen*
   408 F.3d 1262 (9th Cir. 2005)                                               16

27 *Kane v. Garcia Espitia*
   546 U.S. 9 (2005)                                                        10, 14
28

## TABLE OF AUTHORITIES  (continued)

Page

*Kassel v. Consol. Freightways Corp. of Del.*
450 U.S. 662 (1981) ..... 12

*Maynard v. Cartwright*
486 U.S. 356 (1998) ..... 9

*McQuillion v. Duncan*
342 F.3d 1012 (9th Cir. 2003) ..... 7

*Miller-El v. Cockrell*
573 U.S. 322 (2003) ..... 12

*Morrissey v. Brewer*
408 U.S. 471 (1972) ..... 7, 11

*Nguyen v. Garcia*
477 F.3d 716 (9th Cir. 2007) ..... 11, 14

*Ortiz-Sandoval v. Gomez*
81 F.3d 891 (9th Cir. 1996) ..... 2

*Plumlee v. Masto*
___ F.3d ___, 2008 WL 151273 at *6 (9th Cir. 2008) ..... 8, 11, 15

*Sandin v. Connor*
515 U.S. 472 (1995) ..... 5

*Sass v. California Board of Prison Terms*
461 F.3d 1123 (9th Cir. 2006) ..... 5, 7, 15

*Stenson v. Lambert*
504 F.3d 873 (9th Cir. 2007) ..... 11, 15

*Strickland v. Washington*
466 U.S. 668 (1984) ..... 10

*Superintendent v. Hill*
472 U.S. 445 (1985) ..... 6, 9, 13-14

*United States v. Cronic*
466 U.S. 648 (1984) ..... 10

*Wilkinson v. Austin*
545 U.S. 2384 (2005) ..... 9

*Williams (Terry) v. Taylor*
529 U.S. 362 (2000) ..... 8

*Wolff v. McDonnell*
418 U.S. 539 (1974) ..... 11, 12

*Wright v. Van Patten*
___ U.S. ___, 128 S. Ct. 743 (2008) ..... 6, 10, 11, 14

## TABLE OF AUTHORITIES  (continued)

| | Page |
|---|---|
| *Ylst v. Nunnemaker*<br>501 U.S. 797 (1991) | 8 |

**Constitutional Provisions**

| | |
|---|---|
| California Constitution, Article V<br>§ 8 | 7 |
| Sixth Amendment | 10 |

**Regulations**

| | |
|---|---|
| California Code of Regulations, Title 15 | |
| § 2402 | 14 |
| § 2402(c)(1) | 7 |

**Statutes**

| | |
|---|---|
| 28 United States Code | |
| § 2244(d)(1) | 7 |
| § 2254 | 2, 5 |
| § 2254, Rule 2(a) | 2 |
| § 2254(d) | 7 |
| § 2254(d)(2) | 16 |
| § 2254(e)(1) | 16 |
| California Penal Code | |
| § 3041(b) | 7 |
| § 3041.2 | 7 |
| § 3041.5 | 4 |

**Other Authorities**

| | |
|---|---|
| Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) | 5-8, 10, 13, 14 |

1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | JULIE L. GARLAND
Senior Assistant Attorney General
4 | ANYA M. BINSACCA
Supervising Deputy Attorney General
5 | AMBER N. WIPFLER, State Bar No. 238484
Deputy Attorney General
6 | 455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
7 | Telephone: (415) 703-5721
Fax: (415) 703-5843
8 | Email: Amber.Wipfler@doj.ca.gov

9 | Attorneys for Respondent Warden R.L. Ayers

10

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14

15 | **RICKY A. CARPENTER,** | C 08-1199 WHA

16 | Petitioner, | **ANSWER TO THE ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES**

17 | v.

18 | **Warden ORNOSKI,** | Judge: The Honorable William Alsup

19 | Respondent.

20

21 | **INTRODUCTION**

22 | Petitioner Ricky Carpenter is an inmate at San Quentin State Prison, proceeding pro se in

23 | this habeas corpus action. Petitioner alleges that the Board of Parole Hearings violated his due

24 | process rights by denying parole at his 2006 parole consideration hearing. Specifically,

25 | Petitioner claims that the Board manipulated the factual record and failed to "actually consider"

26 | his parole suitability. Petitioner further claims that the Board's decision is unsupported by any

27 | evidence. Finally, Petitioner argues that this Court should analyze his claim under the

28 | substantive-evidence standard of review.

Ans. to OSC; Mem. of P. & A.

*Carpenter v. Ornoski*
C 08-1199 WHA

1     On March 13, 2008, this Court issued an order to show cause. Respondent Warden R.L.

2 Ayers[1] answers as follows, and denies that Petitioner is entitled to habeas relief.

3                          **ANSWER TO THE ORDER TO SHOW CAUSE**

4     In response to the petition for writ of habeas corpus filed on February 28, 2008, Respondent

5 admits, denies, and alleges:

6     1.    Petitioner is in the lawful custody of the California Department of Corrections and

7 Rehabilitation following his 1978 conviction of first degree murder and theft. (Ex. A, Abstract

8 of Judgment.) He is currently serving an indeterminate life sentence of seven years to life. (Ex.

9 B, Life Prisoner Evaluation.) Petitioner does not challenge his underlying convictions in the

10 present action.

11    2.    Respondent affirmatively alleges that on January 15, 1978, the eighteen-year-old

12 Petitioner decided that he wanted to kill his neighbor, fifty-seven-year-old Evelyn Bentley. (Ex.

13 C, Probation Officer's Report at 1-2.) According to Petitioner, he wanted to kill Mrs. Bentley

14 because he believed she caused his formerly lenient mother to exert more discipline over him.

15 (Ex. D, Parole Hearing Transcript at 13.) After putting on leather gloves, Petitioner walked to

16 Mrs. Bentley's house and knocked on her door. (Ex. C at 5.) When she answered, Petitioner

17 asked if he could use her telephone, as his was out of order. (*Id.*) Mrs. Bentley agreed, and led

18 Petitioner into her house. (*Id.*) Petitioner then punched her in the face, causing her to fall to the

19 floor. (*Id.*) When she began to struggle, Petitioner choked her into unconsciousness. (*Id.*) He

20 then went to the kitchen, obtained a butcher knife, and stabbed the victim repeatedly in the chest,

21 leaving the knife embedded in her chest. (*Id.*) The stabbing caused Mrs. Bentley to regain

22 consciousness, and she again began to struggle. (*Id.*) Petitioner first attempted to suffocate her

23 with a small area rug, but when this proved unsuccessful, removed the knife from her chest and

24 stabbed her in the right side of her neck. (*Id.*) He then took forty-two dollars from her purse and

25 

---

26    1. A petitioner seeking habeas corpus relief under 28 U.S.C. § 2254 must name the state

27 officer having custody of him as the respondent to the petition. Rule 2(a) of the Rules Governing
§ 2254 Cases; *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 894 (9th Cir. 1996). As the current warden

28 of San Quentin State Prison, R.L Ayers replaces former warden S.W. Ornoski as the proper
Respondent in this action.

Ans. to OSC; Mem. of P. & A.                                              *Carpenter v. Ornoski*
                                                                          C 08-1199 WHA

1  walked home to wash the blood from his clothing. (*Id.*)  An autopsy later revealed that Mrs.

2  Bentley was killed by a stab wound which traversed through her entire neck. (*Id.* at 2.)  She also

3  suffered seven additional stab wounds, including one to the back of her head, one to her shoulder

4  (at a depth of four and one-half inches), and five to her chest (at a depth of five and one-half

5  inches). (*Id.* at 3.)  The medical examiner also noted numerous contusions and abrasions to her

6  head, including a two-inch contusion of the upper right ear, a three-inch contusion surrounding

7  her right eye, and several abrasions on her lips. (*Id.*)

8      3.    Respondent affirmatively alleges that Petitioner has a long history of substance abuse.

9  He began smoking marijuana at age thirteen, and began drinking regularly at age fifteen. (Ex. D

10  at 15.)  When asked what types of drugs he had tried, Petitioner answered, "Pretty much

11  everything." (*Id.* at 16.)  On the day of the commitment offense, he had consumed hard liquor,

12  beer, and several Valium. (*Id.* at 15.)  Petitioner continued to abuse drugs throughout his first

13  twenty years of incarceration. (*Id.* at 16.)  He reported that he last used drugs, namely heroin, in

14  1998. (*Id.*)

15      4.    Respondent affirmatively alleges that despite Petitioner's substance abuse history and

16  self-admitted "addictive personality," he has only sporadically attended Alcoholics Anonymous

17  or Narcotics Anonymous, and has not taken part in any other self-help or treatment groups

18  specifically addressing substance abuse. (Ex. D at 41-43.)  In 2001, Petitioner told his evaluating

19  psychologist that he believed he could maintain sobriety without participation in such programs.

20  (*Id.* at 43-44.)

21      5.    Respondent affirmatively alleges that in 2006, Petitioner's evaluating psychologist

22  determined that based on Petitioner's "history and . . . present clinical presentation, he remains at

23  risk for relapse into alcohol or drug use in a less restricted environment." (Ex. E, 2006

24  Psychological Evaluation at 2.)  The psychologist further wrote that "[a]ny use of alcohol or

25  drugs could result in an impairment of judgment and lessened impulse control." (*Id.* at 6.)  The

26  psychologist also determined that Petitioner had a personality disorder not otherwise specified

27  (with avoidant, dependent, and anti-social features) that was "improving," and scored his Global

28  Assessment of Functioning at seventy-eight out of a possible 100. (*Id.* at 2.)

Ans. to OSC; Mem. of P. & A.                                              *Carpenter v. Ornoski*
                                                                          C 08-1199 WHA

3

6. Respondent affirmatively alleges that during his incarceration, Petitioner has received six serious rule violation reports (115s), for offenses such as possession of controlled substances, possession of drug paraphernalia, gambling, and conspiracy to extort money. (Ex. B at 5.) At the time of his 2006 hearing, Petitioner's most recent disciplinary violation was from 2005, arising from his failure to show up for a medical appointment. (*Id.*) This violation was subsequently reduced to a less serious counseling memorandum (128). (*Id.*) Petitioner has also been counseled for smoking, most recently in 2003. (*Id.*)

7. Respondent admits that at a parole consideration hearing held on September 21, 2006, the Board determined that Petitioner was not yet suitable for parole and would pose an unreasonable risk of danger to society if released from prison. (Ex. D at 69.) The Board based its decision in part on the egregious nature of the commitment offense, finding that the offense demonstrated an exceptionally callous disregard for human suffering, involved the abuse and defilement of the victim's body, and was carried out for an inexplicable motive. (*Id.* at 70.) Second, the Board also based its decision on Petitioner's failure to adequately participate in self-help programs, particularly those addressing substance abuse, and noted that there were many programs at San Quentin in which Petitioner had failed to participate. (*Id.* at 70-72.) Third, the Board found that Petitioner's psychological evaluation was not entirely supportive, as the evaluating psychologist wrote that he remained at risk for drug relapse and that his Global Assessment Functioning Score was only seventy-eight out of 100. (*Id.* at 72.) Fourth, the Board cited Petitioner's disciplinary history and in-prison drug use as a reason for denying parole. (*Id.* at 75.) Finally, as required by law, the Board noted the opposition of the District Attorney of Santa Clara County. Cal. Pen. Code § 3041.5; (Ex. D at 74.) The Board commended Petitioner for his accomplishments and stated that he had "done an amazing job in [his] education," but that the positive factors did not outweigh the factors of unsuitability, and denied parole for three years. (Ex. D at 69.)

8. Respondent admits that on April 24, 2007, the Los Angeles County Superior denied Petitioner's habeas petition, in which he alleged the same general causes of action as in the current petition. (Ex. F, Superior Court Petition and Denial.) The court did not evaluate all the

Ans. to OSC; Mem. of P. & A.

*Carpenter v. Ornoski*
C 08-1199 WHA

4

1 | factors cited by the Board as indicative of parole unsuitability, but nonetheless found that

2 | sufficient evidence supported the Board's decision. (*Id.*)

3 |     9.   Respondent admits that on July 9, 2007, the California Court of Appeal summarily

4 | denied Petitioner's petition for writ of habeas corpus, in which he alleged the same general

5 | causes of action as in the current petition. (Ex. G, Appellate Court Petition and Denial.)

6 |     10.  Respondent admits that on January 16, 2008, the California Supreme Court summarily

7 | denied Petitioner's petition for writ of habeas corpus, in which he alleged the same general

8 | causes of action as in the current petition. (Ex. H, Supreme Court Petition and Denial.)  Thus,

9 | Respondent admits that Petitioner has exhausted his state court remedies as to the claims raised

10 | in the current petition.  Respondent denies that Petitioner has exhausted his claims to the extent

11 | that they are more broadly interpreted to encompass any systematic issues beyond the review of

12 | his 2006 parole reversal.

13 |     11.  Respondent denies that Petitioner has a federally protected liberty interest in parole;

14 | hence, Petitioner fails to assert a basis for federal jurisdiction. *Greenholtz v. Inmates of Neb.*

15 | *Penal & Corr. Complex*, 442 U.S. 1 (1979); *Bd. of Pardons v. Allen*, 482 U.S. 369, 374 (1987)

16 | (no federal liberty interest without an expectation of early release); *In re Dannenberg*, 34 Cal. 4th

17 | 1061, 1087 (no expectation of early release in California); *Sandin v. Connor*, 515 U.S. 472, 484

18 | (1995) (due process limited to freedom from restraint which imposes "atypical and significant

19 | hardship on inmates in relation to ordinary incidents of prison life.")  Respondent acknowledges

20 | that the Ninth Circuit came to the opposite conclusion in *Sass v. California Board of Prison*

21 | *Terms*, 461 F.3d 1123 (9th Cir. 2006), but preserves the argument.

22 |     12.  Respondent denies that the state court denials of habeas corpus relief were contrary to,

23 | or involved an unreasonable application of, clearly established United States Supreme Court law,

24 | or that the denials were based on an unreasonable interpretation of facts in light of the evidence

25 | presented.  Petitioner therefore fails to make a case for relief under the Anti-Terrorism and

26 | Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254.

27 |     13.  Respondent affirmatively alleges that Petitioner had an opportunity to present his case,

28 | and that the Board provided him with a detailed explanation as to why he was denied parole.

Ans. to OSC; Mem. of P. & A.          *Carpenter v. Ornoski*
                                                    C 08-1199 WHA

1    Thus, Petitioner received all process due under *Greenholtz,* the only clearly established Supreme

2    Court law regarding the due process rights of inmates at parole consideration hearings.

3        14.    Respondent affirmatively alleges that the Board conducted an individualized

4    assessment of Petitioner's parole suitability and considered all relevant and reliable evidence

5    before it.  Respondent denies that the Board merely went through the motions of determining

6    Petitioner's parole suitability.  Respondent further denies that the Board "manipulated all of the

7    evidence supporting a finding of unsuitability," or that the Board "manipulat[ed] the facts of the

8    hearing through lies, distortion, and omission." (Pet. Brief at 8-8a.)

9        15.    Respondent denies that this Court must review Petitioner's parole denial under the

10   some-evidence standard.  In *Carey v. Musladin,* ___ U.S. ___, 127 S. Ct. 649, 653 (2006) and

11   *Wright v. Van Patten,* ___ U.S. ___, 128 S. Ct. 743, 747 (2008) the United States Supreme Court

12   emphasized that under AEDPA, only Supreme Court holdings regarding the specific issue

13   presented may be used to overturn valid state court decisions.  As no clearly established Supreme

14   Court law provides that a parole denial must be supported by some evidence, this Court need not

15   review the current matter under the some-evidence standard.

16       16.    Respondent affirmatively alleges that if the some-evidence standard does apply to the

17   review of parole denials, the proper standard is that found in *Superintendent v. Hill,* 472 U.S.

18   445, 455 (1985), which requires that only a "modicum of evidence" support the decision to deny

19   parole.  Respondent affirmatively alleges that under this standard, some evidence supports the

20   Board's parole denial.

21       17.    Respondent denies that due process requires that this Court examine whether

22   "substantive evidence" supports the Board's parole denial.

23       18.    Respondent denies that this Court must make an independent determination of whether

24   Petitioner currently poses an unreasonable risk of danger to society in order to uphold the state

25   court decisions denying parole.

26       19.    Respondent denies that the Board relied solely on immutable factors to deny parole, as

27   the decision was based in part on Petitioner's psychological evaluation, drug use, disciplinary

28   violations, and failure to participate in adequate self-help programs. (Ex. D at 69-79.)

Ans. to OSC; Mem. of P. & A.                                                    *Carpenter v. Ornoski*
                                                                                C 08-1199 WHA

1    20.   Respondent affirmatively alleges that the Board properly considered the gravity of

2 Petitioner's commitment offense, as required under California Penal Code section 3041(b) and

3 California Code of Regulations title 15, sections 2402(b), (c)(1)-(2).  Respondent further

4 affirmatively alleges that federal due process does not preclude the Board from relying on static

5 factors to deny parole. *Sass*, 461 F.3d at 1129.

6    21.   Respondent denies that Petitioner's numerous cites to state appellate cases are relevant

7 to evaluating a federal due process claim under AEDPA.

8    22.   Respondent denies that, if habeas relief is granted, the proper remedy is an order

9 compelling Petitioner's release.  The function of the federal habeas corpus court with respect to

10 issues of state parole  is to ensure, within the limits of review set out in 28 U.S.C. § 2254(d),  that

11 the prisoner is accorded due process.  *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972).  Thus,

12 even if a due process violation is found, the remedy should be limited to a new parole

13 consideration hearing that comports with due process. *See Benny  v. U.S. Parole Comm'n*, 295

14 F.3d 977, 984-85 (9th Cir. 2002) (due process violation in parole revocation process remedied

15 through new hearing); *contra McQuillion v. Duncan*, 342 F.3d 1012 (9th Cir. 2003).  Moreover,

16 an order for Petitioner's release would divest the Governor of his state constitutional authority to

17 review the parole grants of convicted murderers.  Cal. Const. art. V, § 8; Cal. Penal Code §

18 3041.2; *In re Rosenkrantz*, 29 Cal. 4th 616, 659 (2002).

19    23.   Respondent denies that the Board violated Petitioner's due process rights by denying

20 parole in 2005.

21    24.   Respondent admits that Petitioner's claims are timely under 28 U.S.C. § 2244(d)(1),

22 and that the petition is not barred by the non-retroactivity doctrine.

23    25.   Respondent denies that an evidentiary hearing is necessary in this matter.

24    26.   Respondent affirmatively alleges that Petitioner fails to state or establish any grounds

25 for habeas corpus relief.

26    27.   Except as expressly admitted above, Respondent denies, generally and specifically,

27 each allegation of the petition, and specifically denies that Petitioner's administrative, statutory,

28 or constitutional rights have been violated in any way.

1    Accordingly, Respondent respectfully requests that the petition for writ of habeas corpus be

2  denied.

### MEMORANDUM OF POINTS AND AUTHORITIES

### ARGUMENT

**THE STATE COURTS' DENIALS OF PETITIONER'S HABEAS
CLAIMS WERE NOT CONTRARY TO OR AN UNREASONABLE
APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW,
NOR BASED ON AN UNREASONABLE DETERMINATION OF
THE FACTS.**

8    When, as here, the California Supreme Court denies a petition for review without comment,

9  the federal court must look to the last reasoned decision as the basis for the state court's

10  judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-804 (1991).  Here, the last reasoned decision

11  is the Santa Clara Superior Court's April 24, 2007 judgment that some evidence supported the

12  Board's parole denial.  (Ex. F.)  Because nothing in the record indicates that this decision was

13  either contrary to, or an unreasonable application of, clearly established federal law, or based on

14  an unreasonable interpretation of the facts, the provisions of AEDPA mandate that Petitioner's

15  claim for habeas relief be denied.  28 U.S.C. §2254(d)(1-2).

16    **A.    The State Court Decisions Were Not Contrary to or an Unreasonable
        Interpretation of Clearly Established Supreme Court Law.**

18    The first standard of AEDPA is that a state court habeas decision may not be overturned

19  unless it is contrary to, or an unreasonable interpretation of, clearly established federal law.

20  "Clearly established federal law" refers to "the holdings, as opposed to the dicta, of [the United

21  States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*

22  *(Terry) v. Taylor*, 529 U.S. 362, 412 (2000).  As such, for purposes of AEDPA, "[w]hat matters

23  are the holdings of the Supreme Court, not the holdings of lower federal courts." *Plumlee v.*

24  *Masto*, 512 F.3d 1204, 1210 (9th Cir. 2008).  Petitioner, however, asks this Court to overturn

25  three valid state court decisions based on state appellate court holdings and Ninth Circuit dicta.

26  Because AEDPA does not permit such a result, and because the state court decisions denying

27  Petitioner relief did not violate clearly established Supreme Court law, the petition must be

28  denied.

Ans. to OSC; Mem. of P. & A.                                          *Carpenter v. Ornoski*
                                                                      C 08-1199 WHA

1       **1.  Petitioner received all process due under the only United States Supreme Court
2       law addressing due process in the context of parole suitability.**

3       It is undisputed that *Greenholtz*, 442 U.S. 1, is the only Supreme Court decision addressing

4  due process in the specific context of parole consideration hearings. *Greenholtz* specifically

5  rejected the idea that the parole authority must specify particular evidence to support its decision,

6  and held that the only process due an inmate at a parole consideration is first, an opportunity to

7  be heard, and second, if parole is denied, an explanation for the denial. *Id.* at 16. Thus, as a

8  matter of clearly established Supreme Court law, a challenge to a parole decision will fail if the

9  inmate has received the protections required under *Greenholtz*. *See Maynard v. Cartwright*, 486

10  U.S. 356, 361-62 (1998); *Wilkinson v. Austin*, 545 U.S. 2384, 2397 (2005). Because Petitioner

11  received both of these protections, and does not argue otherwise, he received all process due

12  under clearly established Supreme Court law. Accordingly, the state court decision upholding

13  the Board's parole denial is not contrary to clearly established federal law, and Petitioner is not

14  entitled to habeas relief.

15       **2.  The Ninth Circuit's some-evidence test is not clearly established Supreme Court
16       law.**

17       Respondent agrees with Petitioner's claim that this Court should not follow the Ninth

18  Circuit's erroneous holding that clearly established federal law requires a parole decision to be

19  supported by some evidence. *Irons v. Carey*, 505 F.3d 846, 850-51 (2007). The some-evidence

20  standard in the context of parole suitability stems from the Supreme Court decision in

21  *Superintendent v. Hill*, 472 U.S. 445, 455-56, which provides that some evidence must support

22  the decision of a prison disciplinary board to revoke good-time credits. In *Irons*, the Ninth

23  Circuit took the some-evidence standard from the prison disciplinary context, applied it to the

24  parole consideration context, and deemed this new application "clearly established Supreme

25  Court law" for the purposes of AEDPA.

26       In the last two years, the Supreme Court has made it clear that circuit courts may not import

27  a federal standard used for one set of circumstances into an entirely different set of circumstances

28  under the guise of "clearly established federal law." In *Musladin*, the Supreme Court examined

Ans. to OSC; Mem. of P. & A.           *Carpenter v. Ornoski*
                            C 08-1199 WHA

1  the Ninth Circuit's holding that under clearly established federal law, courtroom spectators who

2  wore buttons depicting the victim of a murder inherently prejudiced the murder defendant and

3  denied him a fair trial. *Id.* at 652. To reach this conclusion, the Ninth Circuit determined that the

4  prejudice tests used by the United States Supreme Court in two similar but factually distinct

5  cases constituted clearly established federal law for the purposes of AEDPA. *Id.* The Supreme

6  Court reversed the decision upon review, holding that the Ninth Circuit's determination of

7  "clearly established federal law" was improper because the highest court had "never addressed a

8  claim that private-actor courtroom conduct was so inherently prejudicial that it deprived a

9  defendant of a fair trial." *Id.* at 653. In doing so, the *Musladin* court held that clearly established

10  federal law refers only to the holdings of the Supreme Court on the specific issue presented.

11  *Musladin,* ___ U.S. ___, 127 S. Ct. at 653; *see also Kane v. Garcia Espitia,* 546 U.S. 9, 10

12  (2005) (prisoner denied access to law library has no relief under AEDPA absent a Supreme Court

13  decision addressing that issue).

14      The Supreme Court recently affirmed the *Musladin* principle in *Wright v. Van Patten,* ___

15  U.S. ___, 128 S. Ct. 743 (2008), a case which again demonstrates how narrowly federal courts

16  must construe "clearly established federal law." In *Van Patten,* the petitioner pled no-contest to

17  murder at a plea hearing where his attorney linked to the court proceedings via speaker phone.

18  128 S. Ct. at 744. Using the ineffective assistance of counsel test found in *Strickland v.*

19  *Washington,* 466 U.S. 668 (1984), the state courts denied that the attorney's telephonic

20  appearance violated the petitioner's Sixth Amendment right to counsel. *Id.* The Seventh Circuit

21  Court of Appeals, however, determined that the attorney's physical absence constituted a

22  "complete denial of counsel," and that the claim must therefore be evaluated under the less

23  stringent test found in *United States v. Cronic,* 466 U.S. 648 (1984). *Van Patten,* 128 S. Ct. at

24  744.

25      The Supreme Court reversed, holding that because "[its] precedents do not clearly hold that

26  counsel's participation by speaker phone should be treated as a 'complete denial of counsel . . . it

27  cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law." *Id.*

28  at 746-47 (citations and internal quotation marks omitted). Thus, in *Van Patten,* the high Court

1   again made it clear that in the absence of Supreme Court guidance on the exact issue presented, a

2   state court decision cannot be deemed an unreasonable application of clearly established federal

3   law.

4       The Ninth Circuit has affirmed the *Musladin* principle in *Nguyen v. Garcia*, 477 F.3d 716,

5   718, 727 (9th Cir. 2007), *Crater v. Galaza*, 491 F.3d 119, 1126, n. 8 (9th Cir. 2007), *Foote v. Del*

6   *Papa*, 492 F.3d 1026, 1029-30 (9th Cir. 2007), *Stenson v. Lambert*, 504 F.3d 873, 881 (9th Cir.

7   2007); and *Plumlee*, 512 F.3d at 1210. Each of these cases acknowledges that decisions by

8   courts other than the Supreme Court are non-dispositive under AEDPA standards.

9       In *Irons*, however, the Ninth Circuit did exactly what the *Musladin* and *Van Patten*

10   courts warned against. Although the Supreme Court has never held that any particular

11   evidentiary standard should apply to parole consideration hearings, the Ninth Circuit took the

12   some-evidence standard from the prison disciplinary context, applied it to the entirely different

13   setting of parole consideration, and deemed the new application "clearly established federal law"

14   for purposes of AEDPA. Such action is not appropriate under the narrow definition of clearly

15   established federal law provided in *Musladin* and *Van Patten*.

16       Moreover, as pointed out by Petitioner, the *Irons* decision was based on the erroneous

17   determination that that a parole consideration hearing and a prison disciplinary hearing both

18   impact the length of an inmate's sentence; hence, the same standard of review should apply to

19   both. *Irons*, 505 F.3d at 850-51; *see also Jancsek v Or. Bd. of Parole*, 833 F.2d 1389, 1390-91

20   (9th Cir. 1987). While it is true that both prison disciplinary hearings and parole consideration

21   decisions affect the duration of an inmate's confinement, the two situations are not analagous.

22   Specifically, prison disciplinary hearings involve a finding of guilt, meaning that the process due

23   in disciplinary hearings is greater than that required in parole hearings. *Greenholtz*, 442 U.S. at

24   15-16. In fact, the *Greenholtz* court specifically distinguished a parole consideration hearing

25   from a prison disciplinary hearing, stating that "[p]rocedures designed to elicit specific facts,

26   such as those required in *Morrissey, Gagnon,* and *Wolff*[2] are not necessarily appropriate" in the

27

---

28       2.  *See Morrissey* 408 U.S. 471 (1972) (establishing process due in parole revocation
hearings); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (establishing process due in probation

Ans. to OSC; Mem. of P. & A.                                *Carpenter v. Ornoski*
                                                                      C 08-1199 WHA

1  parole determination context, as a parole hearing is a unique, non-adversarial proceeding that is

2  by its very nature subjective. *Id.* at 14. Unlike a prison disciplinary hearing, in which certain

3  facts demonstrate whether an inmate is guilty of a prescribed offense, "there is no prescribed or

4  defined combination of facts which, if shown, would mandate release on parole." *Greenholtz*,

5  442 U.S. at 8. Rather, parole hearings involve an "'equity' type judgment," in which the Board

6  uses "a synthesis of record facts and personal observation filtered through the experience of the

7  decisionmaker" to make "a predicative judgment as to what is best both for the individual inmate

8  and for the community." *Id.* Thus, a parole consideration hearing and a prison disciplinary

9  hearing are fundamentally different, and the Ninth Circuit erred in holding that under clearly

10  established federal law, the same standard of review applies to both.

11       Petitioner's argument that due process requires a more stringent standard of review than

12  that provided in *Greenholtz* is without merit. First, no clearly established federal law provides

13  that state parole decisions must be supported by "substantive evidence." Moreover, three

14  California courts have already evaluated the substantive merits of Petitioner's claims. (CD 5,

15  EOR I 20-22.) The absence of further evidentiary review does not diminish his due process

16  rights; rather, it merely defers to the state courts' evaluation of those rights, consistent with

17  AEDPA's stated purpose of "further[ing] comity, finality, and federalism," as well as the state's

18  "presumptively constitutional" exercise of police power and efforts to protect the safety of its

19  citizens. *Miller-El v. Cockrell*, 573 U.S. 322, 337 (2003); *Kassel v. Consol. Freightways Corp.*

20  *of Del.*, 450 U.S. 662, 669-70 (1981).

21       Thus, no clearly established federal law provides that in order to uphold the state and

22  district court decisions, this Court must independently determine that some evidence supports the

23  Board's parole denial. As *Greenholtz* is the only United States Supreme Court authority

24  describing the process due at a parole consideration hearing, Petitioner was entitled to only those

25  protections provided in *Greenholtz*. Because he received these protections—and does not argue

26  otherwise—the state court decisions upholding his parole denial are not contrary to clearly

27

28  revocation hearings); *Wolff v. McDonnell*, 418 U.S. 539 (1974) (establishing process due in prison
disciplinary hearings).

Ans. to OSC; Mem. of P. & A.         *Carpenter v. Ornoski*
C 08-1199 WHA

1 established federal law.

2        **3.    Even if the some-evidence standard was clearly established federal law in the parole context, the standard was correctly applied by the state courts.**

3

4       Even if the some-evidence standard was clearly established federal law in the parole

5 context for the purposes of AEDPA, Petitioner's claim would nonetheless fail because the state

6 courts correctly applied the standard to deny habeas relief.  The some-evidence standard "does

7 not require examination of the entire record, independent assessment of the credibility of

8 witnesses, or weighing of the evidence;" rather, it is satisfied if there is "*any* evidence in the

9 record that could support the conclusion made by the [initial decision-maker]."  *Hill*, 472 U.S. at

10 455-57 (emphasis added); *see also Sass*, 461 F.3d at 1129 ("*Hill's* some evidence standard is

11 minimal").

12       The facts of *Hill* demonstrate how little evidence is required to satisfy the some-evidence

13 standard.  In *Hill*, three inmates were seen jogging in the opposite direction of an inmate who had

14 been injured.  472 U.S. at 448.  There were no eyewitnesses to the attack and the injured inmate

15 swore that the other three had not caused his injures, but the prison disciplinary board

16 nonetheless found the three inmates guilty of assault.  *Id.* at 447-48.  The Supreme Court

17 affirmed that some evidence supported the guilty finding, stating that "[a]lthough the evidence in

18 this case might be characterized as meager, and there was no direct evidence identifying any one

19 of three inmates as the assailant, the record is not so devoid of evidence that the findings of the

20 disciplinary board were without support or otherwise arbitrary."  *Id.* at 457.  Thus, *Hill*

21 demonstrates that the some-evidence standard is very minimal, and will be satisfied with only a

22 "modicum of evidence."  *Id.* at 450.

23       Here, there is at least a "modicum of evidence" to support the Board's findings that

24 Petitioner's commitment offense was especially heinous, that he had an unstable social history

25 characterized by chronic substance abuse, that he had disciplinary violations for drug use, that he

26 had not participated in adequate self-help and drug abuse treatment programs, and that his

27 psychological evaluation was not entirely supportive of release.  As each of these factors tends to

28 indicate parole unsuitability under California law, the state courts correctly denied Petitioner's

1 │ claims. *See* Cal. Code Regs. tit. 15, § 2402.

2 │      Petitioner claims that the Board's denial may not be based on the fact that he

3 │ demonstrates multiple regulatory factors tending to show parole unsuitability. Rather, he claims

4 │ that the Board must articulate some "nexus" between the factors tending to show parole

5 │ unsuitability and his present danger to society. As this does not reflect the law in California, let

6 │ alone clearly established law for the purposes of AEDPA review, Petitioner's argument is

7 │ without merit.[3/]  Thus, if *Hill*'s some-evidence standard is applicable in the parole consideration

8 │ context, Petitioner fails to show that it was unreasonably applied by the state courts, and the

9 │ petition must be denied.

10 │     **4.**    **The Board may rely on static factors to deny parole.**

11 │      Petitioner argues that the Board violated due process by basing its decision "solely" on

12 │ his commitment offense and past behavior. This argument fails for a number of reasons. First,

13 │ the Board did not rely solely on static factors to deny parole. On the contrary, the decision was

14 │ also based on Petitioner's psychological evaluation, his disciplinary violations, and his failure to

15 │ adequately pursue self-help. (Ex. D at 69-79.) Second, California's parole provisions explicitly

16 │ state that parole may be denied based on the factors of an inmate's commitment offense.

17 │ *Dannenberg*, 34 Cal. 4th at 1094; Cal. Penal Code § 3401; Cal. Code Regs. tit. 15, § 2402(c)(1).

18 │      Finally, and most importantly, no clearly established federal provides that the Board

19 │ cannot base a parole denial on the factors of an inmate's commitment offense or criminal history.

20 │ Moreover, the Supreme Court has never held that after a certain period of time, a criminal's past

21 │ behavior is no longer predicative of his future actions. Although the Ninth Circuit held in *Biggs*

22 │ *v. Terhune*, 334 F.3d 910, 917 (9th Cir. 2003) that continuing reliance on an unchanging factor to

23 │ deny parole "may result in a due process violation," AEDPA does not permit the use of circuit

24 │ court dicta to overturn a valid state court decision. *Musladin*, 127 S. Ct. at 653; *Kane*, 546 U.S.

25 │ at 10; *Van Patten*, 128 S. Ct. at 744; *Nguyen*, 477 F.3d at 718, 727; *Crater*, 491 F.3d at 1126, n.

26 │

27 │     3. The California Supreme Court is currently determining whether a reviewing court need ever examine an inmate's risk of danger to society under state law. *In re Lawrence*, 150 Cal. App.

28 │ 4th 1511 (2007), review granted (Sept. 19, 2007). This decision has no impact on Petitioner's case, however, as state court decisions are not relevant to determine clearly established federal law.

Ans. to OSC; Mem. of P. & A.                                                     *Carpenter v. Ornoski*

1  8; *Foote*, 492 F.3d at 1029-30; *Stenson*, 504 F.3d at 881; *Plumlee*, 512 F.3d at 1210.

2    The Ninth Circuit's recent decision in *Hayward v. Marshall*, 512 F.3d 536 (2008) (pet'n.

3  for rehr'g. pending), does not compel a different result. In *Hayward*, the Ninth Circuit

4  erroneously used state appellate decisions (rather than Supreme Court jurisprudence) to

5  determine that the inmate-appellant's commitment offense no longer indicated that he would

6  pose an unreasonable risk of danger to society, and ordered the inmate's release. *Id.* at 543-44.

7  Not only is this decision not final, but the court strictly limited its holding to the particular facts

8  of the case, and held that due process did not necessarily preclude the parole authority from

9  relying on static factors to deny parole. *Id.* at 547 fn 10. Moreover, just like *Biggs*, *Sass*, and

10  *Irons*, the *Hayward* decision is circuit court authority that may not be used to overturn a valid

11  state court decision. Thus, *Hayward* has no impact on Petitioner's claim.

12    The mandate in AEDPA is clear: only violations of Supreme Court law are grounds for

13  granting habeas relief when such relief has been denied in the state courts. 28 U.S.C. §

14  2254(d)(1)-(2). Because the Supreme Court has never held that due process precludes a state

15  parole board from relying on the gravity of an inmate's commitment offense to deny parole,

16  Petitioner's claim is without merit, and the state courts' judgments must stand.

17    **5.**  **The Board engaged in individualized consideration and considered all**
       **relevant, reliable evidence before it.**

18

19    Petitioner's final claim is that the Board manipulated the facts of his hearing and merely

20  "went through the motions" of providing individualized consideration. The record belies this

21  argument, as the Board conducted an extensive review of Petitioner's criminal activity, social

22  history, in-prison programming, psychological evaluation, letters of support, and parole plans.

23  (Ex. D.) As Petitioner has the burden of proving his allegations in a habeas corpus proceeding,

24  this claim must fail. *See Johnson v. Zerbst*, 304 U.S. 458, 468-69 (1938).

25

26

27

28

Ans. to OSC; Mem. of P. & A.                      *Carpenter v. Ornoski*
                                             C 08-1199 WHA

15

1    **B.    The State Court Decisions Upholding the Board's Parole Denial Were**
         **Based on a Reasonable Interpretation of the Facts.**

2

3        The second standard under AEDPA is that a state court habeas decision must be based on

4    a reasonable determination of the facts in light of the evidence presented.  28 U.S.C. §

5    2254(d)(2).  Petitioner bears the burden of proving that it was objectively unreasonable for the

6    state courts to conclude that the Board acted in accordance with due process and that some

7    evidence supported the factual basis of the Board's parole denial.  28 U.S.C. § 2254(e)(1); *Juan*

8    *H. v. Allen*, 408 F.3d 1262, 1270 (9th Cir. 2005).  Petitioner fails to do so, as some evidence in

9    the record supports the Board's finding; furthermore, he does not provide any evidence to show

10   that the Board's determination of parole suitability violated federal due process.  Petitioner may

11   disagree with the Board's analysis, but that is not sufficient to prove that the state courts'

12   decisions were objectively unreasonable.  Thus, because Petitioner fails to show that the state

13   courts' factual determinations were unreasonable under AEDPA standards, the petition must be

14   denied.

15                                    **CONCLUSION**

16       In order for this Court to grant habeas relief, Petitioner must prove that the state court

17   holdings were contrary to, or an unreasonable application of, clearly established federal law—not

18   Ninth Circuit dicta—or that the decisions were based on an unreasonable interpretation of the

19   facts.  Petitioner fails to make such a showing.  First, he received all the protections provided in

20   *Greenholtz*, the only clearly established federal law regarding the process due at parole

21   consideration hearings.  Second, the some-evidence standard does not apply to Petitioner's case;

22   however, even if it did, the Board's decision is supported by some evidence of parole

23   unsuitability.  Third, clearly established federal law does not preclude the Board from relying on

24   static factors to determine parole suitability.  Finally, Petitioner provides no evidence to support

25   his claim that the Board failed to provide him with individualized consideration.  Accordingly,

26   / / /

27   / / /

28   / / /

Ans. to OSC; Mem. of P. & A.                                          *Carpenter v. Ornoski*
                                                                       C 08-1199 WHA

1  the petition for writ of habeas corpus should be denied.

2      Dated: May 12, 2008

3                          Respectfully submitted,

4                          EDMUND G. BROWN JR.
                           Attorney General of the State of California

5                          DANE R. GILLETTE
                           Chief Assistant Attorney General
6
                           JULIE L. GARLAND
7                          Senior Assistant Attorney General

8                          ANYA M. BINSACCA
                           Supervising Deputy Attorney General

9

10

11
                           AMBER N. WIPFLER
12                         Deputy Attorney General
                           Attorneys for Respondent
13

14
   40249170.wpd
15 SF2008401034

16

17

18

19

20

21

22

23

24

25

26

27

28

Ans. to OSC; Mem. of P. & A.                          *Carpenter v. Ornoski*
                                                      C 08-1199 WHA

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Carpenter v. Warden**

No.:          **C 08-1199 WHA**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>May 12, 2008</u>, I served the attached

### ANSWER TO THE ORDER TO SHOW CAUSE;
### MEMORANDUM OF POINTS AND AUTHORITIES
### (W/EXHIBITS A-H)

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

Ricky A. Carpenter
B-95921
San Quentin State Prison
SN14L
San Quentin, CA 94964
    *In Pro Per*
    *B-95921*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on May 12, 2008, at San Francisco, California.

|                    |                    |
|--------------------|--------------------|
| S. Redd            | *Q. Redd*          |
| Declarant          | Signature          |

40252547.wpd

# EXHIBIT   A

DEPT. No. _____     CASE NO. 68207

In the Superior Court of the State of California

IN AND FOR THE _____ COUNTY OF Santa Clara

ABSTRACT OF JUDGMENT
(Commitment to State Prison as provided by Penal Code Section 1213.5)

The People of the State of California,                    Hon. JOHN A. FLAHERTY
                                                              (Judge of Superior Court)

                                    vs                     A. NUDELMAN
                                                              (District Attorney)

RICKY ALLEN CARPENTER
              Defendant                                    P. MANSFIELD
                                                              (Counsel for Defendant)

This certifies that on the 4th day of August, 1979 judgment of conviction of the above-named defendant
was entered as follows:

In Case No. 68207 _____ Count No. One _____ he was convicted by JURY _____ on his plea of _____
                                                              (Court or Jury)
Not Guilty _____ (guilty, not guilty, former conviction or acquittal, once in jeopardy,

not guilty by reason of insanity); of the crime of Murder - stipulated to be First Degree

(designation of crime and degree, if any, including fact that it constitutes a second or subsequent conviction of same
offense if that affects the sentence and if under Section 209 of the Penal Code whether victim suffered bodily harm)

in violation of _ Section 187 of the Penal Code
                        (reference to Code or Statute, including Section and Sub-section);

with prior convictions charged and proved or admitted as follows:

| DATE | COUNTY AND STATE | CRIME | DISPOSITION |
|------|------------------|-------|-------------|
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |
|      |                  |       |             |

Defendant was _____ charged and admitted being, or was found to have been armed with a deadly weapon at the time
                    (was) or (was not)

of commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sec-
tions 969c and 3024, 12022(b).

I certify that this image is a true copy per master certification on this fiche.
Name *Mary Caruthers* Date 9-28-82

*Phyllis, Mady 9-28-82*

Defendant __was not__ adjudged a habitual criminal within the meaning of Sub-division (a) or (b) of
Section 644 of the Penal Code; and the defendant __is not__ a habitual criminal in accordance with Sub-division (c)
of that Section.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprison-
ment in the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff
of the _____ County of Santa Clara _____ and by him delivered to the Director of Corrections of the
State of California at the place hereinafter designated.

It is ordered that sentences shall be served in respect to one another as follows: (Note whether concurrent or consecutive as to each count:)
As to Count 2, 484 PC (Petty Theft) - Pro-
bation denied and defendant sentenced to time already served of 187 days.
As to 12022(b)PC - One year imposed and stayed until completion of sentence

imposed on Count 1, 187 PC.

Credit for Time Served - 187 Days. $5.00 Penalty Assessment - 13967 Gov't
Code.

and in respect to any prior incomplete sentence's (s) as follows:
(NOTE whether concurrent or consecutive as to all incomplete sentences from other jurisdictions:)

To the Sheriff of the _____ County of Santa Clara _____ and to the Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at Reception-Guidance Center, Vacaville, California.
at your earliest convenience.

Witness my hand and seal of said court

this __4th__ day of __August, 1978__

JOHN KAZUBOWSKI _____ Clerk

by _____ J. GRANT _____ Deputy

State of California, ss.
County of Santa Clara

I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made
and entered on the minutes of the Superior Court in the above entitled action as provided by Penal
Code Section 1213.
Attest my hand and seal of the said Superior Court this __4th__ day of __August, 1978__

JOHN KAZUBONSKI by J. Grant
County Clerk and Ex-officio Clerk of the Superior Court of the State of California in and for the
County of Santa Clara

The Honorable
JOHN A. FLAHERTY
Judge of the Superior Court of the State of California, in and for the _____ County of
Santa Clara

Note: If probation was granted in any sentence of which abstract of judgment is certification, attach a
minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

# EXHIBIT  B

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
APRIL 2006 CALENDAR

I. **COMMITMENT FACTORS:**

A. **Life Crime:**

Count one: Murder in the first degree, PC187 with the use of a weapon (knife), PC12022 (b). Count two: Petty theft, PC484. Case number 68207 in the County of Santa Clara. Sentence: Count one-7 years to life, as to PC12022 (b) one year imposed and stayed until completion of sentence; Count two-sentenced to time already served of 187 days. Minimum Eligible Parole Date: 01130/85. Victim: Evelyn Bentley, age 57. Received by the California Department of Corrections (CDC) on 08/10/78.

1. **Offense Summary:**

On January 16, 1978, Santa Clara Sheriffs Deputies responded to a residence, as the lights were on and the front door was ajar. Deputies discovered the body of Evelyn Bentley clad in pajamas and a dressing gown, lying on her back on the floor. Her upper garments were soaked in blood as was the rug under her head and the hard wood floor. There was a kitchen (butcher's) knife lying by Bentley's right shoulder with the blade covered in blood.

When Deputies interviewed Ricky Carpenter, he related that following his mother's departure at about 8:00 p.m., he suddenly decided to kill Bentley. He disliked her because as she approved of the separation of his mother and stepfather. Carpenter walked over to the Bentley residence and knocked on the front door explaining that he needed to use the telephone as his was out of order. Bentley unlocked the door, allowing Carpenter to enter. Carpenter followed Bentley to the master bedroom where the telephone was located. Carpenter then stuck Bentley in the face with his fist causing her to fall to the floor. When Bentley began to struggle, Carpenter tripped her, choked her into unconsciousness, picked up a butcher's knife from the kitchen and stabbed her several times in the chest. Carpenter attempted to suffocate Bentley with a small area rug on the floor, leaving the knife imbedded in her chest. When Carpenter's attempts to kill Bentley in this matter proved unsuccessful, he pulled the knife out of her chest, removed the area rug from her face and stabbed her through the right side of the neck causing her death.

2. **Prisoner's Version:**

Carpenter stated that he murdered Bentley as a means of striking out against his mother. He states she was just there and did not deserve what happened to her. Carpenter stated that Bentley knew more about him and the things he was doing, than his own family did because her house was situated with a clear view of the entrance to his room. He stated that Bentley knew that he was a

CSP-SQ

teenage alcoholic and drug user and that she received the brunt of his misplaced anger and frustration. He reiterates that she did nothing to deserve what happened to her, makes no excuses for his actions and accepts full responsibility for his actions.

## B. Aggravating/Mitigating Circumstances:

### 1. Aggravating Circumstances:

a) Bentley was vulnerable due to her age.
b) Carpenter had a relationship of confidence and trust with Bentley as they were neighbors and acquainted with one another.
c) Carpenter had the opportunity to cease but continued with the crime.
d) The murder was senseless and served to purpose.
e) The victim was stabbed repeatedly.
f) Carpenter used a knife in the commission of the murder.
g) Carpenter was under the influence of drugs and alcohol at the time of the murder.
h) The nature of the crime was extremely vicious.

### 2. Mitigating Circumstances:

a) Carpenter has a minimal history of criminal behavior.
b) The murder was committed during a brief period of extreme mental trauma.

## II. PRECONVICTION FACTORS:

### A. Juvenile Record:

| Date | Charge | Disposition |
|---|---|---|
| 01/17/75 | Burglary | 6 months probation |
| 07/04/75 | Possession of a destructive devise (firecrackers) | Dismissed 10/04/75 |

### B. Adult Convictions and Arrests:

The instant offense is Carpenter's only arrest/conviction as an adult.

### C. Personal Factors:

The most significant factor, which may lead to explain Carpenter's involvement in the life crime seems to stem from the anger he held towards his mother, at the time, based on the deteriofation of their relationship. They had a close relationship until she expressed her disapproval of his lifestyle, which included the use of alcohol and drugs and dropping out of school. As confrontations with his mother increased so did his anger, however, he could not express this anger to his mother due to his affection for her. This displaced anger ultimately culminated in the death of Bentley.

CSP-SQ

## III.  POSTCONVICTION FACTORS:

### A.  Special Accommodations/Disability:

None noted or requested.

### B.  Custody History:

Carpenter was received by CDC on 08/10/78. He was processed through the Northern Reception Center at the California Medical Facility (CMF) and was placed at the Deuel Vocational Institution (DVI) on 09/19/78. He was transferred back to CMF on 08/17/82 for a Category 'T' program. Subsequent placements were to the California Men's Colony-East (CMC-E) on 10/24/87, to CMF on 06/02/00, to DVI on 12/27/90, to CMC-E on 03/26/92, to DVI on 06/25/92 and finally to San Quentin (SQ) on 03/29/93. Transfers were non-adverse in nature and Carpenter seemed to make an acceptable adjustment to each move. Carpenter has maintained Medium A custody throughout most of his incarceration. Carpenters classification score was reduced to 0 in 1988. Carpenter was placed in Administrative Segregation (Ad Seg) at CMF on 10/12/90 based upon the discovery of gambling paraphernalia in his assigned living quarters. He was released from Ad Seg on 10/16/90, retention in Ad Seg was deemed not required. He was next placed in Ad Seg at SQ on 03/14/97 pending investigation that he conspired to commit extortion for money and battery against another inmate. Carpenter was released to the general population at SQ on 05/07/97. Carpenter has held a wide array of positions including numerous positions within the Prison Industry Authority (PIA), positions within the laundry including lead-man tailor and maintenance mechanic and numerous positions on the yard including yard lead-man. He has been commended numerous times for his wood working skills and has held many 'special assignments'. Carpenter is currently assigned to PIA as a machinist in the wood room. Work supervisor reports and educational reports have been consistently average to exceptional. Carpenter's case was heard before the Board of Prison Terms (BPT) on 10/28/96. Carpenter states he did not attend because his attorney was changed. The BPT denied parole for four years and recommended that Carpenter become disciplinary free, upgrade vocationally and educationally, and participate in available self-help and therapy programs. Carpenter appeared before The Board of Prison Terms 2/26/02 the BPT again denied parole for four years and recommended that Carpenter upgrade academically become disciplinary free and participate in Self Help/ Therapy activities. On 3/6/02 Carpenter appeared before Unit Classification Committee (UCC) for his Post Board Review, he continued with his present program. On 9/4/02 Carpenter appeared before the UCC for his annual review, no changes were made to his program. On 8/27/03 Carpenter appeared before the UCC for his annual review, his classification score was changed to 19, the new mandatory minimum score for an inmate serving a life sentence. On 5/24/04 Carpenter was placed in administrative segregation (ad-seg) for safety reasons, he was released from On 7/22/04 after the Investigative Services Unit completed their investigation and determined that Carpenters safety was not in jeopardy, Carpenter

CSP-SQ

appeared before the UCC for his annual/program review, no changes were made to his program.

C.    **Therapy & Self-Help Activities:**

| | |
|---|---|
| 08/12/82 | Category E Group Counseling |
| 10/26/83 | Group and Individual Therapy |
| 05/21/84 | Category T Therapy |
| 02/27/85 | Group and Individual Therapy |
| 01/14/87 | Completed Category T Therapy |
| 03/01/88 | Beginning Stress Management and Relaxation Skills Training |
| 04/22/88 | Assertiveness/ Self Esteem Group |
| 06/04/92 | Completed Category X Therapy |
| 04/07/99 | Self Esteem Enhancement Group |
| 3/1/02 | REACH tutor training |
| 12/26/02 | San Quentin Toy Program |
| 2/16/04 | Kairos Mens Retreat |
| 04/8/05 | Creative Conflict Resolutions |
| 5/23/05 | IMPACT- Relationships (class completed) |
| 6/27/05 | IMPACT Relationship Dynamics (class completed) |
| 8/1/05 | IMPACT Cultivating Successful Relationships (class completed) |
| 9/26/05 | IMPACT Specific Relationships (class completed) |

Carpenter has been an active member of Alcoholics Anonymous since 1991.
Carpenter has been an active member of Narcotics Anonymous since 1998.

Laudatory Chronos

| | |
|---|---|
| 06/19/84 | Laudatory Chrono written by D. Clark, Chief of Plant Operations- for excellent work bringing 250 bed modulars on line. |
| 08/07/82 | Laudatory chrono written by J. Oshberg, carpenter shop supervisor- commending Carpenter for his excellent attendance, conscientiousness, being a leader and helping others. |
| 07/18/90 | Laudatory chrono written by B. Russell, Carpenter II- for excellent carpenter skills, pleasure to work with, gets along well with inmates and staff and has excellent safety skills. |
| 3/2/06 | Letter of Reference and Appreciation from A. Howell, Superintendent I, Wood Products. Stating that Carpenter is his lead man, handles situations with staff and inmates with tact. Carpenter is positive, an excellent time manager and is goal oriented. |

D.    **Academics:**

| | |
|---|---|
| 3/31/82 | Completed Vocational Wood Technology |
| 1985 | Completed GED |
| 05/1/98 | Math Fundamentals (San Quentin College) |
| 05/4/98 | Introduction to Computation (San Quentin College) |

CSP-SQ

| | |
|---|---|
| 10/13/98 | Modern American Literature (San Quentin College) |
| 12/17/98 | Art History and Appreciation (San Quentin College) |
| 01/7/99 | Introduction to Literature (San Quentin College) |
| 05/5/99 | American Government (San Quentin College) |
| 05/21/99 | Communications (San Quentin College) |
| 9/21/99 | Modern World of Literature (San Quentin College) |
| 9/28/99 | Computer Literacy (San Quentin College) |
| 10/19/99 | Introduction to Reading and Composition (San Quentin College) |
| 01/11/00 | Ethics (San Quentin College) |
| 01/25/00 | Sociology (San Quentin College) |
| 05/8/00 | Literary Studies of the Bible (San Quentin College) |
| 06/22/00 | The American Experience (San Quentin College) |
| 07/3/00 | Studies in Multi Cultural Literature (San Quentin College) |
| 12/6/01 | Philosophy, Astronomy and Psychology (San Quentin College) |
| 10/16/02 | Indonesian Literature (San Quentin College) |
| 05/7/03 | Algebra |
| 06/24/04 | Psychology, Child Development, Art Appreciation, Theater Improv. (San Quentin College) |

Carpenter earned his Associate of Arts Degree through Patten University.
(He sent his degree home, and is trying to obtain a copy through family and the education department at San Quentin State Prison) His transcripts reflect that he has completed 60 units of college credit.

E. **Disciplinary History:**

| Date | Document | Charge | Disposition |
|---|---|---|---|
| 05/06/83 | Serious 115 | Possession of Paraphernalia | 5-days disciplinary detention-suspended for 90-days clean. |
| 10/12/90 | Serious E 115 | Gambling | Guilty-no credit loss. |
| 11/07/94 | Administrative 115 | Possession of Gambling Material | Guilty-Reduced to Administrative. |
| 03/10/97 | Serious B 115 | Possession of Controlled Substance | Placed on random drug testing. |
| 03/14/97 | Serious B 115 | Conspiracy to extort | Counseled regarding behavioral expectations. |
| 07/01/05 | Serious F 115 | Calls and Passes | Guilty- reduced to 128-B. |

Carpenter has two 128-B's for smoking in a state building dated 01/13/099 and 12/23/03. Carpenter addressed the 7/01/05 115 by stating that he went to leave the building for his ducat, but that the officer would not let him out because of the "Special Feeding Program" he went to breakfast and went to his ducat the next day.

CSP-SQ

## IV.  FUTURE PLANS:

### A.  Residence:

Carpenter plans to reside with his sister, Laura Dimascio, who currently resides in Washington.  Laura works for a computer software company (Symantec), which is based in California.  She plans to relocate to California when Carpenter is granted parole and assist him in his re adjustment to society.

Laura Dimascio
17200 NE 32 Ave.
Ridgefield, WA 98642
(360) 571-5111

Carpenters aunt, Loretta F. Wilson, sent a support letter dated 03/11/06 stating that she will provide housing, financial support and if needed transportation to and from work.  Carpenter's uncle, Peter J. Wilson, sent a support letter dated 3/8/06 indicating that he and his wife are supportive of Carpenters release and they will provide housing and financial support for six months.

Loretta and Peter Wilson
2227 Benton Street
Santa Clara, Ca 95050

Carpenter has sent inquiry letters to nine (9) agencies that provide transitional housing, a copy of this letter and a list the agencies is located in his Central File.

### B.  Employment:

Carpenter plans to seek employment as a carpenter and cabinet-maker. Carpenter has woodworking skills and experience in woodworking; he should have little trouble finding employment in this field based on his experience. There are numerous laudatory chronos in his central file, which speak to his skills in woodworking. Carpenter has sent an inquiry letter and a resume to eleven (11) woodworking companies in Santa Clara County.  A copy of the letter, resume and list of prospective employers is located in his Central File.  Carpenter states that his sister will also provide employment for him, she will be sending a letter with that information.

## V.  SUMMARY:

### A.

Carpenter's incarceration period can be described, for the most part, as conforming. He had some minor problems early on but I believe this can be attributed to his young age (18) when first incarcerated. As to the most recent disciplinary actions, I believe them to be the exception to his programming history rather than the norm. He has earned his GED and his Associate of Arts degree. He should be commended for his efforts in continuing his education. Carpenter is taking the necessary steps to ensure

CSP-SQ

that his transition into society will be successful. Carpenter has sent letters to several programs in search of programs that offer temporary transitional housing and to prospective employers. Carpenter will have family support from his aunt, uncle and sister to ensure that his transition back into society will be successful. Carpenter is continuing his self-improvement programs to ensure that his transition to society will be successful.

B.    Prior to release, Carpenter would benefit by remaining disciplinary free and continuing his participation in Alcoholics or Narcotics Anonymous. Conditions of parole should include participation in one of these programs.

C.    This report is based on a thorough three to four hour review of Carpenter's central file, an hour interview with Carpenter.

D.    Carpenter reviewed his Central File on 3-24-06, and the chrono indicating his file review is located in the Central File.


V. Zanni
Correctional Counselor I

V. Kelley
Correctional Counselor II

C. Belshaw
Correctional Counselor III, C&PR

# EXHIBIT  C

Vacaville

# PROBATION OFFICER'S REPORT

To the Department of Corrections
(Submitted in accordance with Section 1203c of the Penal Code)

NAME   RICKY ALLEN CARPENTER        ALIAS   N/A

COUNTY   Santa Clara County        COUNTY CLERK NUMBER   58207

Count One, Section 187 PC (Murder), 1st Deg.
with Section 12022 (b) PC (Did Use a Deadly Weapon)
& Count Two, Section 484 PC (Petty Theft)

CONVICTED OFFENSE

Pursuant to Section 1203c of the Penal Code, as amended effective September 20, 1963, the Administrator of the Youth and Adult Corrections Agency has prescribed the form of the Probation Officer's report which shall accompany the commitment papers of persons committed to an institution under the jurisdiction of the Department of Corrections.

This sheet, with the identifying data as indicated above, may serve as a transmittal letter or a copy of the Probation Officer's report prepared either before or subsequent to sentence. Copies are available upon request to this department.

The information requested in paragraphs I, II, III, and IV below is prescribed as necessary for the proper evaluation of inmates. Most of this information is included in the usual Probation Officer's report. Therefore, to prevent the necessity of preparing a separate report on those cases committed to the custody of the Director of Corrections, the form prescribed shall consist of the report as prepared by the Probation Officer in the regular course of his investigation and as subject to the rules and policies of his department and the prerogatives of the respective courts. Important data not included in the Probation Officer's report may be added as an attachment to this sheet.

There are limited exceptions requiring only a report upon circumstances of the offense and/or the prior record and history of the defendant as prepared by the Probation Officer on request of the court and filed with the court before sentence. These include:

a. Case ineligible for probation. (Sec. 1203c P.C.)
b. Cases committed under non-criminal narcotic addict proceedings. (Sec. 6500 P.C.)

Other exceptions are:

a. Cases or offenses by defendants who are already under commitment to the Director of Corrections, either in an institution or on parole or at large as an escapee. Such reports may be limited to circumstances of any new offense and available data of activities while at large, if an escapee.

b. Those cases where time limitations and lack of resource material prohibit detailed reports. Such limitations should be indicated under the appropriate headings.

Factual information is a prime requirement. Succinct and selective reporting is preferred. Indicate the source of information and extent to which it is substantiated. Guidelines on the data to be included are given in paragraphs I, II, III, and IV.

I certify that this image is a true copy per master certification on file.
Name _____ Date 9-28-8

Phyllis A. Moody 9-28-8

**I. CIRCUMSTANCES OF OFFENSE:** Include a summary of the offense for each count for which convicted and sentenced. Include a description and the disposition of other counts charged but dismissed or otherwise disposed of.

**II. CRIMINAL HISTORY:** Show all prior offenses including those on CII and/or FBI transcripts. Supplement each item with information obtained by the Probation Officer regarding the nature and disposition of each of the various offenses. A lengthy record of offenses similar in pattern may be grouped and summarized.

**III. OTHER CONFINEMENT HISTORY** - Trace history of, and evaluate response to, confinement in mental hospitals, juvenile institutions, and other institutional experience.

**IV. CASE HISTORY INFORMATION:** Describe personal historical factors; name, age, occupation and addresses of parents and siblings; early family structure and nature of parental interaction and inter-family relation; residential pattern; childhood socio-economic circumstances; sexual development and adjustment; marital history and adjustment, both legalized and common-law; include attitude toward dependents, attitude of spouse, etc.; name and age of children; with whom residing, whether supported by ANC or otherwise; military service, including medical, social and emotional problems and related treatment.

Describe behavior problems and criminal history including institutionalization and probation. This need not duplicate notations made under Items II and III, but might include summary of juvenile delinquency; reactions to probation supervision; history of adjustment to placements; response and progress under mental hospitalization and release supervision; details regarding sexual and assaultive offenses; character references from relatives, friends and neighbors.

Describe current criminal involvement; details of offenses under Item I need not be repeated, but extent and nature of involvement might be verified and evaluated; factors underlying criminal behavior including defendant's attitude toward his behavior and impending confinement; his response to previous confinement experiences and Probation Officer's recommendations for institutional treatment with reasons in support of these recommendations.

Describe education and vocational history; include employment record with names and addresses of employers; the kind of business and duties of defendant; comments from former employers with emphasis on relationship to other employees and supervisors; skills demonstrated; pattern of attendance, etc. Such factors as last job held, best held and who he worked for the longest are significant. Special mention should be made of any employer willing to reemploy.

Describe psychological factors; give excerpts from diagnostic evaluations from mental hospitals, private or out-patient treatment or court-ordered examinations. Include name and location of hospital, date, name and title of psychiatrist or psychologist. Such excerpts are not indicated if complete report can be attached. Indicate defendant's interest in treatment and evaluation, if appropriate, of his probable response; indicate alcohol and narcotic involvement. Is he an occasional or heavy drinker? Did he use marijuana, heroin or other opiate? Was he addicted and rate of use?

CDC-104

*Phyllis J. Mady 9-28-82*     Name *Mary Christie*  Date *9-28-82*

Q5 7/12

## SANTA CLARA COUNTY
## ADULT PROBATION INTERVIEW SHEET

Date Prepared _7/29/78_
Prob. Officer _KAMMELAAR_

318

Court No. _68207_
Date Due _Aug. 4, 78_
Time Due _9 am_
Judge _Flaherty_

Name _Ricky Allen Carpenter_

Aka _Ricky DiMascio — used in school._   mother
_grandm._
_sister_

Address _464 Bundy Av., S.J. 95117    H: 246-6667_

Charge _Ct 1, 187 PC, 1st° w/12022_ (bro) Plea or Conviction _7-10-78_
_Ct 2, 484 PC, misd._

Date of Arrest _____   Arr. Agency _____

Where Arrested _1/30/78_   Bail _w) 100,000 —_
_no other matter pending._

Co-def., Accomplices _none_

Attorney _P. Mansfield, atty_ D.A. _A. Audelman_

Name, Address of Complaining Witness _____

Local Relatives, Friends _mother = as per above_
_father = ? San Diego, Ca._

Date of Birth _8/16/59_   Age _18_   Birthplace _San Jose, Ca._

Father's Name _Marvin Carpenter_ Mother's Maiden Name _Sandra Ohanian_

Parents Address, Marital Status _married & then divorced when S was 4 yrs._
_M = married to John DiMascio — now separated (4/77)_
_M = clerk at main post office (Meridian) in S.J._
_F = remarried — self-employed beach concessions, Pacific_

Brother's Name, Address _Ronnie, 14, was at Boys Ranch for various things, ran away to S. Diego 9/7/63 — last S knew, he did run away_

Sister's Name, Address _S has 1 half sister, Laura Marie, 8, at home with mother — as a result of mother's second marriage._
_As a result of father's second marriage, S's father has 3 daughters_

Marriages, Common-law, Dates, Maiden Name

(1)

(2)

(3)

_Separated, Divorced — Date_

Ethnicity _____ Age _____ Sex _____ Wt _____

Emig. to U.S. _____ State _____ County _____ Citizen _____

Occupation _Forklift operator_    Union Member _____

Present Employment _____ Dates _unemployed since 10/77 - supported_ Wage _____

Previous Employment (1) _by mother & had some savings_

(2) _National Canning Co. Race Street & Augusta — forklift operator, 3 mo. 7/8/77 — 10/77 — laid off_

(3) _Harrad's Casino, So. Lake Tahoe, Nevada — Maintenance, 1 mo. quit as moved back to S.J._

Other Sources of Income _none_    Soc. Sec. No. _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_

Military Record _no history_    Date of Enlistment _____

Discharge _____    Type _____

Courts Martial _____

Over-Seas Service _____    Service No. _____

Comment Re: Prior Arrest _not on prob or parole_

Hold for Other Agencies _____

Vehicle _(none)_    Lic. No. _____    Oper. Lic. _valid - Calif expires 1979_

I.D. No. _____    FBI No. _____    DMV No. _____

Height _5'10"_    Weight _265_    Eyes _Blue_    Hair _Brn_

## STATEMENT OF ACT:

Started drinking alcohol at age 15. Started having problem alcohol last yr. Started drinking on a daily basis — becoming intox about 4 times per wk. In no alcohol program. Drank beer, seldom hard liquor. No one else has drinking problem in family — drank as enjoyed it.

Started smoking M at age 14 - 15.5. Smoking on a daily basis — smoked 3-4 joints per day daily basis — from age 16. LSD at age 16.

Experimented LSD at age 16.
Cocaine — "NO"
Heroin — "NO"
Whites = started using them at age 16 — sporadic use to present time.

I certify that this image is a true copy per master certification on this image.

Name: Mary Carruthers   Date: 9-2-82

Phyllis J. Moody 9-28-82

In the Case of: RICKY CARPENTER
Charge: Secs. 187 & 484 PC
Santa Clara County Number 53207

August 4, 1975

INVESTIGATING OFFICERS' REPORT:   (Continued)

spattered clothing in the washing machine.) The defendant also noted he rinsed off his blood stained boots and gloves which he then threw in the garbage. Before falling asleep on the couch, the defendant advised he telephoned his mother and asked her to bring home some ice cream. When questioned regarding whether or not he had consumed any drugs or alcoholic beverages on the day of the murder, the defendant advised he had ingested three valium pills and had consumed about a six-pack or two six-packs of beer that day with friends, becoming slightly intoxicated. The defendant's friends were subsequently interviewed and they advised between 2:45 in the afternoon and 7:15 in the evening of the day of the murder, the defendant consumed about five or six beers and smoked a small amount of marijuana while watching the Super Bowl on television. They all noted the defendant did not appear intoxicated when he left to go home with witness Shoemaker. When reinterviewed, Shoemaker confirmed his friends' statements, indicating the defendant might have been slightly "high" but not intoxicated.

VICTIM'S STATEMENT:

Due to the nature of the offense, a victim's letter was sent to the decedent's daughter, Barbara Halstead, 1396 Harbor View Avenue in San Jose. Any subsequent information will be submitted to the Court if received prior to the date of sentencing.

DEFENDANT'S STATEMENT:   (Requested - Not Received)

Upon advice of his attorney, the defendant did not provide either a written or verbal statement.

Regarding his alcohol and narcotic consumption habits, the defendant advised he began imbibing alcohol at age 13, and since that time, his consumption habits have steadily increased until last year when he was consuming two to three six-packs of beer per day, becoming intoxicated on the average of four times per week. At age 14, the defendant was introduced to the use of marijuana, and for the past two years, he has been smoking an average of three or four marijuana cigarettes per day. Since age 15, the defendant noted he has sporadically used amphetamines. The defendant denied the utilization of all other controlled substances except for a brief period of experimentation with LSD at age 16. An examination of his arms failed to reveal any indications of intravenous drug usage.

FAMILY HISTORY:

The defendant is a single, 18-year-old native of San Jose, California, who, when not in custody, lists his address as that of his

c .... Available

Phyllis A. Maidy 9-28-82

I certify that this image is a true copy per master certification on this fiche.
Name Mary Carruthers Date 9-23-

IN THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA

                                        Plaintiff,

                    vs.                                    REPORT OF
                                                ADULT PROBATION OFFICER
RICKY ALLEN CARPENTER            Defendant,      No. 68287
                                                 August 4, 1978
                                                 A. Nudelman, D.A.
                                                 P. Mansfield, Atty.


CHARGE:  Count One, Section 187 of the Penal Code (Murder), First
         Degree, with Section 12022(b) of the Penal Code (Did
         Use a Deadly Weapon), Found True

         Count Two, Section 484 of the Penal Code (Petty Theft)

DATE OF ARREST:  January 30, 1978  (Santa Clara County Sheriff's
                                    Office)

DATE OFFENSE COMMITTED:  January 15, 1978

DAYS IN JAIL AT TIME OF REPORT:  187 actual days; presently in cus-
                                 tody.

PLEA OR CONVICTION:  On 7/10/78, the def. was found Guilty by Jury
                     Verdict of Ct. 1, a viol. of Sec. 187 PC (Mur-
                     der), stipulated to be 1st Deg., w/Sec. 12022(b)
                     PC (Did Use a Deadly Weapon), Found True. & Ct.
                     2, Sec. 484 PC (Petty Theft), a LIO of Sec.
                     211 PC (Robbery), w/Sec. 12022(b) PC (Did Use
                     a Deadly Weapon).

AGE & DATE OF BIRTH:  18; August 16, 1959; San Jose, California


INVESTIGATING OFFICERS' REPORT:

The Court, having presided over the Jury Trial in this matter, is
aware of the factual situation surrounding the present offense.
The following information is a summarization of statements made
in the Santa Clara County Sheriff's report and the testimony pro-
vided at the Preliminary Examination.

At about 8:50 a.m., on January 16, 1978, deputies of the Santa
Clara County Sheriff's Department responded to 464 Sundy Avenue
in San Jose, to investigate a report called in by a neighbor, who
suspected foul play might have occurred at that residence as the
lights were on the and the front door was open. Upon their arrival,

8170 REV 6/77

Best Copy Available

Phyllis A. Mardy 9-28-82

I certify that this image is a true copy per master certification on this fiche
Name Mary Carratta Date 9-28-82

In the Case of: **RICKY CARPENTER**
Charge: Secs. 187 & 484 PC
Santa Clara County Number 68207

August 4, 1978

### INVESTIGATING OFFICERS' REPORT: (Continued)

deputies noted several lights were on at the residence and the
front door was completely open, although the screen door was
closed.

After entering the residence, the deputies proceeded down the
hallway to the master bedroom, where they discovered the body of
Evelyn Bentley, age 57. The victim, clad in pajamas and a dressing
gown, was lying on her back on the floor with her head toward the
side of the bed and her feet toward the hallway. All her upper
garments were soaked in blood as was the area rug under her head
and the adjacent hardwood floor. There was a kitchen butcher's
knife by the victim's right shoulder and the blade was covered
with blood. Although the bed had not been slept in, drops of
blood were found on the pillow case and the bedspread. Drops of
blood were also discovered on the victim's nearby handbag and wal-
let, which contained no currency. In the living room, deputies
located a telephone which appeared to have been pulled or cut
loose from the wall. Investigating officers observed no signs of
forced entry, noting all the doors to the residence were locked
except the front door.

While investigating the scene of the homicide, officers contacted
reporting party and next door neighbor Sandra DiMascio, who ad-
vised she had engaged in a telephone conversation with the vic-
tim at about 2:00 p.m. on the previous day. At that time, wit-
ness DiMascio noted the victim was happy as it was her birthday
and she was looking forward to visiting her daughter in Oregon in
the near future. At about 11:30 that evening, the witness noted
the lights were still on in the victim's residence and the front
door was ajar. She then attempted to telephone the victim, but
received no response. On the following morning, the witness's
daughter noted the victim's front door was still open and the
lights were still on. Concerned over this situation, the witness
entered the victim's residence with another next door neighbor
and called the victim's name. Upon receiving no response, they
went to the garage and observed the victim's automobile still
parked inside. Fearful something was wrong, witness DiMascio
left the residence without checking the bedrooms and summoned
authorities.

In the afternoon of January 16, 1978, an autopsy was performed
on the victim's body by the Santa Clara County Coroner's Office.
During the autopsy, the medical examiner determined the victim
died of a stab wound to the neck. This wound was caused by a
sharp instrument entering the right side of the neck and penetrat-
ing through the left side. The sharp instrument passed trans-
versely through the neck, fracturing the right hyoid horn, pene-
trating the right larynx, and transecting the epiglottis. The
wound tract continued to the left side of the upper larynx, in-

-2-

Case 3:06-cv-01799-WHA    Document 8-4    Filed 05/12/2006    Page 9 of 13

*Phyllis A. Moody 9-28-82*

I certify that this image is a true copy per master certification on this fiche.

Name *Mary Caruthers*  Date *9-28-82*

In the Case of: RICKY CARPENTER
Charge:  Secs. 187 & 484 PC
Santa Clara County Number 66207

August 4, 1978

INVESTIGATING OFFICERS' REPORT:  (Continued)

volving the upper esophagus and the left hyoid horn.  Additionally, there were seven other stab wounds to the victim's body; one to the back of the head; one to the anterior left shoulder with a depth of four and one-half inches; and a cluster of five stab wounds on the left breast, each about five and one-half inches in depth.  The medical examiner noted the victim had also sustained numerous contusions and abrasions to her head, including a two-inch contusion of the upper right ear, a three-inch contusion surrounding the right eye, and several abrasions on her lips.

During the course of their investigation, officers contacted Barbara Holstead, the victim's married daughter, and several of the victim's neighbors and friends.  All of the victim's friends and neighbors noted the victim was a very religious woman who kept her residence clean and securely locked at all times.  They advised although she had been divorced for about three years, she had no known boyfriends.  The neighbors indicated they had viewed no one at the victim's residence at the time of her demise.

In her statement, Barbara Holstead advised on December 24, 1977, she had given her mother a personal check in the amount of $126, which was to be utilized by the victim for plane fare to Eugene, Oregon.  Witness Holstead noted her mother apparently then cashed the check at the Stevens Creek Branch of the Crocker National Bank on January 13, 1978.  A subsequent review of bank files revealed the victim had deposited two checks on that date, one in the amount of $126.00 and the second in the amount of $97.03.  However, officers learned the victim had retained $57.03 in currency, making a deposit of only $166.00.  Investigating officers noted they had been unable to discover any currency in the victim's purse or residence leading them to suspect the victim had been robbed at the time of her demise.

On January 18, 1978, investigating officers received a telephone call from witness Graham, who advised she was a babysitter for Sandra DiMascio, a next door neighbor to the victim.  The witness related on the evening of the murder, Sandra DiMascio was visiting her residence when DiMascio received a telephone call from her son, Ricky Carpenter.  Upon answering the telephone, DiMascio asked her son why he was so upset and excited.  When DiMascio had finished with the telephone call, she advised witness Graham that her son wanted her to bring home some ice cream.  Believing the request for ice cream was strange when her friend's son was apparently very excited, witness Graham decided she would advise authorities of the telephone conversation.

Several hours later, police received a telephone call from witness Comen, who advised while picking up her daughter at witness Graham's

-3-

*Phyllis J. Moody 9-28-82*

I certify that this image is a true copy per master certification on this fiche.
Name *Mary Carruthers*   Date 9-28-82

In the Case of:  RICKY CARPENTER
Charge:  Secs. 187 & 484 PC
Santa Clara County Number 68287                    August 4, 1978

INVESTIGATING OFFICERS' REPORT:  (Continued)

residence, she overheard Sandra DiMascio's daughter indicate to her
mother that Ricky could have done it as he had a key to the vic-
tim's residence. Witness Gomez then heard Sandra DiMascio advise
her daughter that the victim had changed her locks a long time ago.

Pursuant to this information, officers interviewed Ricky Carpenter,
subsequently determined to be the defendant in this matter. The
defendant denied ever having possessed a set of keys to the vic-
tim's residence or entering her house. He advised on the evening
of the victim's demise, he was visited by a friend, Louis Shoemaker,
afterwhich he fell asleep while watching television. At about
10:00 that evening, he awakened with a dry throat due to a cold
and he subsequently telephoned his mother at witness Graham's
residence, instructing her to bring home some ice cream. During
that telephone conversation, the defendant advised his mother
never asked him why he was so excited. Thereafter, he noted he
fell asleep until Monday morning when the victim's body was found.

In order to verify the defendant's statements, the investigating
officers then interviewed Louis Shoemaker who advised he had
arrived at the DiMascio residence at about 6:00 on the evening of
the murder and departed for home about an hour and one-half later.
During the visit, witness Shoemaker noted the defendant was ill
with a bad cold and they had remained inside the DiMascio resi-
dence, listening to records and making a couple of telephone calls
to some friends.

Thereafter, officers reinterviewed witness Sandra DiMascio, who in-
dicated she had gone grocery shopping with her daughter and wit-
nesses Graham and Gomez from about 4:30 to 8:00 on the evening of
the murder. When the four of them returned to her home, witness
DiMascio noted the defendant and his friend, Louis Shoemaker,
were at the residence. According to witness DiMascio, she, her
daughter, and her two friends, remained at the residence for only
one half hour before departing for the Graham residence where she
remained until 11:00 that evening. During her visit at the Graham
residence, witness DiMascio noted she did receive a telephone call
from her son, who asked her bring home some ice cream as he was
not feeling well. Upon returning home with her daughter, witness
DiMascio noted victim Bentley's door was ajar and there were
lights on in the residence. Witness DiMascio then entered her own
residence and discovered her son asleep on the living room couch.
The witness attempted to awaken him to help her investigate the
suspicious circumstances at the Bentley residence, but she was un-
successful in arousing him. Unwilling to go alone, the witness was
to bed although she made several attempts to reach the victim by
telephone before falling asleep. On the following day, she did a
cursory inspection of the victim's residence with a neighbor and
subsequently summoned police. Following the interview with witness
DiMascio, officers asked the defendant if he would voluntarily

-4-

Phyllis A. Murphy 9-28-82

I certify that this image is a true copy per master certification on file here
Name Mary Caruthers    Date 9-28-82

In the Case of: RICKY CARPENTER
Charge: Secs. 187 & 464 PC                                    August 6, 1976
Santa Clara County Number 68207

**INVESTIGATING OFFICERS' REPORT:** (Continued)

submit to a polygraph examination. The defendant agreed, indicating he was not involved in the murder and he had nothing to hide.

At about 1:00 on January 30, 1976, a polygraph examination was administered to the defendant. Two hours later, the technician contacted investigating officers and advised the test results indicated the defendant was being untruthful concerning victim Bentley's death, and upon further inquiry, the defendant had confessed to causing the victim's death. The defendant had advised the technician that on the night in question, victim Bentley came over to the DiMascio residence, requesting assistance from the defendant as she thought there was a prowler in her backyard. According to the polygraph technician, the defendant then advised he went next door and after checking the backyard and finding no prowler, he entered the Bentley residence, where the victim began making sexual advances to him. When the defendant refused her advances, the victim came at him with a knife, which he succeeded in removing from her grasp, subsequently stabbing her.

Upon waiving his rights, the defendant admitted he had just provided a statement to the polygraph technician and he agreed to make a further statement to police. However, the defendant related his statement to the technician had not been altogether truthful. The defendant related following his mother's departure at about 8:00 on the evening in question, he suddenly decided to kill victim Bentley. Although the victim had done nothing to him personally in the past, the defendant indicated he disliked her, as she approved of the separation of his mother and stepfather. While wearing leather gloves, the defendant walked over to the Bentley residence and knocked on the front door, explaining he needed to use her telephone as his own was out of order. The ruse succeeded and the victim unlocked the front door, allowing him to enter. The defendant then followed the victim to the master bedroom where the telephone was located. As she turned to walk out of the bedroom with the telephone, which was on a long extension cord, the defendant struck her in the face with his fist, causing her to fall to the floor near the bed. When the victim began to struggle, the defendant choked her into unconsciousness. The defendant then procured a butcher's knife from the kitchen and stabbed her several times in the chest, causing her to regain consciousness. As the victim began to struggle, the defendant attempted to suffocate her with a small area rug on the floor, leaving the knife embedded in her chest. When his attempts to kill her in this manner proved unsuccessful, he pulled the knife out of her chest, removed the area rug from her face, and stabbed her through the right side of her neck.

Following her death, the defendant viewed the victim's handbag a few feet away on the floor and subsequently removed about $42 from the wallet. He then went home and undressed, washing his blood.

I certify that this image is a true copy per master certification on this fiche.

Name Morris Cruning  Date 9-27-5—

Charles J. Mealy 9-28-82

In the Case of: RICKY CARPENTER
Charge: Secs. 137 & 484 PC                                    August 4, 1978
Santa Clara County Number 58207

FAMILY HISTORY:  (Continued)

mother's residence located at 464 Bundy Avenue, San Jose, 95117
(verified). The defendant noted he has been a lifelong resident
of Santa Clara County.

The defendant is the oldest of two sons born to Marvin and Sandra
Chanian Carpenter who legally dissolved their union when the de-
fendant was about six years of age. The defendant's mother, a
postal clerk in San Jose, recently separated from her second
husband, John DiMascio, the manager of Roads of San Mateo. The
defendant's father, who has remarried, is a self-employed beach
concession operator in San Diego. The defendant's only brother,
Ronnie, age 14, is presently classified as a runaway from the
Boys' Ranch where he was recently placed for Lewd and Lascivious
Conduct. The defendant's half sister, Laura, age eight is at home
and attending school. As a result of his father's second marriage,
the defendant advised he has three half siblings.

The defendant advised he has never been married and has no depend-
ents.

At age 17, the defendant withdrew from Blackford High School in
San Jose, prior to the completion of the 12th grade as he was un-
able to graduate due to lack of sufficient credits. Since that
time, the defendant advised he has not attempted to complete his
education. (Verification of the defendant's schooling has been
requested and will be submitted to the Court if received prior to
the date of sentencing.

WORK RECORD:

The defendant, who lists his occupation as forklift operator, has
been unemployed since October of 1977. During this period of un-
employment, the defendant advised he has been supported by his
mother. For three months beginning in August of 1977, the defen-
dant was employed as a forklift operator for the National Canning
Company in San Jose, where he earned $5.81 hourly until he was laid
off at the end of the season. For one month in May of 1977, the
defendant was employed as a kitchen maintenance worker for Harrah's
Casino in South Lake Tahoe, Nevada. For four months beginning in
January of 1977, the defendant was employed as a kitchen mainten-
ance worker for Harvey's in South Lake Tahoe, Nevada. For six
months in 1976, the defendant was employed as general help for the
Campbell Pet Shop in Campbell. The defendant was forced to termi-
nate his employment from this company when the business went
bankrupt. Verification of the defendant's work history has been
requested and will be submitted to the Court if received prior to
the date of sentencing.

The defendant has no military history.

-7-

Case 3:08-cv-01099-WHA    Document P-4    Filed 05/12/2008    Page 13 of 13

In the Case of:  RICKY GARDNER
Charge:  Secs. 187 & 484 PC
Santa Clara County Number 68287                    August 4, 1978

PRIOR RECORD:  CII #:  A6 282 646  (First Known Adult Arrest)

            Juvenile Record - Santa Clara County  (Attached)

        FBI #:  25 2 339 W16

        SS #:  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

CONDUCT WHILE IN CUSTODY:  (No Adverse Reports Received)

INTERESTED PARTIES:

Attached for the Court's perusal is a medical report compiled by
Dr. Douglas M. Harper, indicating, in his opinion, the defendant was
in control of his thought processes during the offense and there
was no evidence of diminished capacity with respect to the defen-
dant's consumption of valium and alcohol.  The doctor considered
the defendant legally sane pursuant to Section 1026 of the Penal
Code.  Also attached for the Court's perusal are two Juvenile
Court reports.

Several attempts were made to contact the defendant's mother,
Sandra DiMascio.  However, all attempts to date have been unsuc-
cessful and any subsequent information or statements will be
submitted to the Court if received on a timely basis.

FINANCIAL REPARATION:

As the defendant has no income or assets at the present time, it is
felt he is not capable of paying a fine pursuant to Section 13967
of the California Government Code.  However, it is felt the defen-
dant should pay the $5 penalty assessment pursuant to this Code
Section.

DISCUSSION:

Circumstances in Mitigation:

The defendant has no prior record as an adult and only two adjudica-
tions as a juvenile in 1975 (Rule 423(b)(1).

Circumstances in Aggravation:

The defendant took advantage of a position of trust to commit the
offense (Rule 421(a)(12)).

Enhancements:

As the jury found the defendant did use a deadly weapon during the
murder pursuant to Section 12022(b) of the Penal Code, the defendant's

# EXHIBIT  D

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**RECORDS COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
)  CDC Number B-95921
)
RICKY CARPENTER )
_____)

CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

SEPTEMBER 21, 2006

PANEL PRESENT:

Linda Shelton, Presiding Commissioner
Joan Thompson, Deputy Commissioner

OTHERS PRESENT:

Ricky Carpenter, Inmate
Johanna Hoffmann, Attorney for Inmate
Ronald Rico, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes          See Review of Hearing
                     Transcript Memorandum

**Kerry Viens**    Northern California Court Reporters

ii

<u>INDEX</u>

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 7 |
| Pre-Commitment Factors | 10 |
| Post-Commitment Factors | 19 |
| Parole Plans | 27 |
| Closing Statements | 50 |
| Recess | 68 |
| Decision | 69 |
| Adjournment | 79 |
| Transcriber Certification | 80 |

--oOo--

1

<u>P R O C E E D I N G S</u>

1             **PRESIDING COMMISSIONER SHELTON:**  Good morning,

2    everyone.  We are here for a subsequent parole

3    consideration hearing for Ricky Carpenter, CDC number B

4    as in boy 95921.  Today's date is September 21st, 2006.

5    The time is about 8:50 a.m., and we are located at San

6    Quentin State Prison.  Mr. Carpenter was received on

7    August 10th, 1978, committed from Santa Clara County.

8    His life term began that same date, August 10th, 1978,

9    and he has a minimum eligible parole date of November

10   30th, 1985.  The controlling offense for which Mr.

11   Carpenter is committed is set forth in case number

12   68207, charging Count 1, violation PC 187, murder in

13   the first degree with a 12022B, use of a weapon, as

14   well, Count 2, PC 484, petty theft.  Mr. Carpenter

15   received a term of seven years to life.  All right.

16   Mr. Carpenter, this hearing is being tape recorded, so

17   we're going to go around the room and introduce

18   ourselves, say our first name, our last name, spell our

19   last name; and, when we get to you, I would like to you

20   add your CDC number.  My name is Linda Shelton, S-H-E-

21   L-T-O-N, Commissioner.

22         **DEPUTY COMMISSIONER THOMPSON:**  My name is Joan

23   Thompson, T-H-O-M-P-S-O-N, Deputy Commissioner.

24         **PRESIDING COMMISSIONER SHELTON:**  Mr. Rico?

25         **DEPUTY DISTRICT ATTORNEY RICO:**  Ronald Rico, R-

26   I-C-O, Deputy District Attorney, Santa Clara County,

2

1    participating by video conference.

2         INMATE CARPENTER:  Rick Carpenter, C-A-R-P-E-N-

3    T-E-R, my number is B-95921.

4         ATTORNEY HOFFMANN:  Johanna Hoffmann, H-O-F-F-M-

5    A-N-N, attorney for Mr. Carpenter.

6         PRESIDING COMMISSIONER SHELTON:  And we have two

7    officers in the room for security purposes who will not

8    be participating in today's hearing.  All right.  Mr.

9    Carpenter, you signed BPT form 1073 July 6, '06.  That

10   form indicated that you had no disabilities that needed

11   accommodation.  As well, you signed a similar form

12   today that's signed accommodation for disabilities

13   outline appearing procedure, and it's marked Exhibit 2.

14   I want to clarify for the record, you're not wearing

15   any glasses, and you don't need any glasses?

16        INMATE CARPENTER:  No.

17        PRESIDING COMMISSIONER SHELTON:  Good.  And your

18   hearing's okay?

19        INMATE CARPENTER:  Yes.

20        PRESIDING COMMISSIONER SHELTON:  And mobility,

21   you walk, sit, stand comfortably for a period of time?

22        INMATE CARPENTER:  Yeah.

23        PRESIDING COMMISSIONER SHELTON:  Are you on any

24   medication at all, sir?

25        INMATE CARPENTER:  No, I'm not.

26        PRESIDING COMMISSIONER SHELTON:  So it appears

27   to me that you're ready to move forward with this

3

1   hearing?

2         INMATE CARPENTER:  Yes, I am.

3         PRESIDING COMMISSIONER SHELTON:  Counsel, would

4   you concur?

5         ATTORNEY HOFFMANN:  Yes, I would.  Thank you.

6         PRESIDING COMMISSIONER SHELTON:  All right.

7   Terrific.  Mr. Carpenter, you've been to these hearings

8   before?

9         INMATE CARPENTER:  Yes.

10        PRESIDING COMMISSIONER SHELTON:  So, tell me

11   what these hearings are about.  Why are you here?

12        INMATE CARPENTER:  About my suitability for

13   parole.

14        PRESIDING COMMISSIONER SHELTON:  Excellent.  I

15   want to go over a couple of rights.  You have certain

16   rights, and these rights include the right to a timely

17   notice of a hearing, the right to review your file, and

18   the right to present relevant documents.  Counsel, have

19   we met your client's rights so far?

20        ATTORNEY HOFFMANN:  To the best of my knowledge,

21   they have been met.  Thank you.

22        PRESIDING COMMISSIONER SHELTON:  You also have a

23   right to be heard by an impartial Panel.  And your

24   Panel today would be Commissioner Thompson and myself.

25   Is that all right with you?

26        INMATE CARPENTER:  Yes, it is.

27        PRESIDING COMMISSIONER SHELTON:  Okay.  Thank

4

1    you.  As well, I wanted to let you know that a couple

2    of years ago the regulations for appealing these

3    hearings changed so, if you need additional information

4    with regards to that, talk with your attorney or you

5    can find out more information at the prison law

6    library.  Okay?

7         INMATE CARPENTER:  Yes.

8         PRESIDING COMMISSIONER SHELTON:  Now, sir, you

9    are not required to admit or discuss your offense.

10   This Panel does accept as true the findings of the

11   court.  Do you understand what that means?

12        INMATE CARPENTER:  Yes.

13        PRESIDING COMMISSIONER SHELTON:  Why don't you

14   tell me what that means?

15        INMATE CARPENTER:  It means that I was found

16   guilty in the court; and, therefore, the Board

17   perceives me as being guilty of my charges.

18        PRESIDING COMMISSIONER SHELTON:  Yeah.  We're

19   not here to retry your case.

20        INMATE CARPENTER:  No.

21        PRESIDING COMMISSIONER SHELTON:  Okay.  Great.

22   Commissioner, do we have any confidential information?

23        DEPUTY COMMISSIONER THOMPSON:  Yes, there is

24   confidential information in the file; but, no, it will

25   not be used in this hearing.

26        PRESIDING COMMISSIONER SHELTON:  Okay.  I pass

27   the hearing checklist to Miss Hoffmann.  Mr. Rico do

5

1    you have all the documents necessary to move forward?

2         DEPUTY DISTRICT ATTORNEY RICO:  Commissioner, I

3    have the checklist that's dated lower right corner

4    8/17/06.  I have all of those documents.  I'm ready to

5    proceed today.

6         PRESIDING COMMISSIONER SHELTON:  All right.

7    Thank you, sir.  Okay.  Are there any additional

8    documents to be submitted?

9         ATTORNEY HOFFMANN:  The only additional

10   documents that I would like the record to reflect that

11   the District Attorney does not have, as far as I know,

12   it's an updated 2006 psychological evaluation, and a

13   couple of letters of support, which, I believe, the

14   commissioner will thoroughly review during the hearing.

15        DEPUTY DISTRICT ATTORNEY RICO:  And, thank you,

16   Counsel.  I did receive, it looks like a fax, September

17   2006, Psychosocial Assessment dated August 24, '06.

18        PRESIDING COMMISSIONER SHELTON:  Yes.

19        ATTORNEY HOFFMANN:  Wonderful.

20        PRESIDING COMMISSIONER SHELTON:  Good.

21        DEPUTY DISTRICT ATTORNEY RICO:  That was

22   recently faxed.  Thank you.

23        PRESIDING COMMISSIONER SHELTON:  All right.

24   Thank you, very much.

25        ATTORNEY HOFFMANN:  Thank you.

26        PRESIDING COMMISSIONER SHELTON:  Are there any

27   preliminary objections?

6

1      **ATTORNEY HOFFMANN:**  I would object to the

2    presence of the District Attorney in that I did not

3    receive notice of his presence or participation until I

4    arrived at the prison for hearings yesterday.

5    According to Title 15, section 2030, the prosecutor

6    shall notify the prison within two weeks if he or she

7    plans on attending and that the prisoner's attorney

8    shall be notified of the prosecutor's attendance.  And,

9    as I said before, I didn't receive notice until

10   yesterday.

11     **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner?

12     **PRESIDING COMMISSIONER SHELTON:**  Yes, sir?

13     **DEPUTY DISTRICT ATTORNEY RICO:**  Just for the

14   record, I did notify Sacramento.  I notified the

15   prison.  I generally do not have any identifying

16   information about counsel, so if counsel didn't get

17   notification, her problem is with the prison rather

18   than with me.

19     **PRESIDING COMMISSIONER SHELTON:**  We're aware of

20   that.  We had a similar situation yesterday, and we're

21   trying to straighten out communications, so I

22   appreciate you acknowledging that you did notify

23   Sacramento, and I'm going to overrule counsel's

24   objections with regards to that.  We're trying to

25   straighten out some communication issues.  All right.

26   Will your client be speaking with us today?

27     **ATTORNEY HOFFMANN:**  Yes, he will.

7

1          PRESIDING COMMISSIONER SHELTON:  In all regards?

2          ATTORNEY HOFFMANN:  Yes.

3          INMATE CARPENTER:  Yes.

4          PRESIDING COMMISSIONER SHELTON:  All right, sir.

5    Please raise your right hand.  Do you solemnly swear or

6    affirm that the testimony you give at this hearing will

7    be the truth, the whole truth and nothing but the

8    truth?

9          INMATE CARPENTER:  I do.

10          PRESIDING COMMISSIONER SHELTON:  All right.

11    We're going to move forward.  I will be discussing with

12    you the offense summary, and your prior record as well

13    as your social history.  I'm going to enter into the

14    record the summary of the offense as taken from the

15    April 2006 Board report; and, when I finish doing that,

16    then I will give you an opportunity to speak to what

17    happened from your perspective.  All right, sir?

18          "On January 16th, 1978, Santa Clara

19          sheriff's deputies responded to a

20          residence as the lights were on and the

21          front door was ajar.  Deputies discovered

22          the body of Evelyn Bentley clad in

23          pajamas and a dressing gown lying on her

24          back on the floor.  Her upper garments

25          were soaked in blood as was the rug under

26          her head and the hardwood floor.  There

27          was a kitchen, in parenthesis butcher's

8

1      knife lying by Bentley's right shoulder

2      with the blade covered in blood.  When

3      deputies interviewed Ricky Carpenter, he

4      related that following his mother's

5      departure at about 8:00 p.m., he suddenly

6      decided to kill Bentley.  He disliked her

7      because she approved of the separation of

8      his mother and step father.  Carpenter

9      walked over to the Bentley residence and

10     knocked on the front door explaining that

11     he needed to use the telephone as his was

12     out of order.  Bentley unlocked the door

13     allowing Carpenter to enter.  Carpenter

14     followed Bentley to the master bedroom

15     where the telephone was located.

16     Carpenter then struck Bentley in the face

17     with his fist, causing her to fall to the

18     floor.  When Bentley began to struggle,

19     Carpenter tripped her, choked her into

20     unconsciousness, picked up a butcher's

21     knife in the kitchen and stabbed her

22     several times in the chest.  Carpenter

23     attempted to suffocate Bentley with a

24     small area rug on the floor, leaving the

25     knife embedded in her chest.  When

26     Carpenter's attempts to kill Bentley in

27     this matter proved unsuccessful, he

9

1           pulled the knife out of her chest,

2           removed the area rug from her face, and

3           stabbed her through the right side of the

4           neck, causing her death."

5    All right.  Mr. Carpenter, why don't you tell me what

6    was going on with you that day?

7          INMATE CARPENTER:  I was in an argument earlier

8    that day with my mother, but, to understand, I agree

9    with the facts of the case.  I killed Mrs. Bentley.  I

10   don't believe some of that, it seems like -- it's a

11   terrible crime, and it seems like it's built up to even

12   look terrible.  Some of the facts, I mean, they're

13   small in nature, but I agree with what you just read.

14   To understand, I think, to understand the crime, I

15   mean, you have to understand a little bit about my

16   background, who I was up to that day because that day

17   will never be explainable.  I can't explain why I did

18   that to Mrs. Bentley.  I can only understand where I

19   was in my life, and that took me to that point.  As far

20   as the excuse that I felt that she was a hindrance with

21   my step father and mother as to getting separated.  She

22   had just gotten separated probably a year earlier, and

23   that, let me just back track a little bit.

24         PRESIDING COMMISSIONER SHELTON:  Just take your

25   time.

26         INMATE CARPENTER:  I was born -- can I start

27   from the beginning.  I'll be fast.  I'll try to move

10

1   right along.

2          PRESIDING COMMISSIONER SHELTON:  You want to

3   talk about your social history?

4          INMATE CARPENTER:  Yes.  Because it is really

5   important to understand my social history to understand

6   the crime.

7          PRESIDING COMMISSIONER SHELTON:  Okay.  Well,

8   let's do this.  Let's take a look at your prior record.

9   Talk about your social history and meld all that into

10  leading you up to the spot where you did that.  Okay?

11  Does that sound decent?

12         INMATE CARPENTER:  Thank you.

13         PRESIDING COMMISSIONER SHELTON:  With regards to

14  prior records, you only have a juvenile record because

15  you were 18 at the time of this offense, correct?

16         INMATE CARPENTER:  Yes.

17         PRESIDING COMMISSIONER SHELTON:  And basically

18  your juvenile record says you did a burglary in January

19  of '75, and you received six months probation?

20         INMATE CARPENTER:  Yes.

21         PRESIDING COMMISSIONER SHELTON:  Was that a

22  burglary of a residence?

23         INMATE CARPENTER:  Yes.

24         PRESIDING COMMISSIONER SHELTON:  Then in July

25  '75, you had fire crackers.

26         INMATE CARPENTER:  Yes.

27         PRESIDING COMMISSIONER SHELTON:  And evidently

11

1    that was dismissed.  Was there anything else that you

2    got arrested for?

3           INMATE CARPENTER:  No.

4           PRESIDING COMMISSIONER SHELTON:  Then why don't

5    we talk about you.  I have, with regards to your social

6    history, let's walk through it together.  I want to

7    verify your birth date of August 16th, 1959.

8           INMATE CARPENTER:  Yes.

9           PRESIDING COMMISSIONER SHELTON:  And where were

10   you born, sir?

11          INMATE CARPENTER:  San Jose.

12          PRESIDING COMMISSIONER SHELTON:  San Jose?

13          INMATE CARPENTER:  Yes.

14          PRESIDING COMMISSIONER SHELTON:  Okay.  I'm

15   going to walk you through this a little bit so I have

16   some kind of an outline in my head.  Did you have any

17   brothers and sisters?

18          INMATE CARPENTER:  Yes.  I have one brother and

19   one half sister.

20          PRESIDING COMMISSIONER SHELTON:  And were they

21   in the household with you growing up?

22          INMATE CARPENTER:  No, ma'am.  I'm the oldest of

23   three.  My brother lived with my great aunt when he was

24   born.  At an early age, he went to live with my great

25   aunt.  My sister is ten years younger than me; and,

26   when she was born, I came to live with my step father

27   and mother.  But, prior to that, I was back and forth

12

1    from my grandparents and my mother.  My mother was

2    really young when she had me.  She had to get married

3    in 1959, a Catholic family, you have to get married.

4    The marriage didn't last.  She was divorced, and I

5    think was an outcast from the family.  My grandparents

6    treated her like the, I will say the --

7         PRESIDING COMMISSIONER SHELTON:  The plague?

8         INMATE CARPENTER:  Yeah.  Step daughter, you

9    know, the --

10         PRESIDING COMMISSIONER SHELTON:  Yeah, Catholic

11    family.

12         INMATE CARPENTER:  Yeah.  So she was outcast and

13    didn't have no education, had to take jobs that, well,

14    that an uneducated person.  She was a go go dancer, and

15    different things.  And, from time to time, when she was

16    doing well, I would go live with her, stay with her for

17    short periods of time.  And seeing the life style in

18    which she lived, I was right there.  So that was not

19    very good for a young kid, but I was tossed back and

20    forth.  And, when I would come stay with her, I think

21    out of her own guilt and the way she was treated, she

22    would be real giving to me rather than being a parent

23    and nurturing me that she should, it was easier to give

24    me $5, send me on my way, show her love that way.  When

25    finally I did go live with -- my sister was born, and I

26    lived with my step father and my sister and my mom.

27    She took on a good job as a postal worker, and it was

13

1    the way a family should be, the way I seen a family

2    should be through my eyes, my friends' families.  So I

3    was happy.  I was happy and content; but, yet, I had

4    learned that I didn't have to follow the rules.  There

5    was no rules.  I didn't know the rules.  There really

6    was no rules or boundaries set forth around me, and at

7    a younger age, like I said, it was okay because I

8    wasn't in trouble.  I wasn't forced to go to school,

9    wasn't made to do my homework, and I learned, I learned

10   a life on the streets, I guess.  My education was from

11   the streets.  I think that, what finally happened is

12   that I guess she seen, my step father tried to use

13   authority on me, and she wouldn't allow it.  She said,

14   'You know, it's not your kid.  Let me raise him.'  And,

15   so, it was real easy for me, I guess, to manipulate

16   things the way I want.

17           **PRESIDING COMMISSIONER SHELTON:**  Played them

18   against each other?

19           **INMATE CARPENTER:**  Against each other.  I was

20   able to, you know, but -- as it came time for me to

21   graduate from school, I wasn't graduating.  I couldn't

22   hold a job.  I couldn't even read or write.  I mean, I

23   had no education at all.  The tables had turned.  Now,

24   with my mother, there was on me, you know, on me to do

25   something with my life.  And that felt like the

26   influence was coming from Mrs. Bentley.  It was a

27   new -- it was her new relationship.  She befriended

14

1    Mrs. Bentley and was friends with Mrs. Bentley, and I

2    was using drugs and alcohol, and, you know, and

3    couldn't think clear.  Going back, Mrs. Bentley was

4    probably lonely as I look back on it, and seeking a

5    friend, you know.

6        PRESIDING COMMISSIONER SHELTON:  Were you

7    jealous of that relationship between your mom and Mrs.

8    Bentley?

9        INMATE CARPENTER:  No.  I felt like -- I felt

10   like they talked about her problems.  My mother had

11   problems at home, and what Mrs. Bentley had been

12   through.  I think that's what they talked about and my

13   mom was feeling that possible separation, they were

14   going to get separated, my step dad and her, and I felt

15   like it was being influenced for her.  I don't think

16   that -- my mom passed away in '97.  They stayed

17   together.  She passed away as married to my step

18   father.  But --

19       PRESIDING COMMISSIONER SHELTON:  So you saw Mrs.

20   Bentley meddling into family affairs?

21       INMATE CARPENTER:  Yes.

22       PRESIDING COMMISSIONER SHELTON:  I know I read

23   somewhere in your file that where her home was, which

24   was across the street from your home, she could watch

25   your comings and goings.

26       INMATE CARPENTER:  Actually her house was set,

27   it was next door, but her kitchen was set up turned

15

1    sideways to where I entered in the garage of my house

2    because my room was right there, and I would enter

3    late, late hours with alcohol, go to the backyard.

4    And, anyone in the world knew, yes, it was Mrs.

5    Bentley.  Mrs. Bentley would be seeing me.

6           PRESIDING COMMISSIONER SHELTON:  So you were

7    under the influence of drugs and alcohol that day or

8    night when you killed her?

9           INMATE CARPENTER:  Yes.

10          PRESIDING COMMISSIONER SHELTON:  What were you

11   on?

12          INMATE CARPENTER:  I had taken some valiums and

13   been drinking hard liquor and beer.

14          PRESIDING COMMISSIONER SHELTON:  How old were

15   you when you started drinking?

16          INMATE CARPENTER:  Regularly, probably around

17   15.

18          PRESIDING COMMISSIONER SHELTON:  And you drank

19   whatever you could get your hands on?

20          INMATE CARPENTER:  Yes, from under the cabinet,

21   under the sink to whatever I could get.

22          PRESIDING COMMISSIONER SHELTON:  What about --

23   how old were you when you started drugs?

24          INMATE CARPENTER:  Probably smoked pot -- well,

25   I probably smoked pot for the first time I was like 12

26   or 13.  Growing up, I seen my parents smoking, smoking

27   hash and pot from the age of probably 9.

16

1  PRESIDING COMMISSIONER SHELTON:  Did they give

2  you drugs?

3  INMATE CARPENTER:  No.  I didn't want none.  I

4  felt it was wrong, knew it was wrong.  I didn't want

5  any.  But I was always around it.

6  PRESIDING COMMISSIONER SHELTON:  But you did use

7  them anyway?

8  INMATE CARPENTER:  Yes.  Later on I did

9  because --

10  PRESIDING COMMISSIONER SHELTON:  So what kinds

11  of drugs have you tried in your lifetime, so to speak?

12  INMATE CARPENTER:  Pretty much everything.

13  PRESIDING COMMISSIONER SHELTON:  When was the

14  last time you were under the influence, sir?

15  INMATE CARPENTER:  1998.

16  PRESIDING COMMISSIONER SHELTON:  What was in

17  '98?

18  INMATE CARPENTER:  What was in '98?

19  PRESIDING COMMISSIONER SHELTON:  Yeah.

20  INMATE CARPENTER:  Probably heroin.  Heroin.

21  PRESIDING COMMISSIONER SHELTON:  In here?

22  INMATE CARPENTER:  Yes.

23  PRESIDING COMMISSIONER SHELTON:  All right.  So

24  you didn't get your high school diploma.  Did you ever

25  get married?

26  INMATE CARPENTER:  Yes.

27  PRESIDING COMMISSIONER SHELTON:  When?

17

1        INMATE CARPENTER:  In 1979 I was married.

2        PRESIDING COMMISSIONER SHELTON:  So you got

3    married right after you came in here?

4        INMATE CARPENTER:  Yes.

5        PRESIDING COMMISSIONER SHELTON:  Are you married

6    now?

7        INMATE CARPENTER:  No.  I was divorced in '86.

8        PRESIDING COMMISSIONER SHELTON:  So how many

9    times have you been married?

10       INMATE CARPENTER:  One.

11       PRESIDING COMMISSIONER SHELTON:  Okay.  You were

12   married from '79 to '86.  Do you have any children?

13       INMATE CARPENTER:  No.  Excuse me.  You said I

14   never got my high school diploma.  I have got my high

15   school diploma since.

16       PRESIDING COMMISSIONER SHELTON:  Inside?

17       INMATE CARPENTER:  Yes.

18       PRESIDING COMMISSIONER SHELTON:  But not, you

19   never got it outside?

20       INMATE CARPENTER:  No.

21       PRESIDING COMMISSIONER SHELTON:  Okay.  Who

22   comes and visits you here?

23       INMATE CARPENTER:  My aunt and uncle, and my

24   aunt is my mom's sister and her husband.  My mom's

25   brother, my uncle, my sister and her husband.

26       PRESIDING COMMISSIONER SHELTON:  This would be

27   your half sister that you mentioned earlier?

18

1    INMATE CARPENTER:  Yes.

2    PRESIDING COMMISSIONER SHELTON:  Do you have

3    contact with anybody else via phone or letters or

4    anything?

5    INMATE CARPENTER:  I have letters from some

6    great aunts, my godmother.

7    PRESIDING COMMISSIONER SHELTON:  Okay.  Anything

8    you wanted to add about the offense at this time?  I

9    mean, there's all kinds of analogies like you killed

10   Mrs. Bentley instead of killing your mom and all of

11   that.  Tell me what your feelings are on that.

12   INMATE CARPENTER:  No, I mean, my mom -- my

13   relationship with my mother was one of a love-hate

14   relationship.  I have never felt that I wanted to kill

15   my mother or hurt my mother.  I mean, it's a senseless

16   crime, and, for that, I take responsibility regardless

17   of trying to justify it or come to some understanding

18   inside as to what happened and what was happening with

19   me.  I still take full responsibility.

20   PRESIDING COMMISSIONER SHELTON:  Is there

21   anything you would like to add about your social

22   history that we haven't talked about?  It sounds like

23   you had not a very happy childhood.  You dropped out of

24   school, started living a street life style, used drugs,

25   alcohol, and ended up here?

26   INMATE CARPENTER:  Yes, pretty much it.

27   PRESIDING COMMISSIONER SHELTON:  Okay.  Anything

19

1    else you would like to add at this point before we move

2    onto --

3          INMATE CARPENTER:  No.

4          PRESIDING COMMISSIONER SHELTON:  Okay.  We're

5    going to move onto post-conviction factors with

6    Commissioner Thompson, and she's going to talk with you

7    about your -- what you've been doing in here.  Okay.

8          DEPUTY COMMISSIONER THOMPSON:  Okay.  Good

9    morning.

10         INMATE CARPENTER:  Good morning.

11         DEPUTY COMMISSIONER THOMPSON:  We're looking at

12   the period of February the 26th, 2002, to today,

13   September 21st, 2006.  You've been housed at San

14   Quentin State Prison.  Your classification score is the

15   mandatory 19 for people with a life sentence.  You were

16   usually found in the general population, but you did

17   have a period in Administrative Segregation from May

18   24, 2004 to July the 2nd, 2004, when there was

19   apparently some personal jeopardy issue that they

20   investigated?

21         INMATE CARPENTER:  What was the dates, please?

22         DEPUTY COMMISSIONER THOMPSON:  It said May the

23   24th, 2004, to July the 22nd, 2004.

24         INMATE CARPENTER:  No.  Excuse me.  I was placed

25   there, yes, for two days.

26         DEPUTY COMMISSIONER THOMPSON:  Two days?

27         INMATE CARPENTER:  I was only there two days and

20

1    (inaudible) let me out.  They said they had nothing to

2    substantiate that I was in danger.

3            DEPUTY COMMISSIONER THOMPSON:  That was why they

4    let you out?  Yeah, that's true, there was an issue

5    where you had -- well, what they recorded, let's just

6    say, you went in on May the 24th, 2004, because of a

7    personal safety issue and were released thereafter when

8    they found there was no basis for it?

9            INMATE CARPENTER:  Yes.  It was only 48 hours.

10           DEPUTY COMMISSIONER THOMPSON:  Okay.  And you

11   essentially returned to the general population and a

12   Medium-A custody status; is that correct?

13           INMATE CARPENTER:  Yes.

14           DEPUTY COMMISSIONER THOMPSON:  Okay.  Now,

15   disciplinaries, you have a total of 11 since you

16   entered the system, and the last was March the 14th of

17   1997, and you have four 128's, the last of which was

18   July the 1st, 2005.  Does that correspond with your --

19   some of them are very, very old, but --

20           INMATE CARPENTER:  Yes.

21           DEPUTY COMMISSIONER THOMPSON:  That's what's in

22   the C-File.

23           INMATE CARPENTER:  Yeah.  I don't - oh, yeah,

24   I'm not sure of the number being correct.

25           ATTORNEY HOFFMANN:  Can you just repeat what you

26   said the last 128 was?

27           DEPUTY COMMISSIONER THOMPSON:  The last 128 was

21

1  July the 1st, 2005, and he only has four in total

2  128's.

3      ATTORNEY HOFFMANN:  Okay.  Thank you.  My

4  records didn't indicate that July 1st was initially a

5  115 which was reduced.

6      DEPUTY COMMISSIONER THOMPSON:  And was reduced,

7  right.

8      ATTORNEY HOFFMANN:  And it didn't show that.  So

9  thank you for noticing.

10      DEPUTY COMMISSIONER THOMPSON:  Okay.  And then

11  academically, you've completed your GED in 1985, while

12  were you in the system, or at least that's --

13      INMATE CARPENTER:  Yes.  I got it early, yes.

14      DEPUTY COMMISSIONER THOMPSON:  And then you

15  apparently have achieved an AA degree was well through

16  the San Quentin prison college from Patten University,

17  and did you get that in July of '04 --

18      INMATE CARPENTER:  Yes.

19      DEPUTY COMMISSIONER THOMPSON:  Okay.  So you

20  have that and congratulations.  Your performance

21  reports are average to excellent in the education

22  program.  In the work or vocational training, you've

23  been working in the Prison Industry Authority

24  apparently largely since you've been incarcerated, and

25  you've had various positions.  You've been in the

26  laundry, you've been lead man tailor, you have been

27  maintenance mechanic in the wood room, and I believe

22

1    that may be your present assignment.

2         INMATE CARPENTER:  Yes, ma'am, I'm in the wood

3    room.

4         DEPUTY COMMISSIONER THOMPSON:  And that

5    continues to date.  And your performance reports range

6    from average to exceptional, and particularly in the

7    woodworking and wood related matters, they say you're

8    very skilled.  And then in self-help, you've been in

9    Alcoholics Anonymous attender since 1991 and Narcotics

10   Anonymous since 1998, and you have also participated, I

11   believe it's pronounced Cairos.

12        INMATE CARPENTER:  Yes.

13        DEPUTY COMMISSIONER THOMPSON:  Creative Conflict

14   Resolution and then in a program called IMPACT?

15        INMATE CARPENTER:  Yes.

16        DEPUTY COMMISSIONER THOMPSON:  And there you

17   completed relationship class, dynamics, relationship

18   dynamics and cultivating successful relationships, and

19   specifics of relationships, all four of those were in

20   that IMPACT and all were completed successfully.

21   You've received four laudatory chronos, the last of

22   which was March the 2nd of this year, 2006, from the

23   woodwork supervisor who sees you as having exceptional

24   skills, working at a journeyman level and able to

25   instruct others in the area or help them out when they

26   hit a problem that they can't deal with.  That's very

27   favorable.  Psych treatment, none is shown.  And your

23

1    Board report of April of '06 views your disciplinaries

2    as being due to your immaturity upon entering into the

3    system you were only 18 when you came to prison, and

4    what disciplinaries you have the writer felt were just

5    because of your age and your situation.  You're now

6    more mature and taking the necessary steps to

7    transition to the community.  Did I leave anything out

8    or do you want to amend anything?

9            INMATE CARPENTER:  No.

10           PRESIDING COMMISSIONER SHELTON:  I have a

11   question.  Did you receive a certification in a

12   vocation with the woodworking?

13           INMATE CARPENTER:  Yes.  And, actually, the GED

14   is from 1979, at which I'm after I did that, I went

15   into mill and cabinet through the vocational institute

16   and graduated in '82.

17           DEPUTY COMMISSIONER THOMPSON:  Yes.  I'm sorry I

18   wrote it on the back of the page, and it is he has his

19   certification for proficiency in all phases of mill

20   work and also machinist all phases.  Regrettably I put

21   it on the back of the piece of paper, and I hadn't

22   turned it over.

23           PRESIDING COMMISSIONER SHELTON:  Not a problem.

24           ATTORNEY HOFFMANN:  Can I just add to that that

25   certificate dated March 14th of 2006, indicates that he

26   has over 11,900 hours doing the woodworking.  That's a

27   pretty significant amount of time.

24

1    DEPUTY COMMISSIONER THOMPSON: Yes, it is.  And

2    then we have your psychological evaluation which was

3    completed August the 24th, 2006, and they go back

4    through your commitment offense and like the many

5    things you've been discussing there a psychologist's

6    point of view.  This report was prepared by a Michael

7    Inaba, I believe it is, who is a doctor not contacts,

8    contract.

9        PRESIDING COMMISSIONER SHELTON:  Psychologist.

10   He's a contract psychologist.

11       DEPUTY COMMISSIONER THOMPSON:  Oh, meaning hired

12   outside, so that's a new.  Okay.  All right.  On the

13   diagnostic and statistic, they said that on Axis I,

14   which relates to mental disorder, that you're an

15   alcohol dependent in remission in a controlled

16   environment and polysubstance dependence in remission

17   in a controlled environment.  On Axis II, which deals

18   more with emotional problems, they say personality

19   disorder not otherwise specified, avoidant dependant

20   anti-social features in an improving situation.

21   Physically, they say there is nothing related to your

22   mental health.  On Axis IV which is stressors in your

23   life, it is your life sentence, your incarceration.

24   And on your Global Assessment of Functioning, you

25   attained a score of 78, which is rather good.  And then

26   the final -- they see you as more mature and moving

27   toward stability and his closing statement is he has

1   become a more -- a much stronger individual than he was

2   at the time of his crime or events earlier in his

3   incarceration remains at risk for relapse into the use

4   of alcohol or drugs in a less structured setting.   He

5   would benefit from paroling to a program.   I don't know

6   about a program having experience, but a program where

7   he would receive support and follow-up on these areas,

8   and anything there that you want to comment on?

9          INMATE CARPENTER:   I'd like to comment on a

10  couple things.   I would like to also just to back up to

11  the 115's you spoke of, I would like to speak to the

12  last two and only because one of the -- the last 115 I

13  got that would be in this period since my last hearing

14  was for refusing medical treatment.   What happened

15  there is like I went to the doctor and they put me in

16  for a blood test, which is a fasting blood test that I

17  had to go over there in the morning before breakfast.

18  When I proceeded to go to the hospital, movement had

19  been frozen because they were feeding the protective

20  custody inmates, special program they call it.   And

21  there was like 600 of them, and they would not let me

22  proceed to the hospital.   They said you can't go.   So I

23  thought I did the responsible thing.   I went onto eat,

24  I went to work, and when I got back from -- I contacted

25  the hospital, and we made an arrangement for me to go

26  the following Monday morning, and I went and gave blood

27  on Monday.   Because the hospital had just been in a

26

1   change of management, everyone who failed to go to a

2   ducket received a 115, and I just wanted to make that

3   clear that that's what happened.

4         **PRESIDING COMMISSIONER SHELTON:**  That was in the

5   one in July of '05?

6         **ATTORNEY HOFFMANN:**  Which has been dropped to a

7   128.

8         **DEPUTY COMMISSIONER THOMPSON:**  It was reduced to

9   a 128.

10        **PRESIDING COMMISSIONER SHELTON:**  Right.  It was

11   reduced to a 128.

12        **DEPUTY COMMISSIONER THOMPSON:**  Which is like a

13   guidance counseling, don't do it again.

14        **PRESIDING COMMISSIONER SHELTON:**  Yes.  I

15   understand, and then did you want to speak to the 115

16   before that as well?

17        **INMATE CARPENTER:**  Yeah.  I'd like to speak also

18   to in the report, my last 115, serious 115 was the

19   extortion or attempted extortion and that about

20   violence they talk about.  And I admit -- I was

21   involved in drugs.  I was involved with people that

22   used drugs, and what had happened here is this is

23   individual, which I'm sure that if we used confidential

24   information, was in drug debt, was in debt to people,

25   and him and his cellee came to me for support to ask if

26   I could help them out, buy them some time to pay their

27   bill, and when I seen that they just continuing to use

27

1    drugs to people they owed, I said, you know, I can't

2    help you.  You know, you're not paying your bill.  So I

3    guess they felt betrayed that I didn't, I didn't --

4    they said I tried to extort money.  These individuals

5    had no money.  There was no money to extort.  They owed

6    the money that they're saying I was trying to extort.

7    He owed other individuals, and all I did was try to buy

8    him some time, and I'm, I'm guilty of being stupid, and

9    using drugs.  You know, when I shouldn't have been.

10            DEPUTY COMMISSIONER THOMPSON:  Yeah, I think

11   your explanation as they recorded, it was he's so far

12   in debt, what money would I get from him or something

13   to that effect.

14            INMATE CARPENTER:  Yes.

15            DEPUTY COMMISSIONER THOMPSON:  In response to

16   your saying you had reportedly trying to extort money

17   from him.  That's true.  That's what's in the file.

18            PRESIDING COMMISSIONER SHELTON:  Okay.

19            DEPUTY COMMISSIONER THOMPSON:  If that's it

20   concerning the post-conviction, nothing else you want

21   to address in this section?

22            INMATE CARPENTER:  Nothing of interest.

23            DEPUTY COMMISSIONER THOMPSON:  Okay.  Well, then

24   I'll return it to the chair.

25            PRESIDING COMMISSIONER SHELTON:  Let's talk

26   about parole plans and support letters.  We're going to

27   cover all of that.  According to this, you want to live

28

1   with your sister, who currently lives in Washington and

2   works for a computer software company, and the report

3   says she plans to move to California.

4          INMATE CARPENTER:  Right now she works for

5   Semantic, which is a company based in Silicone Valley

6   in Sunnyvale, and she's in such a position that if

7   necessary, she could relocate to California temporarily

8   while I was on parole if that was -- she lives in

9   Washington now.  Most of work is down out of her house.

10          PRESIDING COMMISSIONER SHELTON:  Okay.  As an

11   alternate, your aunt, Loretta Wilson said that she

12   would be willing to provide housing and support and

13   transportation?

14          INMATE CARPENTER:  Yes.

15          PRESIDING COMMISSIONER SHELTON:  And we'll get

16   to those letters.  And they live, yeah, in Santa Clara.

17   With regards to employment, it says you plan to seek

18   employment as a carpenter and or cabinet maker.  We've

19   ascertained that you've got woodworking skills and

20   experience, and as well, the commissioner mentioned you

21   have laudatory chronos with regard to that.  And

22   evidently, you've been sending out letters and a

23   resume.

24          INMATE CARPENTER:  Yes.  I sent out resumes.  In

25   fact, right here I have copies, and a cover letter of

26   a -- these are letters I sent to programs seeking to

27   get in, and I only received one response stating that I

29

1    was not acceptable to their program due to the violence

2    and many of the programs, there is many programs.

3         PRESIDING COMMISSIONER SHELTON:  So you sent

4    letters --

5         INMATE CARPENTER:  To all them people.

6         PRESIDING COMMISSIONER SHELTON:  Okay.  These

7    are like help agencies, Agape, Alliance, Gap, City Team

8    Ministries.

9         INMATE CARPENTER:  Yes.  I also sent out

10   resumes, my job resumes to different employers.

11        PRESIDING COMMISSIONER SHELTON:  And this would

12   be your resume?

13        INMATE CARPENTER:  That might be the cover

14   letter to them.

15        PRESIDING COMMISSIONER SHELTON:  This is you're

16   looking for your transitional housing letter.

17        INMATE CARPENTER:  Yeah.  Yeah.

18        PRESIDING COMMISSIONER SHELTON:  And then I have

19   a list, for the order of, of 11 places, prospective

20   employers that you sent letters to.

21        INMATE CARPENTER:  Yes.

22        PRESIDING COMMISSIONER SHELTON:  Did you receive

23   a response from any of these 11?

24        INMATE CARPENTER:  No.

25        PRESIDING COMMISSIONER SHELTON:  All right.

26        INMATE CARPENTER:  This was my resume if you

27   would like it.

30

1       PRESIDING COMMISSIONER SHELTON:  I would like to

2  take a look at it.

3       INMATE CARPENTER:  And the offer letter.

4       PRESIDING COMMISSIONER SHELTON:  I'll look at it

5  during our recess, and I'll make sure you get all this

6  back, all right, sir?

7       INMATE CARPENTER:  Uh-huh.

8       PRESIDING COMMISSIONER SHELTON:  Let's take a

9  look at your support letters.  You'll have to bear with

10  me, some of these I have like 35 copies of one letter.

11  So I tried to mark them when I went through the file

12  earlier.  We do have a letter from your aunt and your

13  uncle verifying that nothing has changed since their

14  last letter which they wrote two days before they wrote

15  this letter.

16       INMATE CARPENTER:  Yeah.

17       PRESIDING COMMISSIONER SHELTON:  In that letter

18  they're talking about that, they talk about your

19  background et cetera.  What I try to do with letters is

20  indicate whether they're support letters, housing or

21  employment.  And, in fact, this letter, your aunt and

22  your uncle are offering housing for you.  Then there's

23  a letter received from A. Howell, Superintendent 1,

24  your supervisor in the wood.

25       DEPUTY COMMISSIONER THOMPSON:  That was the

26  laudatory chrono most recently received.

27       PRESIDING COMMISSIONER SHELTON:  Okay.  That is

31

1    a letter of reference and appreciation, talking about

2    the good work that you do.  That's a duplicate.  I have

3    duplicates here of letters.  I think that's all I have

4    is the aunt and the uncle here.

5         ATTORNEY HOFFMANN:  Okay.

6         PRESIDING COMMISSIONER SHELTON:  And then I

7    know, Counsel, you had some.  Are we needing to flip

8    over the tape?

9         DEPUTY COMMISSIONER THOMPSON:  We've got about 5

10   or 10 minutes left.

11        PRESIDING COMMISSIONER SHELTON:  I've received a

12   letter from step mom.

13        ATTORNEY HOFFMANN:  Step father.

14        PRESIDING COMMISSIONER SHELTON:  Step father,

15   John DeMassio.

16        INMATE CARPENTER:  DeMassio

17        PRESIDING COMMISSIONER SHELTON:  Is that the one

18   who was living with your mom?

19        INMATE CARPENTER:  Yes.

20        PRESIDING COMMISSIONER SHELTON:  And this letter

21   is -- said he would offer support.  He feels the best

22   place for to you go to with would be Vancouver,

23   Washington, with your sister.  If you are paroled in

24   the Bay Area, he said he would try to help you.  I will

25   return these to you so you can make copies of these to

26   put into your file.  This other letter is a letter from

27   Laura Balkin, your sister.

32

1    INMATE CARPENTER:  My sister.

2    PRESIDING COMMISSIONER SHELTON:  And she is

3    writing -- she talks about your rehabilitation, your

4    growth and accomplishments, the fact that you guys are

5    close.  They prefer that you parole to Washington where

6    they live and they have a rental property evidently a

7    three-bedroom, two-bath condo that you're welcome to

8    live in for free or a reduced rent or in their home.

9    So this is a residence.  Also in regards to employment

10   in Washington.  Her husband owns a business called

11   Resource Info Systems, and you could work as a scanning

12   and indexing specialist.  Do you have any idea what

13   that is?

14   INMATE CARPENTER:  No, I don't.

15   PRESIDING COMMISSIONER SHELTON:  Neither do I.

16   DEPUTY COMMISSIONER THOMPSON:  I think we used

17   to call it stock clerk.

18   PRESIDING COMMISSIONER SHELTON:  Could be.  The

19   position would pay a starting rate of $15 an hour.

20   Another employment opportunity potentially would be

21   working in a warehouse at $12 an hour.  Also, I guess,

22   they have properties, rental properties that you could

23   do some maintenance work on as well.  With regards to

24   transportation, they have a vehicle for your use.  And

25   they have a church lined up for you to attend.  If

26   you're paroled to the Bay Area, she's willing to pay

27   for an apartment for you to live in and she said that

33

1   she would travel down to stay for days or weeks,

2   whatever, to help.  So that's a wonderfully strong

3   commitment from your sister.  Did I miss -- I'll return

4   these to you.  Did I miss anymore letters of support?

5   More letters.  This would be your sister's husband?

6          INMATE CARPENTER:  Yes.  Grant.

7          PRESIDING COMMISSIONER SHELTON:  Yes, Grant

8   Balkin.  Basically, he reiterates --

9          ATTORNEY HOFFMANN:  There's one additional job

10  offer, I think, at the bottom of his.  It's at the

11  bottom one there.  Just in the carpentry industry,

12  there's another job and some mill work.

13         PRESIDING COMMISSIONER SHELTON:  Okay.  That

14  would be out of state.  And then Arthur Lapis?

15         INMATE CARPENTER:  Yes, a friend of my sister's.

16         PRESIDING COMMISSIONER SHELTON:  Is this a

17  gentleman that you've met?

18         INMATE CARPENTER:  No, I haven't met him.

19         PRESIDING COMMISSIONER SHELTON:  He offers work

20  as well in Oregon, warehouse type work starting at $12

21  an hour.  As I said, I'll return those to you too.

22         ATTORNEY HOFFMANN:  The only other thing that I

23  want to add about the letters of support is that

24  Loretta and Pete Wilson offer at least six months of

25  residence, transportation and assistance with

26  employment, and it's my understanding is that the goal

27  of that is to support Mr. Carpenter if he's released to

34

1  Santa Clara County while he's obtaining an interstate

2  transfer to make it up to Oregon to live with his

3  sister.

4       **PRESIDING COMMISSIONER SHELTON:**  Okay.  Great.

5  All right.  Sir, is there anything else you'd like to

6  add with regard to parole plans?

7       **INMATE CARPENTER:**  No.  You covered them.  It's

8  obvious that my family does strong support.  I mean, I

9  have a large group of individuals, but I have a solid

10 group.  They're really committed to helping me, and,

11 you know, I'm thankful of that.

12      **PRESIDING COMMISSIONER SHELTON:**  I can see that.

13 I think before we go into the next portion of this

14 hearing, we'll stop and turn over the tapes.  The next

15 portion is questions.  So go ahead.  Let's turn over

16 the tapes now.

17      **DEPUTY COMMISSIONER THOMPSON:**  You appear to be

18 on tape.

19      **PRESIDING COMMISSIONER SHELTON:**  There's always

20 that disclaimer.  You appear to be on tape.  All right.

21 This portion of the hearing next has to do with

22 questions.  That means the commissioner and I can ask

23 you questions as well as Mr. Rico and Miss Hoffmann,

24 and then we will go into closing statements, and you

25 will be allowed to make the last closing statement

26 today.  I've been asking you questions all along.  I

27 guess my one question would be is how do you feel about

35

1    your victim in this situation?  I haven't gotten a true

2    sense from you about what's going on there.

3        INMATE CARPENTER:  I feel terrible.  I mean,

4    it's something that, you know, I live with every day,

5    and that may sound cliché or something, but it's, I

6    mean, I'm aware of Mrs. Bentley every day.  I'm aware

7    of what I cost her, what I took from her and her

8    family, her family that had been coming to these

9    hearings for quite some time.  I understand.

10        PRESIDING COMMISSIONER SHELTON:  I would assume

11    they were not in support of parole?

12        INMATE CARPENTER:  No.  And I felt bad because I

13    have a hard time talking about it anyway, and then they

14    would be present in the room, which even made it more

15    difficult because here I am, you know, I took their

16    mother, their grandmother from them, and I wanted to

17    plead for my life, you know, for my release, and it's

18    not real easy.  It's not, I almost felt like I don't

19    deserve it.  I don't have it coming.  So, I'm totally

20    aware of that.  I mean, that's something that I could

21    be released ten years from now and, yet, I'm going to

22    carry that.  It might be five years.  It might be

23    today, but I'm going to carry that with me always, you

24    know, what I did.  So --

25        PRESIDING COMMISSIONER SHELTON:  Okay.  Thank

26    you.  I have no more questions at this time.

27    Commissioner, do you have any?

36

1          **DEPUTY COMMISSIONER THOMPSON:**  No, I don't think

2  so, thank you.

3          **PRESIDING COMMISSIONER SHELTON:**  Mr. Rico?

4          **DEPUTY DISTRICT ATTORNEY RICO:**  Yes,

5  Commissioner, I have some questions.  And again I will

6  address them to the chair?

7          **PRESIDING COMMISSIONER SHELTON:**  Yes.

8          **DEPUTY DISTRICT ATTORNEY RICO:**  How much does

9  Mr. Carpenter believe that either alcohol or drugs

10  contributed to his commission of the life crime?

11         **PRESIDING COMMISSIONER SHELTON:**  And direct your

12  answers to me.

13         **INMATE CARPENTER:**  I believe that they are a

14  major part of committing the crime because I had

15  started using drugs and alcohol at such an early age

16  that I was unable to probably develop mentally like I

17  should have.  I was held back as a result of the

18  alcohol and drug use, and I don't believe, the DA is

19  familiar, you know, very familiar with this crime, and

20  I don't think that someone not, who was not under the

21  use of drugs or alcohol could commit such a crime.

22         **DEPUTY DISTRICT ATTORNEY RICO:**  And I was

23  looking back at the probation report and for Mr.

24  Carpenter's and his counselor's benefit as well as the

25  Panel, I'm looking at -- I'm trying to find a page

26  number here.  It's a poor quality, but it's under

27  defendant's statement in the probation report a few

1    pages into it.  And it indicates that Mr. Carpenter had

2    said that his alcohol usage had increased until the

3    year before the crime when he was consuming two to

4    three six packs of beer per day, becoming intoxicated

5    on the average of four times per week; is that

6    accurate?

7             INMATE CARPENTER:  To the best of my knowledge,

8    yes.

9             DEPUTY DISTRICT ATTORNEY RICO:  And it goes on

10   to indicate that for the two years prior to the life

11   crime, you'd been smoking an average three or four

12   marijuana cigarettes per day and since age 16 had been

13   sporadically using amphetamines; is that also accurate?

14            INMATE CARPENTER:  Yes.

15            DEPUTY DISTRICT ATTORNEY RICO:  And as I look up

16   above on that same page, it says when requested

17   regarding whether or not he had consumed any drugs or

18   alcoholic beverages on the day of the murder, the

19   defendant advised he had ingested three valium pills

20   and had consumed about a six pack or two six packs of

21   beer that day with friends becoming slightly

22   intoxicated.  Does Mr. Carpenter remember is that how

23   he explained it or does that sound right?

24            INMATE CARPENTER:  I'm sure in the testimony

25   that that was brought up, and I believe, though, that

26   isn't my testimony.  You know, I want to say that, you

27   know, I committed this crime, and I feel bad for it,

38

1    but there was a moment when I was arrested, before I

2    was arrested, I took a lie detector test and failed

3    miserably and knew that I would, but, you know, but

4    still, here's this kid who's an alcoholic, who's a drug

5    addict and who's uneducated, and for a fleeting moment,

6    I'm -- how am I going to get out of here.  That was

7    going through my mind.  How am I going to get out of

8    this situation I'm in, you know, and so there might

9    have been some, you know embellishment into how much I

10   drank and what happened.

11        DEPUTY DISTRICT ATTORNEY RICO:  I guess what I'm

12   asking is the crime took place on Super Bowl Sunday;

13   isn't that true?

14        INMATE CARPENTER:  Yes, sir.  Yes.

15        DEPUTY DISTRICT ATTORNEY RICO:  And earlier that

16   day I see a note here that Mr. Carpenter had been

17   watching the Super Bowl game with his friends and

18   drinking; is that accurate?

19        INMATE CARPENTER:  Yes.

20        DEPUTY DISTRICT ATTORNEY RICO:  So when there

21   was the reference here that I read about maybe drinking

22   about taking three valium pills and then maybe drinking

23   one or maybe even two six packs is what Mr. Carpenter's

24   indicating is that maybe he embellished a little bit on

25   how much he actually drank that day.

26        INMATE CARPENTER:  Yes, yes.  You know, because,

27   when questioned, when my friends see it, I went to a

39

1    Super Bowl party.  It was more or less a Super Bowl

2    party where alcohol and food, and you know, it carries

3    on.  I drank all day.  I took the pills before I left

4    the house and then I drank all day.  There was hard

5    liquor also.  You know, a lot of my defense, you know,

6    basically before trial admitted guilt and my lawyer

7    used the defense of diminished capacity, so, now, the

8    counter was that I wasn't high, I wasn't drunk, you

9    know, to go ahead and just blow that diminished

10   capacity out of the water that, you know, he drinks

11   regularly, he really wasn't that drunk.  So, sir, I

12   don't know exactly what it is you're asking.

13          **DEPUTY DISTRICT ATTORNEY RICO:**  Let me just

14   rephrase it.  I guess what I'm going is this, and I'm

15   not trying to trick Mr. Carpenter or do anything, it

16   looks like Mr. Carpenter, and he's explained very well

17   his background and his feelings and all of that, but

18   it's Super Bowl Sunday.  He's watching the Super Bowl

19   game with friends.  He's drinking, and at some point he

20   takes three valiums.  And the life crime, which takes

21   place later, shows a lot of anger, and I'm wondering if

22   Mr. Carpenter has anything to suggest when this anger

23   came up, why on a day when he's sitting drinking with

24   friends watching the Super Bowl game suddenly that's

25   over and he goes off and all of this anger comes out

26   and he kills the victim.  Can he put any of that in

27   context?  That's what I'm asking.

40

1    PRESIDING COMMISSIONER SHELTON:  Do you

2  understand the question?

3    INMATE CARPENTER:  Yes.  You know, I believe, in

4  some of these reports you looked at, that that morning

5  had I got up, my mother was in her rare form that she

6  was in always, yelling and screaming trying to get my

7  sister up and the phone rang.  We were in the middle of

8  an argument hollering and it was Mrs. Bentley on the

9  phone.  And, so, to make a connection to the rage,

10  where the rage came from, I believe it that was a good

11  beginning point right there.

12    PRESIDING COMMISSIONER SHELTON:  Well, I'm going

13  to follow-up on that a little bit too because I have

14  the same question in my mind.  If you're kind of laid

15  back having a good time at a Super Bowl party, after

16  the party what triggered you wanting to go to her

17  house?  Was there another trigger in there?  I mean,

18  from morning --

19    INMATE CARPENTER:  Not that I'm aware of.

20    PRESIDING COMMISSIONER SHELTON:  You're -- you

21  just got up and decided to go do it?

22    INMATE CARPENTER:  It was like -- I'd been angry

23  at her.  As I said throughout, throughout my childhood

24  when I moved to this house, I mean, this was like the

25  answer to how I wanted things to be and upon moving in

26  there, I mean, I was only like 12 years old.  I hadn't

27  started using drugs.  For the most part, I was a quiet,

41

1   good kid. And my first encounter with Mrs. Bentley was
2   accusing me of throwing olives at her wall of her
3   house. She had a big olive tree, and this was, and not
4   to say, you know, I've never tried to justify what
5   happened, but I'm just saying that these are the things
6   that I recall of Mrs. Bentley in my mind.
7        PRESIDING COMMISSIONER SHELTON: I understand.
8        INMATE CARPENTER: Of always accusing me.
9        DEPUTY DISTRICT ATTORNEY RICO: I guess what
10  I've been trying to get at here is how much alcohol or
11  drugs could have been a trigger here, and does Mr.
12  Carpenter have anything else to say on that other than
13  what he's already said?
14       INMATE CARPENTER: It was a lot, and, you know,
15  with my personality, and it's too many, too, it's
16  something I can't have. I believe that the reason why
17  I used alcohol and drugs was because I couldn't
18  communicate. I couldn't function normally, and this
19  was something I used to numb myself.
20       DEPUTY DISTRICT ATTORNEY RICO: And if I might,
21  shifting to a couple of things. The most recent Board
22  report as well as -- the recent Board report says at
23  Page 4 of 7 that Mr. Carpenter has been an active
24  member of Alcoholics Anonymous since 1991 and has been
25  an active member of Narcotics Anonymous since 1998.
26  That's what that says. But I look at the July 9th,
27  2001, psych eval at Page 4, and that says during the

42

1    course of incarceration, Mr. Carpenter has

2    intermittently attended both Narcotics Anonymous one

3    quarter ending on 3/20/98 and 1/18/01 to 4/18/01, and

4    Alcoholics Anonymous and then it gives some dates.  He

5    did not participate in the 12-step program.  He stated

6    I went back to using in '95 but stopped using in '98.

7    I recognize that's an '01 report.  But on the one hand,

8    the most current Board report says he's been

9    continually involved and as recently as '01 it says it

10   was intermittent.  Could Mr. Carpenter speak to the

11   extent of his involvement in recent years in AA and NA?

12           INMATE CARPENTER:  In AA, I do not attend AA.  I

13   attend NA, and I feel that you are right in that it was

14   sporadic in the '90's.  Since '98, since I quit using

15   and turned my life around, I attend meetings weekly.

16   Sometime it's every other week.  And maybe not a good

17   excuse or for lack of better word, it isn't even an

18   excuse.  I wasn't attending the meetings when I was

19   going to college classes.  I felt that going to college

20   and getting my education and understanding and being

21   able to communicate was something that why I used drugs

22   and alcohol, and I realized, that, you know, I need

23   both of them.  I needed the education, but I also

24   needed to attend the meetings.  And the meetings are

25   something that I do regularly still.  In fact, I didn't

26   submit, but I have the latest chronos from this

27   quarter's NA meetings right here.

43

1      PRESIDING COMMISSIONER SHELTON:  Okay.  My

2   question to follow-up with Mr. Rico's would be you

3   are -- when was the last time you attended AA?

4      INMATE CARPENTER:  It's been probably three

5   years.  I've turned it -- I go to NA meetings, and

6   they're basically the same.

7      PRESIDING COMMISSIONER SHELTON:  And so how long

8   have you been attended NA consistently, I mean, at

9   least twice a month for how long?

10     INMATE CARPENTER:  Oh, the last several years,

11  three years.

12     PRESIDING COMMISSIONER SHELTON:  The last three

13  years?

14     INMATE CARPENTER:  Yes.

15     PRESIDING COMMISSIONER SHELTON:  Okay.  Does

16  that answer your question, Mr. Rico?

17     DEPUTY DISTRICT ATTORNEY RICO:  Thank you.  And

18  also I look at the most current psych, the new psych

19  and it says at Page 5, Mr. Carpenter describes himself

20  as an addictive personality.  He realizes that he is

21  prone to relapse and must actively work against that

22  possibility constantly.  But looking back at the July

23  9th, '01 report at Page 4, at that interview, he

24  indicated that he feels no need to drink and thinks

25  that he can maintain sobriety without support of such

26  organizations as AA or NA, and it says both his

27  parents, uncle and brother all have history's of

44

1   substance abuse.  So my question is, is this a recent

2   insight on his part that he does need AA or NA on the

3   outside to avoid the possibility of relapse?

4        **INMATE CARPENTER:**  I don't think it's a recent

5   discovery.  That's something that I've been aware of

6   for a long time, that I did have a substance abuse

7   problem, that I have an addictive personality.  I think

8   my statement in '01 was kind of taken out of contents,

9   you know, I'm trying to keep, walk a fine line here

10  with going to the meetings but also doing some other

11  things that my personality needs that will benefit me,

12  for one is school.  I was going to school, and I felt

13  that, that's where the statement comes from.  I was

14  going to school which was helping me understand myself

15  better and giving me the things I needed there.  And,

16  therefore, it was felt like I slighted AA or NA as

17  something I needed, and that's the furthest thing from

18  the truth.  The 12-step program is something that I'm

19  going to have to carry with me forever.

20       **DEPUTY DISTRICT ATTORNEY RICO:**  And two last

21  questions:  Has Mr. Carpenter, and I know that parole

22  plans are a little bit still in formation as to whether

23  he'd live with his sister in Washington or she would

24  relocate or the aunt, has Mr. Carpenter explored

25  possible locations of treatment programs such as NA or

26  AA in any of the areas that he may go to live if he is

27  released?

45

1    **INMATE CARPENTER:** Well, it's obvious, that I'm

2   unfamiliar with Washington, but I know where some AA

3   and NA facilities are in Santa Clara County, one being

4   right at the Valley Medical Center, so I do know where

5   to reach out to a meeting if paroled.

6    **DEPUTY DISTRICT ATTORNEY RICO:** And the last

7   question would be -- I didn't mean to interpret. Did

8   Mr. --

9    **INMATE CARPENTER:** No. I'm done.

10   **DEPUTY DISTRICT ATTORNEY RICO:** And the last

11  question would be how does Mr. Carpenter feel about the

12  author of the most current psych assessment statement

13  that Mr. Carpenter would benefit from paroling to a

14  program that has experience with polysubstance abusers

15  who have committed violent crimes. And I don't know if

16  he's talking about someplace like Delancey Street or

17  some similar program. How does Mr. Carpenter feel

18  about that?

19   **INMATE CARPENTER:** You know what, I greatly, you

20  know, accept that. I think that is great because for

21  this reason. I gave the commissioner a list of

22  organizations that I've written asking for transitional

23  housing and getting in a program, but I also feel that

24  someone who has done the time I did, who has committed

25  the crime I did, who was involved in alcohol and drugs,

26  not only can a program help me, but I can help the

27  program. And I that, you know, I would openly be

46

1    willing to do that.

2          DEPUTY DISTRICT ATTORNEY RICO:  Thank you.  I

3    have nothing further.

4          PRESIDING COMMISSIONER SHELTON:  Thank you, Mr.

5    Rico.  Miss Hoffmann, do you have any questions?

6          ATTORNEY HOFFMANN:  I do.  Thank you.  Mr.

7    Carpenter, did you know how to read and write when you

8    came to prison?

9          INMATE CARPENTER:  Barely.  Just enough to get

10   by, to write my name.

11         ATTORNEY HOFFMANN:  Okay.  And within a year of

12   arriving, you obtained your GED, correct?

13         INMATE CARPENTER:  Yes.

14         ATTORNEY HOFFMANN:  And shortly thereafter you

15   began college courses?

16         INMATE CARPENTER:  College began in '97.

17         ATTORNEY HOFFMANN:  Okay.  What types of classes

18   have you taken?

19         INMATE CARPENTER:  Sociology, history, English,

20   basic, the basics for an AA degree.

21         ATTORNEY HOFFMANN:  What was your GPA when you

22   got your AA degree?  Do you remember?

23         INMATE CARPENTER:  I think it was 3.75.

24         ATTORNEY HOFFMANN:  What has your education done

25   for you?

26         INMATE CARPENTER:  It's helped me in my

27   personality and to realize that, I mean, for the

47

1    longest time, I felt useless. You know, and it's

2    obviously that, you know, it showed me that I am a

3    capable person. I am worthy of myself and not a loser,

4    but it's helped me to communicate, open up.

5         ATTORNEY HOFFMANN: So you'd say you've gained

6    self-esteem also going to school?

7         INMATE CARPENTER: Yes.

8         ATTORNEY HOFFMANN: Okay. Have you -- sorry.

9    Before I get into that, are any of the other groups

10   that you have participated in while you've been in

11   prison also dealing with substance abuse issues aside

12   from AA and NA?

13        INMATE CARPENTER: Basically all of them. The

14   IMPACT, the IMPACT group, which deals with -- IMPACT,

15   I'm not sure if the Panel is aware of, it's an acronym

16   for Incarcerated Men Putting Away Childish Things.

17   And, it's basically, the program was started by other

18   inmates suffering from like other inmates are, and we

19   developed this program together, you know, and it's an

20   ongoing program, and we deal with all those issues of

21   substance abuse, violence.

22        ATTORNEY HOFFMANN: What does that group do

23   specifically to deal with substance abuse issues?

24        INMATE CARPENTER: Talk about it and show how

25   you were when you drank and we talk about it and how to

26   avoid it.

27        ATTORNEY HOFFMANN: All right. Are there any

48

1  other groups other than IMPACT that deals with

2  substance abuse issues as well?

3          INMATE CARPENTER:  Cairos, Cairo is a Christian

4  based group that is a fellowship, and also through

5  there you find strength and you realize that you are

6  important, you know, and they deal with all your

7  issues.

8          ATTORNEY HOFFMANN:  And would you say that, do

9  you follow the 12 steps in your daily life?

10         INMATE CARPENTER:  Yes.

11         ATTORNEY HOFFMANN:  And would you say that going

12 to AA and NA alone would ensure you remain sober when

13 you're released, or do you think that there are going

14 to be other factors?

15         INMATE CARPENTER:  Well, I think NA and AA will

16 help me remain sober, but, yes, there's definitely got

17 to be other factors.  I don't think that an NA meeting

18 is entirely, would be fulfilling to someone.  There has

19 to be more to someone's life.

20         ATTORNEY HOFFMANN:  Like what?

21         INMATE CARPENTER:  Family, friends, family, job.

22         ATTORNEY HOFFMANN:  Do you want to continue your

23 education when you get out?

24         INMATE CARPENTER:  Yes.

25         ATTORNEY HOFFMANN:  I know that it was difficult

26 for you before when we talked about your victim, and I

27 was hoping that while were you still upset about it, we

49

1    could get to the questions, but now you've kind of

2    gotten over it and we're going to have to come back to

3    it for a bit, so I'll try and keep it as brief as

4    possible.  But, you mentioned that they used to come to

5    your hearings, the victim's family.

6            INMATE CARPENTER:  Yes.

7            ATTORNEY HOFFMANN:  And how did you feel when

8    they were here?

9            INMATE CARPENTER:  Terrible, terrible, because I

10   wanted to reach out to them, but yet I couldn't.  I

11   mean, it's something, I can't.  I'm unable to do.  I

12   don't know if it was appropriate or not now, but I

13   wanted to stop their pain and didn't know how, don't

14   know how, and the pain, I don't want the pain to be

15   passed on generation to generation, which it has in

16   this case.  There was several generations of people

17   that were there, and I felt horrible.

18           ATTORNEY HOFFMANN:  Have you thought about what

19   you could say to them if you could speak with them

20   directly?

21           INMATE CARPENTER:  Many times.  And, you know,

22   no words can speak to what I did.  No words can make it

23   any better.  No words could make them feel better.

24   Sometimes, I think it's just easier that for everything

25   that's been wrong in their life, they feel I'm to blame

26   for and sometimes it's easier just to accept that and

27   to be willing to be the one.

5 0

1    **ATTORNEY HOFFMANN:**  I have no further questions.

2    **PRESIDING COMMISSIONER SHELTON:**  All right.

3   Thank you.  All right.  We are going to go into closing

4   statements.  First Mr. Rico will have an opportunity to

5   speak followed by your attorney, and then you will have

6   an opportunity.  Mr. Rico?

7    **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,

8   Commissioner.  I think that this hearing has well

9   documented the commission of the life crime.  I

10   recognize that Mr. Carpenter was only 18 at the time

11   that he committed the crime.  The victim was, was much

12   older, and vulnerable in comparison.  The crime itself

13   involved extreme violence, anger.  The victim was

14   stabbed seven times, with some of those wounds to the

15   depth of five plus inches, and it would appear, and I

16   think it's without question, I understand Mr. Carpenter

17   when he's indicating his own attempts to gain some

18   insight into the crime.  And I see that in current

19   assessments there was some reference, I think the

20   phrase was that he had the capacity to gain insight

21   into the offense, and I think that's true because I

22   think that he has done an admirable job today

23   explaining what he thinks led up to it in terms of his

24   background.  And I think that it's clear that there was

25   a lot of dysfunction in the family, and perhaps he was

26   the product of a broken or dysfunctional family, and

27   maybe it's not appropriate to rate that family on a

51

1   scale of 1 to 10.  There have been worse; there have
2   been better.  But I don't think that the life crime is
3   all due to that.  It's not due to one thing.  Perhaps
4   that background contributed to it.  We have a young man
5   who was allowed to be permissive and engage in drinking
6   and drug use and other things living on the streets and
7   then perhaps started to rebel when his mother tried to
8   rein him in a bit after these patterns were already
9   developed.  But we have the life crime apparently being
10  committed with the uncontrollable anger and violence,
11  perhaps fuelled by the alcohol and the drugs.  And,
12  now, as Mr. Carpenter sits there, he's 47, and quite
13  frankly, I've been quite impressed when he has talked
14  earlier today about his insight as to what got him to
15  where he is today, looking back on that, trying to
16  assess it.  One thing was a little bit troubling, I
17  thought, is that when specific questions were asked
18  about what triggered it that day, you're sitting there
19  at a Super Bowl game, your watching it with friends,
20  kicking back, drinking, and then the game's over and
21  you go out and you do this horrible crime.  He seemed
22  to want to talk about the victim and how bad she'd been
23  to him from when he was 12, and he's going back in time
24  to that relationship talking about the throwing of
25  olives and other things that didn't have anything to do
26  with that moment in time when he killed her.  So, when
27  I look at his time in prison, it seems as recent as

52

1   1998, and he seems to have been quite candid about

2   that, that he was under the influence of heroin, in

3   prison, in 1998, and that's about ate years ago.   Then

4   something happened, and he seems to have decided that

5   I'm not going to drink anymore.   I'm not going to use

6   drugs anymore, and I have no case that he has.   He

7   indicates that he's been clean since then.   And, in the

8   most current psych eval, he's indicating that he

9   recognizes he has an addictive personality and he needs

10  to remain involved in programs to prevent any relapse,

11  but I guess I'm kind of concerned that as recently as

12  2001, as recently as 2001, according to the author of

13  that July 9th, 2001 psych assessment, at the interview,

14  in order to prepare that report, Mr. Carpenter told the

15  author that he felt no need to drink and thought he

16  could maintain sobriety without support of such

17  organizations as AA or NA, in spite of the family

18  history.   And, I guess what troubles me a little bit is

19  not that he's in denial that he's an alcoholic or a

20  drug user but perhaps it's the old phrase if wishes

21  were horses or the road to fill in the blank paved with

22  good intentions.   Mr. Carpenter believes he's got no

23  need to drink now, no feeling that he needs to take

24  drugs and therefore it's not going to be a problem.

25  But it's been decades since he's been out on the

26  streets.   He was 18 then; he's 47 now, and to go back

27  out, there's going to be a lot of stressors.   Even the

53

1  author of the most current psych eval says that he is

2  at risk for relapse, and I think the exact phraseology

3  in that report, the psych assessment says that while he

4  has become a much stronger individual than he was at

5  the time of the crime or even earlier in his

6  incarceration, Mr. Carpenter remains at risk for

7  relapse into the use of alcohol or drugs in a less

8  structured setting, and the outside world, I submit, is

9  certainly a less structured setting, and then the

10  author goes onto say he would benefit from paroling to

11  a program that has experience with polysubstance

12  abusers who have committed violent crimes.  Any use of

13  alcohol or drugs could result in an impairment of

14  judgment and lessened impulse control.  And, perhaps,

15  then, he would go full circle to what he's done before.

16  So I think that Mr. Carpenter, who has been very

17  impressive today in his presentation and has done a lot

18  of things that he should be greatly commended for.  I

19  mean, coming into prison not even able to read or write

20  and doing what he's done is awesome, and to make a

21  decision that he's not going to use drugs, not going to

22  use alcohol, doesn't want to do that, to indicate as he

23  has, and I believe it's been heart felt that he

24  indicates the remorse that he has for the victim.  But

25  I think the weakness is in terms of -- and it's good

26  that there's family support on the outside for him, but

27  the weakness is, and he made efforts to find jobs by

54

1    sending out resumes, but once he gets out, he needs all

2    of the ducks lined up in a row, and he needs more time

3    to remain substance free and away from that.  He hasn't

4    been clean that long.  So that's my concern here, and I

5    think that until the substance abuse issue, the alcohol

6    addiction, until sufficient distance is gained and he

7    shows that his gains are permanent, that the view

8    expressed by the psych report author that he remains at

9    risk for relapse is very real and that means that he

10   would still present a substantial risk.  So that's, I

11   guess, where I draw the line and I look at this, and I

12   indicate at the present time, I don't believe that he

13   is yet ready to be returned to the outside world, that

14   less structured setting because he's not yet strong

15   enough, and I would submit on that in terms of the

16   period of denial.  I know he's been getting four-year

17   denials for the last several.  I have no position as to

18   the amount of time, but I don't believe that he is yet

19   ready for release.  Thank you.

20        **PRESIDING COMMISSIONER SHELTON:**  Thank you, sir.

21   Miss Hoffmann?

22        **ATTORNEY HOFFMANN:**  Thank you.  I'm going to

23   begin just by going over a bit of what the District

24   Attorney focused on during his line of questioning.  I

25   believe that his closing statement was relatively

26   supportive, and I do largely agree with it.  He was

27   reviewing the probation officer's report and looking at

55

1   Mr. Carpenter's drug and alcohol history dating back to

2   when he was just a teenager, which was, at this point,

3   over 30 years ago. His statements and questions seemed

4   to bring out the negative factors of the case, and it

5   was my impression, and I don't want this to be held

6   against Mr. Carpenter, because he may not have felt the

7   same thing, but it seemed like the district attorney

8   was trying to catch Mr. Carpenter in a lie and get him

9   to say that he had maybe had one beer instead of seven

10   beers or 12 beers instead of five beers. You know, Mr.

11   Carpenter isn't here today because of what he had to

12   drink. He's here today because he murdered someone and

13   he has been very candid and honest with everyone about

14   that today. He takes full responsibility for taking

15   the life of Miss Bentley, and whether or not he lied to

16   the police at the time he was arrested because he was

17   scared or immature or whatever the circumstances, he

18   takes responsibility today, and he has done that for

19   decades. If the District Attorney or if the

20   commissioners are interested in knowing where Mr.

21   Carpenter's anger came from when he left the Super Bowl

22   party, we may never know, and I think the picture that

23   the district attorney tried to paint of Mr. Carpenter,

24   you know, being out, relaxing, at a Super Bowl party

25   may not have been the reality of what was going on that

26   day. He may have left and gone to that party to take a

27   break or he may have left with the intention of getting

56

1    drunk because he was already angry with Miss Bentley.

2    We don't know those circumstances, and we can all sit

3    here and try and imagine what occurred that day almost

4    30 years ago, and it's impossible to figure out, and

5    Mr. Carpenter can do his best to try and remember and

6    may or may not.  The triggering event that led him to

7    go from a Super Bowl party where he was drinking and

8    doing drugs admittedly with his friends may have been

9    seeing Miss Bentley's house.  She lived right next door

10   to him.  He could have been fine when he was at the

11   party, walked home, saw her house, and got angry again.

12   We don't know.  And we're not here to make, again,

13   we're not here to retry the case and we're not here to

14   figure out the specific circumstances of the commitment

15   offense justify continuing to keep Mr. Carpenter in

16   prison.  What we're looking at is whether or not the

17   man who is sitting here before us is suitable for

18   release and a threat to public safety today.  The

19   consistency of his attendance in substance abuse

20   programs since he has been in prison has been

21   consistent since 1998.  It may have been sporadic in

22   the '90's, and he admits that and he explains that his

23   absence from AA and NA meetings specifically during

24   that time because he was attending college, and the

25   district attorney focused on a statement about Mr.

26   Carpenter's, but he realizes that he's prone to relapse

27   and must actively work against that possibility

1    constantly.  I think looking at working against that

2    possibility as only attending AA and NA meetings is a

3    little bit short sighted, and I think Mr. Carpenter has

4    a greater understanding of what he needs to do in order

5    to maintain his sobriety.  He has a history of self-

6    esteem issues.  He has leaned (inaudible) and

7    continuing his education and programming and doing

8    things to make him feel the self-worth that he has are

9    very significant, and that those things are going to

10   help him maintain his sobriety.  Making himself, you

11   know, a person that he is proud of is very -- is a

12   primary thing to ensure his future sobriety and I think

13   that Mr. Carpenter is the best to judge at that.  So,

14   if he chooses to attend educational classes or IMPACT

15   verses AA or NA, or Cairos verses AA or NA, I think

16   that he is the best judge of determining what his needs

17   are to ensure his sobriety.  He is also committed to AA

18   and NA and has been since 1998.  I have personally

19   spoken with his sister on a number of occasions.  She

20   is very supportive.  She calls me and e-mails me

21   regularly to check in and find out if there's anything

22   more that she can do to support him.  If there's

23   anything that I think that you might want to see to

24   make sure that you know that she is 110 percent behind

25   him, she has found AA and NA meetings near her home in

26   Washington.  They're there.  Pete and Loretta Wilson

27   have also found the locations of meetings and times of

58

1  meetings for Mr. Carpenter to attend upon his release.

2  The system is set up.  So, while Mr. Carpenter may be

3  at a risk for relapse, as I think everyone with a

4  serious substance abuse history is at a constant risk

5  of relapse.  The district attorney wanted to see Mr.

6  Carpenter's gain as permanent.  We may never get there.

7  His gains may never been seen as permanent.  I know

8  people who have been sober for 20, 25 years who are

9  still at a risk for relapse.  Everyone can chose and

10  make a decision to use again.  Mr. Carpenter has shown

11  that he is dedicated to maintaining his sobriety and he

12  has a very, very strong and impressive support network

13  upon his release to make sure that he continues to

14  maintain that.  In terms of the psychologist's request

15  that he or I won't necessarily call it a request, but

16  statement that Mr. Carpenter would benefit from

17  paroling to a program, Mr. Carpenter has done

18  everything that he can to try and find a program.  He

19  has written to a number of them, including Victory

20  Outreach, Alliance, and Al-Anon, but has not received a

21  confirmation or acceptance into these programs.  He,

22  you know, he recognizes the benefit of a program both

23  for himself and for other people.  I think his

24  experience is unique in that he was locked up at a very

25  young age and he expressed his interest in sharing that

26  experience with others in a program.  Interest in

27  helping others, and I think that is a huge

59

1  accomplishment for someone who came into prison with no
2  self-esteem, with no self-worth who is now sitting here
3  telling the commissioners that he would love the
4  opportunity to speak to others about his experience and
5  make sure that they don't end up following in his
6  footsteps.  In terms of what I think the primary focus
7  of this hearing is today is Mr. Carpenter's assessment
8  of dangerousness.  The 2006 psych evaluation puts him
9  at the mean for male offenders and also at one point
10  indicates that if he remains abstinent from alcohol and
11  drugs and continues to participate in positive
12  programming, he would be expected to be at a low risk
13  of violence in a controlled setting.  Many of the
14  psychologists don't determine what Mr. Carpenter's risk
15  will be if he is released to the community.  This
16  particular psychologist doesn't indicate if he would be
17  low, average or high if released to the community, but
18  she does say that he has been incarcerated all of his
19  adult life, that he would likely face considerable
20  challenges, which he is very well aware of, in adapting
21  to the community but that he has also gained skills and
22  a level of education that would make him employable and
23  provide him with the potential to be a productive
24  citizen.  She notes the importance of gaining
25  acceptance by members of society who are responsible
26  citizens and who do not rely on the use of substances
27  for coping with challenges and stress, and I think that

1   is the exact support network that Mr. Carpenter has

2   available to him upon his release.  I'm going to go

3   into reviewing some of the suitability and

4   unsuitability factors and also the reasons for Mr.

5   Carpenter's denials in the past.  In 1996, he was found

6   unsuitable for parole for the commitment offense, his

7   unstable social history, including previous contact

8   with law enforcement, alcohol abuse, dropping out of

9   high school and having no record of employment.  He

10  also, at that point, had failed to upgrade vocationally

11  or educationally while in prison, failed to participate

12  adequately in self-help and therapy and declined to

13  have a psychological evaluation completed in 1996.

14  During his 2004 hearing, he was given a four-year

15  denial because he needs to continue self-help and

16  therapy programs, the commitment offense was carried

17  out in a brutal and cruel, violent manner and he had

18  received two 115's since his last hearing.  Since those

19  previous findings, Mr. Carpenter has made significant

20  gains.  Again, we're not going to be able to change the

21  circumstance of his commitment offense.  Those are

22  facts that we're stuck with -- do you need to turn the

23  tape over?

24          **PRESIDING COMMISSIONER SHELTON:**  You know, we

25  probably should go ahead.  Why don't we go ahead?

26          **DEPUTY COMMISSIONER THOMPSON:**  Change it.

27          **PRESIDING COMMISSIONER SHELTON:**  I think you

61

1    need to put new tapes in.

2          DEPUTY COMMISSIONER THOMPSON:  And this is on.

3          PRESIDING COMMISSIONER SHELTON:  All right.  It

4    appears we're back on tape.  Go ahead, Miss Hoffmann.

5          ATTORNEY HOFFMANN:  Thank you.

6          PRESIDING COMMISSIONER SHELTON:  Thank you.

7          INMATE CARPENTER:  It's my position that given

8    the gains that Mr. Carpenter has made since his last

9    hearing and I believe since he made a strong commitment

10   to maintaining his sobriety in 1998, that he is

11   currently suitable for parole.  However, I recognize

12   that the Panel may not agree with that finding; and, if

13   that is the case, I would request that the Panel give

14   him a very short-term denial, specifically a one year

15   denial would be ideal in a grant is not given.  I think

16   Mr. Carpenter has shown significant gains, has been

17   able to do a lot in a relatively short period of time.

18   And I think if he came back to the Board in one year,

19   he would be able to show many more significant gains,

20   and I don't think it's necessary to hold him over for

21   any period longer than that.  He's been in prison since

22   1978.  That's almost three decades, and he has almost

23   always followed the recommendation that every Board has

24   given to him.  In terms of the specific suitability

25   factors, one is that the prisoner does not have a

26   juvenile record, which specifically speaks to

27   assaulting others as a juvenile or committing crimes

1    with the potential of personal harm to victims.   Mr.

2    Carpenter has only a juvenile record, only an adult

3    regard in that he was arrested at 18.   His juvenile

4    regard consists of one burglary in 1975 and possession

5    of a destructive device in 1975 as well.   Notably, at

6    1975 arrest for possession of a destructive device was

7    dismissed and therefore was not an actual conviction

8    and that he was arrested for both of these offenses

9    over 30 years ago, neither of them involved assaulting

10   others or were particularly violent in any manner.

11   Since that time, also, he has significantly matured.   I

12   think the district attorney acknowledged that Mr.

13   Carpenter was a teenager at the time of his arrest, and

14   he's now a, for all intents and purposes, a middle aged

15   man.   In terms of stable social history, Mr. Carpenter

16   does have a relatively rocky history, and whether that

17   was a primary contributor to his commitment offense or

18   a secondary issue, is, I think, for the Panel to

19   determine and for Mr. Carpenter to ultimately know.   I

20   believe that many of the factors that go to his social

21   history of being unsuitable are factors that he could

22   not control, and I have an internal memo, I believe

23   that was issued to commissioners and other,

24   commissioners and deputy commissioners in terms of

25   unstable social history being used as a circumstance to

26   use unsuitability, which specifically speaks to the

27   Panel not using experiences of victimization or other

1  circumstances which could not be controlled by the

2  prisoner as circumstances which tend to show

3  unsuitability.  Mr. Carpenter was very young.  It was

4  primarily during the time of his infancy that his

5  social history was unstable, so I don't believe that's

6  a factor that should be held against him.  In terms of

7  signs of remorse, I believe Mr. Carpenter was very

8  candid, open, and honest with the Panel today.  He's

9  been remorseful for the life crime since his initial

10  psychological evaluation was conducted in 1984.  Most

11  recently, he stated, quote, it was a senseless crime.

12  I caused pain and hurt to a lot of people.  It's

13  something I'm ashamed of.  It's something I think about

14  every day.  Mr. Carpenter indicated a strong desire to

15  apologize to his victim and her family, but stated that

16  he has not yet done so because he doesn't feel he has a

17  right to.  He stated, quote, 'I don't feel I have the

18  right to apologize.  How could they ever forgive me?'

19  Mr. Carpenter continued, stating he hoped the victim's

20  family will some day be able to go on with their lives

21  and not pass this hate on to the next generation, a

22  sentiment that was expressed again today during the

23  hearing.  I think his significant insight is readily

24  apparent to everyone in the room today, and he has a

25  deeper understanding at this point of pain that he has

26  caused the victim and the families, and I think that

27  that understanding has a lot to do with the programming

64

1    and the maturity that Mr. Carpenter has gained since he

2    has been inside.  A lot of programs that he has attend

3    and opportunities that he has availed himself of while

4    he has been in prison have gotten him to look at the

5    circumstances that led to the crime as well as the

6    impact that his actions have had, not only on his

7    immediate victim but on their entire family and the

8    community at large.  And, I think, his remorse is not

9    simply limited to Miss Bentley.  His remorse goes to

10   the entire community and everyone who was impacted.

11   Speaking about the motivation for the crime, I will

12   keep it short because I have already touched on it in

13   response to some of the statements that the district

14   attorney indicated, but, again, I don't think that any

15   motive will really be justifiable for killing another

16   human being, and I think Mr. Carpenter is aware of

17   that.  His explanation of the motive and his

18   explanation of the circumstances that happened

19   immediately prior to the crime may sound really trivial

20   and inexplicable at this point, and I just want to

21   refocus the Panel's attention to the fact that he was

22   an 18-year-old boy, so his ability right now at almost

23   50 to look back and try and explain things that may

24   have made sense to him when he was 18 is really

25   difficult, and, at this point, probably don't make

26   sense and aren't logical.  And I think he has gained a

27   significant amount of maturity and insight, but, you

1    know, he is able to sit here today and describe all of

2    these different factors and who he was at that point,

3    which is the context in which we need to understand the

4    commitment offense.  I also just want to point out that

5    given his increased age, he does have a statistical

6    reduced probability of recidivism.  His psychological

7    evaluation from 2006, as I indicated earlier shows a

8    low risk of future violence.  In terms of his

9    understanding and plans for the future, he has very

10   stable and very significant plans.  The District

11   Attorney indicated that those are kind of still in the

12   process of being figured out, and I don't think that is

13   the case.  He has two offers to live in his county of

14   commitment.  He has one offer from Pete and Loretta

15   Wilson to live with them for at least six months until

16   he is either to find another place for himself or get

17   an interstate transfer to go live with his sister up in

18   Washington.  That offer of residence also includes

19   assistance with employment opportunities and financial

20   support and transportation while he is living there.

21   Additionally, his sister, Laura Balkin, has offered him

22   a residence in Santa Clara County by paying for an

23   apartment for him while he is living there.  He is

24   realistic in finding support programs such as AA and

25   NA, as I discussed previously in Santa Clara County as

26   well as in Washington.  His sister has offered him

27   multiple places to live in Washington, multiple jobs.

1  I think his parole plans are solid and complete and

2  current right now.  I don't think there's anything more

3  that needs to be done to prepare them.  Mr. Carpenter's

4  institutional behavior may not have been ideal, and I

5  think his counselors and the psychologist speak to his

6  difficulty adjusting during his first years in prison

7  and chalk a lot of that up to his young age.  He was 18

8  years old.  He didn't really recognize the consequences

9  of his actions clearly with the commitment offense and

10  thereafter with some of the disciplinaries that he

11  received in prison.  And I will acknowledge that some

12  of those disciplinaries were received immediately upon

13  arriving in prison, some of them were not received

14  until the '90's, which may not make sense to the Panel,

15  and I think a thorough review of the record shows that

16  during the '90's was a period of time when Mr.

17  Carpenter was using.  He had expressed that he lost

18  hope, that he felt like there was no chance that he --

19  of ever being released from prison, and he began to

20  receive disciplinary violations and continued using

21  drugs.  In '98, he did turn his life around, and he did

22  refocus himself on continuing to program positively and

23  maintain the gains that he has made, and it is with

24  that that I believe that he is currently suitable for

25  parole.  Thank you.

26          **PRESIDING COMMISSIONER SHELTON:**  Are you sure

27  you're done?

67

1       **ATTORNEY HOFFMANN:** I am done. I'm sorry that

2  was so long.

3       **PRESIDING COMMISSIONER SHELTON:** All right. Mr.

4  Carpenter, would you like to make a statement?

5       **INMATE CARPENTER:** Yes, I would. Excuse me.

6  Several things I'd like to say, and I'll make it brief.

7  But the DA, the District Attorney, you asked whether or

8  not, whether or not I need AA for life or if it's

9  something that I don't need. It's something that, you

10  know, it's one day at a time for me, and that's what it

11  is. And it's been eight years. And eight years to

12  somebody, eight years is a long time. I mean, eight

13  years isn't yesterday. Eight years was a long time

14  ago, and we'd all like to go back eight years in our

15  life so eight years is a good bit of time, and I wish

16  there was more under me, more clean time, but this is a

17  crime that happened three decades ago, and it was a

18  long time ago, and the DA has changed more than once.

19  The Board members have changed, the lawyers have

20  changed, the officers behind me have changed. I'm

21  still here and still talking about it and it's painful.

22  There's nothing I can do because when it comes time to

23  talk, I got to remember what I did. Now, you know, my

24  aunt will say, remember to tell them this. And my

25  sister says, remember, you got work skills now and you

26  need to get out now, but what it all comes down to

27  today is about me and Mrs. Bentley, about whether I'm

68

1    suitable for parole, and remembering that I took her

2    life, and I hope that I'm found suitable, and, if not,

3    I hope that I'm only given a year.  Thank you.

4              PRESIDING COMMISSIONER SHELTON:  Thank you, sir.

5    We are going to recess for deliberations.  The time is

6    10:30.  Mr. Rico, I'm going to put you on mute, sir.

7              DEPUTY DISTRICT ATTORNEY RICO:  Thank you,

8    Commissioner.

9                        R E C E S S

10                        --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

69

## CALIFORNIA BOARD OF PAROLE HEARINGS

### D E C I S I O N

1
2
3      **DEPUTY COMMISSIONER THOMPSON:**  Again we appear
4      to be on tape.
5      **PRESIDING COMMISSIONER SHELTON:**  All right.
6      Good morning, everyone.  We are back in the matter of
7      Ricky Carpenter, CDC number B, as in boy, 95921.
8      Everyone has returned to the room that was here during
9      the hearing as well as Mr. Rico on teleconferencing.
10     The Panel has reviewed all information received and
11     we've relied on the following circumstances in
12     concluding that Mr. Carpenter is not yet suitable for
13     parole and would pose an unreasonable risk of danger to
14     society or threat to public safety if released from
15     prison.  Mr. Carpenter, we gave you a three-year denial
16     this time instead of a four-year denial, and I'm going
17     to go into the particular reasons why, and there are
18     several areas of concern for us, and I think I will,
19     you know, I will be as specific as I can to give you
20     guidance for your next parole hearing.  I do want to
21     start off by saying that we found you to be very
22     sincere and respectful and truthful, and we appreciate
23     that from you, but there's still some areas of concern,
24     especially of areas of dealing with your alcohol and
25     drug addiction and the support and strength that you'll
26     need in that arena to carry you through to a release
27     **RICKY CARPENTER  B-95921    DECISION PAGE 1    9/21/2006**

1   some day. I have a process that I need to follow

2   through, and I am going to talk about the commitment

3   offense. We've already referred to it. I do believe

4   you are remorseful in that area. I do believe that you

5   need to take a look back on that offense because, for

6   the life of me, I think there's a trigger there

7   somewhere that you need to put your finger on so you

8   know how to control that in the future. So the offense

9   was carried out in an especially cruel and callous

10  manner. We've talked about it. The victim, as far as

11  I'm concerned, was abused and defiled during the course

12  of the offense. I mean, not only was she choked and

13  strangled and stabbed and suffocated then her throat

14  slit, the offense showed exceptionally callous

15  disregard for human suffering, and I think we've all

16  agreed around the table that there was no excuse for

17  this death. There was absolutely no reason or

18  motivations. The conclusions are drawn from the

19  statement of facts that came from the April 2006 Board

20  report that stated on January 16th, 1978, Mr. Carpenter

21  went to Miss Bentley's house with the pretense of using

22  a telephone and then proceeded to strike her in the

23  face, tripped her, choked her, stabbed her, suffocated

24  her, and eventually killed her. We've been through the

25  details of that adequately. With regards to your prior

26  record, sir, there is really none of any concern to

27  **RICKY CARPENTER  B-95921   DECISION PAGE 2   9/21/2006**

71

1   this Panel.  Institutional behavior, I want to indicate

2   that you've received 11, 115's, the last being in '97.

3   You've received four 128's, the last was a reduced 115,

4   and that was in July of '05.  You know, we talked about

5   some of the programming and stuff you've done.  For

6   being in prison for 30 years, I find that you've

7   programmed in a limited manner.  There are so many

8   abundance, there's an abundance of programs in this

9   particular prison that you have not availed yourself

10  of, and I also have a difficult time with you didn't

11  attend AA or NA because you're going to college.  I

12  think you can figure out how to multi task.  I know

13  people that are raising families, going to school,

14  working full time and attending AA and NA, so I think

15  that you need to figure out a way to either commit

16  yourself to either AA or NA or some other ongoing

17  substance abuse program from this day forward until the

18  day you die because you are extraordinarily high risk

19  of relapsing based upon what you've presented us today,

20  what's all been in your record and the fact that you

21  have not been consistent.  Your attendance at AA and NA

22  has been very sporadic.  So I have a concern about

23  that.  So I would have to say you've programmed in a

24  limited manner and you've not sufficiently participated

25  in self-help programs at this time, especially for a

26  man that's been in custody for 30 years.  You should

27  RICKY CARPENTER  B-95921   DECISION PAGE 3   9/21/2006

72

1    have reams and reams and reams of certificates and

2    laudatories, all kinds of things.  You've got to jump

3    right head into it, sir.  The psychiatric evaluation

4    was done by Dr. Inaba, I-N-A-B-A, in August of 2006.

5    That psych gave you a Global Assessment Functioning

6    score of 78.  Do you know what that means?  Do you know

7    what a global assessment functioning score is?

8            INMATE CARPENTER:  Yes, it's your functioning

9    within your surroundings.

10           PRESIDING COMMISSIONER SHELTON:  It's kind of

11   how you would function out with in the community.

12   Well, look at it like a grade in school.  78 is like a

13   C plus.  I'd rather have you in the B plus range of

14   Global Assessment Functioning.  Do you understand what

15   I'm saying?

16           INMATE CARPENTER:  Yes.

17           PRESIDING COMMISSIONER SHELTON:  As well, the

18   psychological indicates that you're at risk for relapse

19   because of the use of alcohol and drugs.  With a three-

20   year denial, we are recommending a new psychological

21   for you before your next hearing.  I think that the

22   Panel is going to want to see a stronger support in

23   your behalf.  And this gives you three years of

24   distancing yourself from your last heroin use, which

25   you indicated was in '98, and it will give you a longer

26   distance of being clean.  Do you understand?  So you

27   RICKY CARPENTER  B-95921    DECISION PAGE 4    9/21/2006

73

1   have an opportunity to improve your assessment at your

2   psychological evaluation.  With regards to your parole

3   plans, it appears that your strength is in another

4   state, your strongest support base is in another state.

5   I applaud you for recognizing that paroling to

6   Washington is pretty much an impossibility.  You would

7   have to parole in California, do well for a period of

8   time, and then transfer, a request to transfer to

9   Washington.  I think your parole plans for doing that

10  are okay, but you can strengthen them in a couple of

11  ways, so I just want to give you a heads up for your

12  next hearing.  One is, firm up which residence you want

13  to go to.  What would be your primary choice?  Do you

14  want to live with your aunt and your uncle and do the

15  six months there?  Do you want to continue looking for

16  transition housing? And, I know, sir, I know you've

17  applied to several, and I've been before many, many,

18  lifer hearings and other people seem to have no problem

19  getting into transitional housing.  Do you know a name

20  of an organization called Friends Outside?

21        INMATE CARPENTER:  Yes.

22        PRESIDING COMMISSIONER SHELTON:  Do you have a

23  way to contact them?

24        INMATE CARPENTER:  Yes.

25        PRESIDING COMMISSIONER SHELTON:  Contact them.

26  See if you having them do some of the leg work for you

27  RICKY CARPENTER  B-95921   DECISION PAGE 5   9/21/2006

74

1   out there where they can maybe smooth a pathway for you

2   to get there because that might be an option for you

3   too.  At the very least, the next Board's going to want

4   to see in your file where you're going to attend AA or

5   NA or something like that, where those meetings are,

6   when they're going to be held, how you're going to get

7   there.  Also, line up a sponsor.  You can get a sponsor

8   ahead of time.  You can work with somebody that is

9   willing to sponsor you when you get into the community

10  and they can work with you before you go into the

11  community.  Get a sponsor.  You're going to need one,

12  and you're going to need somebody that's going to be

13  there for you.  Okay.  Before your next parole hearing,

14  make sure that your letters are updated and current

15  especially with regard to residence and employment.

16  Does that make sense?

17            INMATE CARPENTER:  Yes.

18            PRESIDING COMMISSIONER SHELTON:  With regards to

19  responses to 3042 notices that were sent out, those

20  letters go to agencies that have an interest in your

21  case, and that is why Mr. Rico is here representing

22  Santa Clara County District Attorney's office, and we

23  received no other letters, at least I didn't in my

24  file.  I do want to mention the things that you've been

25  doing well.  You have done an amazing job with your

26  education.  Continue with it.

27  RICKY CARPENTER  B-95921   DECISION PAGE 6   9/21/2006

75

1      INMATE CARPENTER:  Yes.

2      PRESIDING COMMISSIONER SHELTON:  I mean, that's

3    not an order, that's a suggestion, because obviously

4    it's important to you.  You received your GED in 1979,

5    coming into prison basically illiterate.  On top of

6    that, you started an AA program in '97 and got your AA

7    in July of '04 with a 3.75 grade point average.  That's

8    excellent work.  You need to put as much due diligence

9    into your abstinence from alcohol or drugs.  In my

10   books, eight years is not very long.  It might seem

11   like long to you.  30 years is long, and that's what

12   you've been in here for, but when you look back out of

13   those 30 years and only eight years of them were

14   totally clean, that's not long in the scheme of your

15   incarceration, and you have received two vocations,

16   from what I understand, mill and cabinet and machinist,

17   and you have 11,900 plus hours of time in those arenas.

18   You worked in PIA laundry, lead man, tailor, and you're

19   currently a maintenance mechanic in the wood room?

20       INMATE CARPENTER:  No, I'm not.  Lead man in the

21   finish mill.

22       PRESIDING COMMISSIONER SHELTON:  Okay.  In the

23   finish mill.  You've participated in the Cairos

24   program.  You've participated in IMPACT.  You've

25   received four laudatory chronos from your woodworking

26   supervisor who says that you are an accomplished woods

27   RICKY CARPENTER  B-95921    DECISION PAGE 7    9/21/2006

76

1    man and operating at the journeyman level, so you

2    should applaud yourself for that as well.  And you have

3    had some past, albeit sporadic participation in AA and

4    NA.  Unfortunately, we did give you a three-year denial

5    and that means that in a separate decision, this Panel

6    finds that you have been convicted of murder and it is

7    not reasonable to expect that parole will be granted at

8    a hearing during the next three years.  First of all,

9    we talked about the offense.  I know counsel indicated

10   nothing's going to change the offense.  I think what

11   needs to change with regards to that is you revisit the

12   day you killed your victim and find out what was the

13   key that day that pushed your button.  I think that's

14   going to be really, really important for you so you

15   know how to defend yourself from that situation again.

16   So we talked about the fact that it was an egregious

17   crime and how it was carried out.  I'm not going to

18   revisit that again.  I truly, truly believe you are

19   remorseful for that incident.  We talked about the fact

20   that -- we talked about your history, regardless of

21   whether or not Miss Hoffmann wants to count that in.

22   You had a terrible childhood, and I'm sorry for that.

23   It shouldn't be a start for anybody, but childhoods do

24   lead to adulthood, and we always have to take a look at

25   what transpires there and keep in mind the strengths

26   and weaknesses of those and not use them as excuses or

27   RICKY CARPENTER  B-95921    DECISION PAGE 8    9/21/2006

77

1   crutches, and I'm not saying that you are, but I'm
2   saying you are partly, you partly are what you were
3   back then. We all are. Good, bad and ugly. I
4   appreciate the fact that you have taken as much time to
5   be introspective about that as you have been.
6   Psychological, kind of sits on the fence for you. 78
7   isn't a great GAF score. I'd like to see it go up, and
8   I'd like to see a new one done on you, which we are
9   requesting, and also it does indicate that you are at
10  risk for relapse into drugs and alcohol. I think
11  that's probably a good deal of where your focus should
12  be the next few years, on strengthening yourself,
13  distancing yourself from that '98 last use. And be
14  proud of yourself. Just continue forward. I'm just
15  going to give you a real quick summary of review of the
16  notes I took during the course of this hearing. Number
17  one, you need to distance yourself from that 128,
18  regardless of what it is or how you got it, it's there
19  so you need to distance yourself from that; so
20  basically what I'm saying is no more 115's, and no more
21  128's. You need to also distance yourself from that
22  last use of heroin in '98. You've had eight years
23  clean. In three years you'll have 11 years clean.
24  That sounds a whole lot more impressive. You need to
25  concentrate on as much self-help as you can, and if you
26  can't participate in a program for whatever reason,
27  **RICKY CARPENTER  B-95921    DECISION PAGE 9    9/21/2006**

78

1    I know you can read now, read books, and write book

2    reports for us.  It doesn't have to be long.  It can

3    just be half a page of a book report about what you

4    read, how it impacted you, and how you think you can

5    use it in your life.  Because I think Mr. Rico was very

6    right when he said there's going to be so many

7    stressors for you out there.  The changes are

8    incredible, and I would hope that we could arm you with

9    as many tools as possible to make for your success

10   because you're certainly moving in the right direction.

11   I talk to you about shoring up your parole plans by

12   including AA, NA type meetings on a regular basis,

13   locations, times, and get yourself a sponsor, and I

14   think that's pretty much it.  Commissioner, did you

15   want to add anything?

16        DEPUTY COMMISSIONER THOMPSON:  That I think he's

17   done very well in trying to advance himself.  He's

18   shown maturity, and I wish him good fortune in the

19   future.

20        PRESIDING COMMISSIONER SHELTON:  Good luck to

21   you, sir.  You're on the right path.  Stay on it.

22        ATTORNEY HOFFMANN:  Thank you.

23   //

24   //

25   //

26   //

27   RICKY CARPENTER  B-95921    DECISION PAGE 10    9/21/2006

79

1      PRESIDING COMMISSIONER SHELTON:  All right that

2    concludes this hearing at 11:00 a.m.

3              A D J O U R N M E N T

4                  --oOo--

23    PAROLE DENIED THREE YEARS.

24    THIS DECISION WILL BE FINAL ON:_____JAN 1 9 2007_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    RICKY CARPENTER  B-95921    DECISION PAGE 11   9/21/2006

80

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KERRY VIENS, a duly designated transcriber,

NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare

and certify under penalty of perjury that I have

transcribed tape(s) which total two in number and cover

a total of pages numbered 1 - 79, and which recording

was duly recorded at CALIFORNIA STATE PRISON, SAN

QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT

PAROLE CONSIDERATION HEARING of RICKY CARPENTER, CDC

No. B-95921, on SEPTEMBER 21, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape(s) to

the best of my ability.

I hereby certify that I am a disinterested party

in the above-captioned matter and have no interest in

the outcome of the hearing.

Dated DECEMBER 4, 2006 at Sacramento County,

California.

*Kerry L. Viens*

_____

Kerry Viens
Transcriber
**Northern California Court Reporters**

# EXHIBIT E

PSYCHOSOCIAL EVALUATION
FOR THE BOARD OF PRISON TERMS
SEPTEMBER 2006 LIFER HEARING
SAN QUENTIN STATE PRISON

PSYCHOSOCIAL ASSESSMENT

I.      <u>Identifying Information:</u>     Mr. Carpenter is a 47 year old, Caucasian male who is
serving a Life sentence for Murder (P187) committed on 1-15-78.  The report is based
on a review of the inmate's central files, medical record and a face-to-face interview
conducted in the staff offices of San Quentin State Prison. Mr. Carpenter was
informed of the limits of confidentiality in that information provided would be
included in a report to the Board of Prison Terms.  Mr. Carpenter stated that he
understood this and was able to demonstrate an understanding of the purpose of the
interview.  He denied any need for assistance or for any adaptive aides and stated that
he was fully able to participate in the interview.  Only Mr. Carpenter and the
examiner were present at the interview.

Mr. Carpenter's developmental history, family history, psychosocial development and
sexual orientation, military history, educational history, employment and income history, and
substance abuse history have been thoroughly reviewed and presented in previous reports and
will not be repeated here.  The reader is referred to the July 9, 2001 report by Dr. Ishida for
this information.

<u>II. Plans if Granted Release:</u>
A. Housing:
Mr. Carpenter would prefer to parole to Washington state where his sister and brother-in-law
would be able to assist him with a car, a job and a condominium residence.

If required to parole to his county of last residence, he would be able to live with an aunt and
uncle.

B. Employment:
In Washington State, Mr. Carpenter would be able to work as a forklift operator or office
worker.  In Santa Clara County, he has not been able to secure any offers of employment
although he has extensive skills as a carpenter and cabinetmaker.

C. Social Support/Services:

Mr. Carpenter would rely primarily on family for social support. He is also committed to continuing his participation in NA. He has applied to residential programs for recovering substance abusers including Victory Outreach, Alliance and Ala-non but has not received a confirmation of acceptance into any program. Mr. Carpenter recognizes that his crime may be a deterrent to being considered by many programs.

## CLINICAL ASSESSMENT

### III. Current Mental Status/Treatment Needs:

Mr. Carpenter presented as a pleasant, sincere soft-spoken man. He appeared to be his stated age. He was well-groomed with somewhat longish hair, and dressed in standard CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. He was able to identify the current governor and U.S. President. He was able to think abstractly. His thought was coherent, linear and logical with no evidence of thought disorder. He had no symptoms of perceptual distortions or delusional thought. His intellectual functioning appeared to be in the average to above average range. Attention, concentration and memory appeared to be within normal limits. He was able to think abstractly and to place common items into appropriate categories. Speech, flow of thought and affect were all within normal range. Mood was mildly depressed and he became tearful several times when discussing his commitment offense. He denied any suicidal or homicidal ideation. His judgment appeared to be sound for most situations. He stated that he would call the fire department and then see if he could help if he was the first one to discover a fire in a crowded building. He demonstrated capacity for insight into his offense.

### A. CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    303.90 Alcohol Dependence (in remission is a controlled environment)
           304.80 Polysubstance Dependence (in remission in a controlled environment)

AXIS II:    301.9 Personality Disorder, NOS (avoidant, dependent, antisocial features), improving

AXIS III:   None related to mental health

AXIS IV:    Stressors: Life Sentence

AXIS V:     GAF = 78

**B:  Current Level of Care:** General Population, not in MHSDS
**C:  Treatment Activities:**  None for mental health reasons.  Mr. Carpenter participates in educational, vocational, and self-help activities
**D:  Medications:** None for mental health treatment
**E. Prognosis:** Based on history and Mr. Carpenter's present clinical presentation, he remains at risk for relapse into alcohol or drug use in a less restricted environment. His gains

in overcoming maladaptive personality traits are likely to be maintain in a structured, supervised environment or as long as Mr. Carpenter is able to set and achieve positive goals for work and self-improvement.

IV. Review of Life Crime:
A. Inmate's Version of Offense
Mr. Carpenter's account of the life crime does not differ from previous accounts or from the account contained in reports found in his C-file.  He acknowledges that he single-handedly caused the death of his neighbor by stabbing her after he had rendered her unconscious.  He confessed to the police after he was arrested and agreed to take a polygraph examination.

B. Relevance of Mental Condition to Crime
While Mr. Carpenter does not have a mental illness or severe mental disorder, he does have maladaptive personality traits that represent an enduring pattern of behavior and inner experience, that deviate markedly from mainstream culture and impact his interpersonal functioning, affectivity, and impulse control.  While this pattern has been of long duration and pervasive across a range of situations, the maladaptive traits have significantly improved in Mr. Carpenter.  These maladaptive traits prevented Mr. Carpenter from learning to cope adaptively with stress and from completing the developmental tasks expected of adolescents. His inability to meet these challenges paired with his dependence on drugs and alcohol were directly related to his motivation for committing the crime, as well as his inability to resist the homicidal impulse.

C. Inmate's Level of Insight and Remorse
Mr. Carpenter takes full responsibility for the crime.  He was under the influence of alcohol and marijuana at the time, but does not believe that his use was the primary causal factor in the crime.  He was in a state of agitation as his mother was no longer as compliant in responding to his attempts to continue living an irresponsible life while she provided for him. He feared losing this arrangement that required no effort from him to achieve or become responsible.  His use of drugs and alcohol were tolerated and he became dependent on them. When his neighbor became a threat to his dependency needs, he displaced the anger he felt toward his mother on her and killed her over a minor provocation that occurred earlier in the day.

Mr. Carpenter is not only remorseful and sad about having committed the crime, he seems to feel a deep sense of shame about the way he performed in all aspects of his life.  He suffers daily as he remembers clearly what he did, and shoulders responsibility for the commission of the crime.

D. Causative Factors
Mr. Carpenter was part of a very dysfunctional family system that tolerated rageful behavior, violence, irresponsibility, verbal and physical abuse, manipulation, and the use of illegal substances.  This affected not only Mr. Carpenter values, but his personality and character formation.

CARPENTER, Ricky Allen B-95921                                    August 24, 2006

---

V. Assessment of Dangerousness:

The following is a risk assessment and not intended to predict future dangerousness with complete accuracy. A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior. Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

Mr. Carpenter was evaluated using two measures of risk for factors related to criminal behavior, and violent recidivism. On the PCL-R, a measure of psychopathy, Mr. Carpenter scored at the 48th percentile for male offenders. He had a T score of 51.8, which places him at the mean for male offenders. The mean T score is 50. He received a score on the Violence Risk Assessment Guide (VRAG) that is associated with a probability of 0.55 of violent recidivism over a 7-year period, if released from custody. This score is based largely on static factors in Mr. Carpenter's case that cannot be changed. The only contributing factors that can be changed are whether he meets the criteria for a personality disorder, and his score on the Hare Psychopathy Checklist (PCL-R). The other factors are related to Mr. Carpenter early adjustment and criminal history. It should be noted that the stated probability is based on Mr. Carpenter's similarity to other offenders whose rates of recidivism have been measured. As behavior is multi-factorial it is not possible to predict the future behavior of any individual with certainty. Some individuals with low probability scores reoffend, while others with high probability scores never reoffend.

A. Violence History:

Mr. Carpenter stated that he was not ever a victim of physical or sexual abuse as a child. He observed violence between the adults in his life. His uncle and his girlfriend used to assault each other. His mother and his grandmother also had physical fights that Mr. Carpenter observed. The conflicts between Mr. Carpenter's mother and his stepfather were primarily verbal with his mother as the aggressor. He stated that his stepfather would try to leave the house when his mother would begin her verbal tirades, but that sometimes he would just explode and hit her. The physical assaults would occur approximately once a week.

Mr. Carpenter first observed serious physical injury when he was six years old and saw a girl hit by a car. He played with BB guns as a child, but never owned a gun. He got into fights with friends in elementary school, but was never suspended or disciplined. He considered himself to avoid violence in general.

B. In a Controlled Environment:

Mr. Carpenter received one write up for a rules violation since his last Board appearance. He received a CDC115 on 7-1-05 for not showing up for a medical ducat. He stated that he had been told that he could return the next day for the laboratory appointment. The 115 states that Mr. Carpenter acknowledged that he went to breakfast instead of going directly to the appointment as scheduled. The laboratory test required a period of fasting before the test.

In 1997, he was found guilty of Conspiracy to Extort $1,500 from another inmate by means of threat of force and violence. The offense reportedly occurred in regard to a drug debt. He has no other record of institutional violence or aggression.

Mr. Carpenter has been attending NA since his last appearance before the Board. Mr. Carpenter has also participated in the San Quentin college program with a high grade point average. He has also participated in Kairos, Creative Conflict Resolution, and IMPACT. If he remains abstinent from alcohol and drugs, and continues to participate in positive programming he would be expected to be at low risk of violence in a controlled setting.

If Released to the Community:

As Mr. Carpenter has been incarcerated for all of his adult life, he would be likely to face considerable challenges in adapting to life in the community. He has gained skills and a level of education that would make him employable and provide him with the potential to be a productive citizen. This assumes that he would be successful in maintaining abstinence from alcohol and drug use while in the community. It would be important for Mr. Carpenter is gain acceptance by members of society who are responsible citizens and who did not rely on the use of substances for coping with challenges and stress.

Mr. Carpenter describes himself as "an addictive personality. He realizes that he is prone to relapse and must actively work against that possibility constantly. He is committed to following a 12-step program such as Narcotics Anonymous. He has come to understand the contribution of his family relationships to his development and his crime. He continues to have a fairly negative self-image in spite of recent accomplishments, such as successful college coursework and proficient skills as a carpenter. He is a lead man at PIA and has opportunities to teach other workers carpentry and production. These experiences of responsibility and helping others to learn have been very positive in allowing Mr. Carpenter to develop a more positive self-image. He states, "I like who I am now, what I am capable of."

There was no indication of anger, hostility or poor impulse in Mr. Carpenter's clinical presentation. Mr. Carpenter appeared to be a mildly depressed individual who suffers from a dearth of positive experiences in his life. Work is very important to him in that it provides him with validation of his competence and value to others. His positive educational achievements are also an important source of self esteem. It would be important for Mr. Carpenter to have the structure and social support necessary to maintain this level of positive functioning in the community. Given his vulnerability for relapse into substance abuse, a comprehensive, supportive program might be necessary to maintain these gains.

VI. Clinician Comments and Summary:

Mr. Carpenter is a greatly improved individual in that he has found ways to make a positive contribution to the San Quentin community in spite of his history of personal shortcomings and irresponsible behavior. He has persisted in obtaining a college degree and solid vocational skills.

Mr. Carpenter's early socialization in a dysfunctional family, his lack of positive role models, and violent crime have resulted in a negative self-concept that Mr. Carpenter works hard to overcome. While he has made impressive improvements, his sense of self-worth remains rather fragile. Part of this comes from his honest self-acceptance of his role in the crime. He would benefit from participation in a victim-offender intervention, while incarcerated, provided the program is run in a manner that would offer him adequate emotional support.

Mr. Carpenter's mildly depressed mood seems to be situational, related to his incarceration and limited social support, as well as a feature of his personality disorder. He did not exhibit symptoms related to major depressive disorder, other than low self-esteem, and a sad affect when discussing his crime. While follow up mental health treatment is not warranted at this time, Mr. Carpenter would benefit from continued participation in skill building and self-help activities. As Mr. Carpenter develops his record of positive achievements, his risk of violent recidivism would continue to lessen.

While has become a much stronger individual than he was at the time of his crime, or even earlier in his incarceration, Mr. Carpenter remains at risk for relapse into the use of alcohol or drugs in a less structured setting. He would benefit from paroling to a program that has experience with polysubstance abusers who have committed violent crimes. Any use of alcohol or drugs could result in an impairment of judgment and lessened impulse control.

Michel Lynn Inaba, Ph.D.                          Date
Contract Psychologist

# EXHIBIT F

FILED

APR 24 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
By _____ Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

```
                                    )    No.: 68207
                                    )
In re                               )
                                    )
    RICKY CARPENTER,                )    ORDER
                                    )
On Habeas Corpus                    )
```

The California Supreme Court, in *In re Dannenberg* (2005) 34 Cal.4th 1061, finding the Parole Board's procedures lawful because the Board is constrained by a framework within which to exercise discretion, stated: "the regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole." (*Dannenberg* at p. 1080. See also page 1096, footnote 16: "the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds.") In this case, because there is 'some evidence' the motive for the crime is inexplicable or very trivial, the crime itself appears to show unsuitability under the "detailed standards." The habeas petition is DENIED.

DATED: __23 Apr__, 2007

_____
PAUL BERNAL
JUDGE OF THE SUPERIOR COURT

cc:  Petitioner
     Attorney General
     Research (3-8A)
     CJIC

1

MC-275

Name __ Ricky A. Carpenter _____

Address ___ B95921 / 2N14 _____

___ San Quentin, CA 94974 _____

_____

CDC or ID Number ___ B95921 _____

# FILED

MAR  8 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
By ___ G. Chua ___ Deputy

Santa Clara County Superior Court

In + For the State of California
*(Court)*

## PETITION FOR WRIT OF HABEAS CORPUS

| | |
|---|---|
| Ricky A. Carpenter | No. __68207__ |
| Petitioner | *(To be supplied by the Clerk of the Court)* |
| vs. | |
| San Quentin State Prison Warden Ornoski | |
| Respondent | |

### INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

**This petition concerns:**

☐ A conviction                ☒ Parole

☐ A sentence                  ☐ Credits

☐ Jail or prison conditions   ☐ Prison discipline

☒ Other (specify):  Parole Hearing Denial

1. Your name:  Ricky A. Carpenter

2. Where are you incarcerated?  San Quentin State Prison

3. Why are you in custody?  ☒ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reasons for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      1st Degree Murder

   b. Penal or other code sections:  PC 187

   c. Name and location of sentencing or committing court:  Santa Clara County Superior Court
      San Jose, CA.

   d. Case number:  # 68207

   e. Date convicted or committed:  8/10/1978

   f. Date sentenced:  8/17/1978

   g. Length of sentence:  7 years to Life

   h. When do you expect to be released?  Unknown; Lifer

   i. Were you represented by counsel in the trial court?  ☒ Yes  ☐ No  If yes, state the attorney's name and address:
      Paul Mansfield, San Jose, CA

4. What was the LAST plea you entered?  *(check one)*

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6.  GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See Attached pages 1 through 8 for Grounds: 1, 2, and 3
INSERT A through INSERT C

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time (*when*) or place (*where*). *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b.  Supporting cases, rules, or other authority (optional):

(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

Did you appeal from the conviction, sentence, or commitment?   ☒ Yes.   ☐ No.   If yes, give the following information:

a.   Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

_Court of Appeal_

b.   Result:   _Denied_                     c.   Date of decision:   _1979_

d.   Case number or citation of opinion, if known:   _Unknown_

e.   Issues raised:   (1)   _Ineffectiveness of Counsel_

       (2)   _Circumstances of case_

       (3)   _Evidence presented_

f.   Were you represented by counsel on appeal? ☒ Yes. ☐ No.   If yes, state the attorney's name and address, if known:

_State Defender's Office_

Did you seek review in the California Supreme Court?   ☒ Yes.   ☐ No.   If yes, give the following information:

a.   Result:   _Denied_                     b.   Date of decision:   _1979_

c.   Case number or citation of opinion, if known:   _Unknown_

d.   Issues raised:   (1)   _Same as above_

       (2)   _Same as above_

       (3)   _Same as above_

). If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_This appeal concerns the denial of parole at a suitability hearing_

Administrative Review:

a.   If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_BPT Administrative Review Process Repealed on 5/1/2004_

b.   Did you seek the highest level of administrative review available?   ☒ Yes.   ☐ No.
     *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

    N/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

    N/A

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No.  If yes, state the attorney's name and address, if known:

    not on this petition.

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No.  If yes, explain:

    N/A

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    N/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3/6/07

▶ _Rick a Carpenter_ (SIGNATURE OF PETITIONER)

INSERT A

## Ground 1

IN VIOLATION OF STATE AND FEDERAL DUE PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") IS CONTINUING TO DENY PAROLE THROUGH THE SOLE USE OF THE COMMITTING OFFENSE AND PRIOR NON-CRIMINAL/PRISON CONDUCT WITHOUT REAL EVIDENCE THAT PETITIONER IS A CURRENT "UNREASONABLE THREAT TO PUBLIC SAFETY," THAT IS SUPPORTED BY THE RECORD, MANIPULATING THE FACTS OF THE HEARING THROUGH RUMORS, WHIM, AND CAPRICE, DISTORTION, AND OMISSION OF EVIDENCE, RESULTING IN A FINDING OF UNSUITABILITY.

Ricky A. Carpenter ("Petitioner") is serving a seven to life for a conviction of first-degree murder committed on January 15, 1978. Petitioner appeared before the Board of Parole Hearings on September 21, 2006, and received a three year denial for parole. Petitioner's Minimum Eligible Parole Date is set at November 30, 1985. That decision is the basis for this petition for writ of habeas corpus.

The record will show that the Board abused their discretion in making findings that are not supported by the record. Petitioner did not get a fair and impartial hearing. By the actions, stated in the grounds above, the Board manipulated all the evidence supporting a finding of suitability (See record), while their manipulations are not because they are relying solely on the committing offense and prior non-criminal conduct. These factors violate Petitioner's constitutional protected Due Process and Liberty Interest rights and illustrate that the Board has abused their discretion and did not conduct a fair hearing. The Board is using "boiler-plate" issues, elements, and language, which were either not found true by the jury, unconstitutionally vague, not supported by the evidence and law, and that are clouding the real issue. The Board wants to rely solely on the controlling offense and prior non-criminal conduct as allowed under the California Supreme Court in the In re Rosenkrantz, 29 Cal.4th 616, but is having a difficult time getting around the Liberty Interest Rights granted under the Ninth Circuit, so they have to cloud the issue and record. (See e.g., Cal. Penal Code § 3041(a)

1.

INSERT A (Ground 1 cont.)

and (b); § 190.2, § 190.4; Cal. Codes of Regs. tit. 15; <u>Cunningham v.</u> <u>California</u> 549 U.S. ___(2007); <u>Superintendent v. Hill</u>, 472 U.S. 455; <u>In re</u> <u>Scott</u> (2005) 133 Cal.App.4th 573; <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910, 915; <u>In re Elkins</u> (2006) 144 Cal.App.4th 475; and <u>In re Weider</u> (2006) 145 Cal.App.4th 579; Fourteenth Amendment of the United States Constitution.)

For the foregoing reasons, the Court should grant the petition and order the Board to set a parole date that conforms with the above stated law. In the event that Petitioner has gone beyond what the Matrix guidelines provides for his case, Petitioner should receive credit for his parole term.

INSERT B

## Ground 2

IN VIOLATION OF STATE AND FEDERAL EQUAL PROTECTION AND DUE PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") FAILED TO "ACTUALLY" CONSIDER ALL OF THE RELEVANT RELIABLE INFORMATION IN THE PROPER MANNER PURSUANT TO CAL. CODE OF REG. TIT. 15 ("CCR-15") § 2402(b); MENTAL HEALTH AND COUNSELOR REPORTS OF RISK ASSESSMENT, CAL. PENAL CODE § 3402 NOTICE SUPPORTING OR NOT OPPOSING PAROLE, PRISON CONDUCT AND REHABILITATION, ETC.. BEYOND THE COMMITTING OFFENSE (AND PRIORS) NON-CRIMINAL CONDUCT, THERE IS NO SUPPORT BY THE RECORD THAT PETITIONER IS A **CURRENT** UNREASONABLE THREAT TO THE PUBLIC IF RELEASED ON PAROLE.

On September 21, 2006, the record demonstrates how the Board of Parole Hearings ("Board") merely went through the motions without "actually" considering all the information. This consideration should really go beyond just stating that the Board did so. The Board abused its discretion in claiming that the committing offense and prior non-criminal prison conduct and prior to the incarceration conduct, which are all unchangeable factors, that would outweigh all of the factors supporting parole: e.g., Mental Health and Counselor Evaluations and Risk Assessments, work assignment performance, self-help groups, parole plans, etc... The weighing process, not standardized, is an Equal Protection violation. Even though the Board acknowledged the positive, it is just as obvious they were not "actually" considering them as factors of suitability. The Board did not "Actually" consider Petitioner's eligible for parole and that parole (according to the intent and spirit of the process described in Cal. Penal Code § 3041(b)) should be granted unless Petitioner is a current unreasonable risk to public safety. The Board instead substituted their "boiler-plate" grounds for denial for an "Actual" determination that is supported by the record and within the intent and spirit of the process. (See. e.g., Penal Code § 3041(a) and (b); § 190.2, § 190.4; Cal. Codes of Regs. tit. 15; <u>Cunningham v. California</u> 549 U.S. ___(2007); <u>Superintendent v. Hill</u>, 472 U.S. 455; <u>In re Scott</u> (2005) 133 Cal.App.4th 573; <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910, 915; <u>In re Elkins</u> (2006)

3.

INSERT B (Ground 2 con )    )

144 Cal.App.4th 475; and In re Weider (2006) 145 Cal.App.4th 579; Fourteenth Amendment of the United States Constitution Equal Protection and Due Process Clause.)

For the foregoing reasons, the Court should grant the petition and order the Board to set a parole date that conforms with the above stated law. In the event that Petitioner has gone beyond what the Matrix guidelines provides for his case, Petitioner should receive credit for his parole term. In the alternative, the Court should appoint counsel, hold an evidentiary hearing, while order the Board to produce records of all "Seven Years to Life" prisoners' decisions. This discovery will show that the Board uses "boiler-plate" language that is unconstitutionally vague, were not present or found true by a jury, and represent a "No-Parole Policy" for those convicted of murder.

INSERT C

## Ground 3

THE BOARD OF PAROLE HEARINGS ("BOARD") VIOLATED PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS IN ITS RELIANCE ON THE "SOME EVIDENCE" QUANTUM OF EVIDENCE DOCTRINE WHEN IT USED THE COMMITTING OFFENSE, PRIOR-CONDUCT (TO INCARCERATION) AND PRIOR NON-CRIMINAL CONDUCT TO MAKE A FINDING THAT PETITIONER WAS AN UNREASONABLE RISK TO PUBLIC SAFETY IF RELEASED ON PAROLE.

When all the evidence is examined, it will show that on September 21, 2006, the record demonstrates how the Board of Parole Hearings ("Board") used the above as the sole evidence, factors to make a finding of unsuitability. Although the authority to do so has been upheld under California Supreme Court's Rosenkrantz decision, it also violates the Liberty Interest ruling in the Ninth Circuit Biggs v. Terhune decision. The "Some Evidence" Doctrine therefore violates Petitioner's Liberty Interest and the Quantum of Evidence must be increased to at least "substantive-evidence" (defined as enough to convince a reasonable person). The "Some Evidence" (under Superintendent v. Hill, 472 U.S. 455 ("Hill"), that was introduced for the first time during "In re Powell" parole hearing having been used ever since) Doctrine should not apply in a parole suitability hearing because the argument posed during Hill is not the same in a parole hearing as it was in a disciplinary hearing: the Superintendent had a violent prison to control and Hill's Liberty Interest was very small.

In Hill, the Court held that due process requires a prison disciplinary decision be supported by some evidence. "In a variety of contexts, the Court has recognized that a governmental decision resulting in the loss of any important liberty interest violates due process if the decision is no supported by any evidence." Id. at 455. Indeed, the general rule is that review of agency decisions, including those made by a quasi-judicial officers, is for substantial evidence. (See e.g., Evans v. Charter, 110 F.3d 1480, 1483 (9th Cir. 1997) (review of ALJ findings); Young v. Sullivan, 911 F.2d 180, 183

INSERT C (Ground 3 co___.)

(9th Cir. 1990) (same.).

The state and federal courts have tended to assume that the "some evidence" standard in _Hill_ is the standard that applies to parole decisions. Petitioner contends that is wrong. The usual standard is substantial evidence. _Hill_ developed an exception for prison disciplinary hearings, and exception premised on the unique circumstances of prison discipline. No U.S. Supreme Court case, and certainly nothing in _Hill_, suggest that the "some evidence" standard is appropriate for, or would satisfy due process in, parole matters.

The requirements of due process are flexible and depends on balancing of the interest affected by the relevant government actions. (See, e.g., _Cafeteria Workers v. McElroy_, 367 U.S. 866, 895 (1961).) In _Hill_, the Supreme Court balanced a prisoner's interest in good time credit against "the distinctive setting of a prison, where disciplinary proceeding 'take place in a closed, tightly controlled environment.'" 472 U.S. at 454. The Court rejected the prison's argument that no particular quantum of evidence should be required in disciplinary proceedings. Nevertheless, the Court held that because "[p]rison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances," a less, rather than more, stringent quantum of evidence satisfied due process. _Id._ at 455-56.

The Due process analysis called for, however, weighs substantially differently, on both ends, in the parole setting context. First, the prisoner's interest is greater. In the prison disciplinary context, the prisoner stands to lose some days of good time credit. Because that will delay his release by that many days, his interest is great; but the decision will not control whether he ever regains his liberty. Parole Board Hearing denials are

INSERT C (Ground 3 con .)                    )

significantly different. A denial of a parole date does not just delay a prisoner's release by a set number of years; it takes away all the good time credit earned toward a set prison term, leaving the very real possibility that the prisoner will spend many years in prison way beyond his Minimum Eligible Parole Date and the terms set forth in the Board's own Matrix guidelines, and perhaps being release only after age has made it almost impossible for him to gain a quality life, or dying in prison. Thus, the prisoner's side of the due process balancing is substantially weightier than it is in a disciplinary hearing.

"The 'some evidence' standard sends a message to prison inmates as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation. This message runs contrary to fundamental principles of criminal law in the United States." Carrillo v. Fabian 701 N.W.2d, 763; 2005 Minn. LEXIS 424.

In the final analysis, it may not be necessary for this Court to determine the quantum of evidence necessary to reverse a parole date, for even under the "some evidence" standard, the evidence before the Board does not support the Board's finding that Petitioner is a current threat to public safety. It is important to note, however, that even under the "some evidence" rule, the evidence must bear "some indicia of reliability." Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904.

Under California law, a parole date must be set unless the panel determines that the "gravity of the current or convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offense is such that consideration of public safety requires a more lengthy period of incarceration...." Cal. Penal Code § 3041(b). The panel must determine "whether the life prisoner is suitable for release on parole," and whether

7.

INSERT C (Ground 3 co...)

"the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15 ("CCR-15") § 2402(a). The panel must consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole. Id. as § 2402(b)-(d).

There is no question that the only basis for finding a life prisoner unsuitable for parole under California law is that he presents a current threat to public safety. There is no evidence that supports such a finding.

For the foregoing reasons, the Court should grant the petition and order the Board to use the proper standard set forth n its own regulation which calls for a "preponderance of the evidence," or "substantial evidence."

# EXHIBIT  G

# ORIGINAL

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

FILED

JUL 9 - 2007

MICHAEL J. YERLY, Clerk

By _____

DEPUTY

In re RICKY CARPENTER,

on Habeas Corpus.

H031553
(Santa Clara County
Super. Ct. No. 68207)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Mihara, Acting P.J., and McAdams, J., participated in this decision.)

Dated _____JUL 9 - 2007_____    _____ Acting P.J.

COPY     MC-275

Name _____ Ricky A. Carpenter _____

Address _____ B95921 /2N14L _____

_____ San Quentin CA 94974 _____

_____

CDC or ID Number ___ B95921 _____

Court of Appeal - Sixth App. Dist.

F I L E D

MAY 16 2007

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

## Sixth District Court of Appeals
## In and For the State of California
(Court)

| | |
|---|---|
| ___ Ricky A. Carpenter ___<br>Petitioner<br>vs.<br>San Quentin State Prison<br>Warden Ornoski<br>Respondent | **PETITION FOR WRIT OF HABEAS CORPUS**<br><br># H031553<br><br>No. _____<br>*(To be supplied by the Clerk of the Court)* |

## INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Form Approved by the<br>Judicial Council of California<br>MC-275 [Rev. January 1, 1999]
**PETITION FOR WRIT OF HABEAS CORPUS**
Penal Code, § 1473 et seq.;<br>Cal. Rules of Court, rules 56.5, 201(h)

**This petition concerns:**

- [ ] A conviction
- [x] Parole
- [ ] A sentence
- [ ] Credits
- [ ] Jail or prison conditions
- [ ] Prison discipline
- [x] Other (specify): Parole Hearing Denial

1. Your name: Ricky A. Carpenter

2. Where are you incarcerated? San Quentin State Prison

3. Why are you in custody? [x] Criminal Conviction  [ ] Civil Commitment

   Answer subdivisions a. through i. to the best of your ability.

   a. State reasons for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      1st Degree Murder

   b. Penal or other code sections: PC 187

   c. Name and location of sentencing or committing court: Santa Clara County Superior Court

      San Jose, CA

   d. Case number: # 68207

   e. Date convicted or committed: 8/10/1978

   f. Date sentenced: 8/17/1978

   g. Length of sentence: 7 years to Life

   h. When do you expect to be released? Unknown; Lifer

   i. Were you represented by counsel in the trial court? [x] Yes.  [ ] No.  If yes, state the attorney's name and address:

      Paul Mansfield, San Jose CA

4. What was the LAST plea you entered? (check one)

   [x] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?

   [x] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

---

MC-275 [Rev. January 1, 1999]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page two of six

6.  GROUNDS FOR RELIEF
    **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

_____

_____ See Attached pages 1 through 8 for Grounds: 1, 2, and 3 _____
_____ INSERT A through INSERT C _____

_____

a.  Supporting facts:
    Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority (optional):
    *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

_____

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment? ☒ Yes. ☐ No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

Court of Appeal

b. Result: Denied    c. Date of decision: 1979

d. Case number or citation of opinion, if known: Unknown

e. Issues raised: (1) Ineffectiveness of Counsel

(2) Circumstances of Case

(3) Evidence presented

f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

State Defender's office

9. Did you seek review in the California Supreme Court? ☒ Yes. ☐ No. If yes, give the following information:

a. Result: Denied    b. Date of decision: 1979

c. Case number or citation of opinion, if known: Unknown

d. Issues raised: (1) Same as Above

(2) Same as Above

(3) Same as Above

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

This appeal concerns the denial of parole at a suitability hearing

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

BPT Administrative Review Process Repealed on 5/1/2004

b. Did you seek the highest level of administrative review available? ☒ Yes. ☐ No.
*Attach documents that show you have exhausted your administrative remedies.*

12. Other than directly appealing your conviction, have you taken any other action with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

n/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

N/A

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

not on this petition.

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

N/A

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

n/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 5/12/07

▶ _____
(SIGNATURE OF PETITIONER)

MC-275 (Rev. January 1, 1999)

PETITION FOR WRIT OF HABEAS CORPUS

Page six of six

## Ground 1

IN VIOLATION OF STATE AND FEDERAL DUE PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") IS CONTINUING TO DENY PAROLE THROUGH THE SOLE USE OF THE COMMITTING OFFENSE AND PRIOR NON-CRIMINAL/PRISON CONDUCT WITHOUT REAL EVIDENCE THAT PETITIONER IS A CURRENT "UNREASONABLE THREAT TO PUBLIC SAFETY," THAT IS SUPPORTED BY THE RECORD, MANIPULATING THE FACTS OF THE HEARING THROUGH RUMORS, WHIM, AND CAPRICE, DISTORTION, AND OMISSION OF EVIDENCE, RESULTING IN A FINDING OF UNSUITABILITY.

Ricky A. Carpenter ("Petitioner") is serving a seven to life for a conviction of first-degree murder committed on January 15, 1978. Petitioner appeared before the Board of Parole Hearings on September 21, 2006, and received a three year denial for parole. Petitioner's Minimum Eligible Parole Date is set at November 30, 1985. That decision is the basis for this petition for writ of habeas corpus.

The record will show that the Board abused their discretion in making findings that are not supported by the record. Petitioner did not get a fair and impartial hearing. By the actions, stated in the grounds above, the Board manipulated all the evidence supporting a finding of suitability (See record), while their manipulations are not because they are relying solely on the committing offense and prior non-criminal conduct. These factors violate Petitioner's constitutional protected Due Process and Liberty Interest rights and illustrate that the Board has abused their discretion and did not conduct a fair hearing. The Board is using "boiler-plate" issues, elements, and language, which were either not found true by the jury, unconstitutionally vague, not supported by the evidence and law, and that are clouding the real issue. The Board wants to rely solely on the controlling offense and prior non-criminal conduct as allowed under the California Supreme Court in the In re Rosenkrantz, 29 Cal.4th 616, but is having a difficult time getting around the Liberty Interest Rights granted under the Ninth Circuit, so they have to cloud the issue and record. (See e.g., Cal. Penal Code § 3041(a)

INSERT A (Ground 1 cont.)

and (b); § 190.2, § 190.4; Cal. Codes of Regs. tit. 15; <u>Cunningham v. California</u> 549 U.S. ___(2007); <u>Superintendent v. Hill</u>, 472 U.S. 455; <u>In re Scott</u> (2005) 133 Cal.App.4th 573; <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910, 915; <u>In re Elkins</u> (2006) 144 Cal.App.4th 475; and <u>In re Weider</u> (2006) 145 Cal.App.4th 579; Fourteenth Amendment of the United States Constitution.)

For the foregoing reasons, the Court should grant the petition and order the Board to set a parole date that conforms with the above stated law. In the event that Petitioner has gone beyond what the Matrix guidelines provides for his case, Petitioner should receive credit for his parole term.

INSERT B

## Ground 2

IN VIOLATION OF STATE AND FEDERAL EQUAL PROTECTION AND DUE PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") FAILED TO "ACTUALLY" CONSIDER ALL OF THE RELEVANT RELIABLE INFORMATION IN THE PROPER MANNER PURSUANT TO CAL. CODE OF REG. TIT. 15 ("CCR-15") § 2402(b); MENTAL HEALTH AND COUNSELOR REPORTS OF RISK ASSESSMENT, CAL. PENAL CODE § 3402 NOTICE SUPPORTING OR NOT OPPOSING PAROLE, PRISON CONDUCT AND REHABILITATION, ETC.. BEYOND THE COMMITTING OFFENSE (AND PRIORS) NON-CRIMINAL CONDUCT, THERE IS NO SUPPORT BY THE RECORD THAT PETITIONER IS A **CURRENT** UNREASONABLE THREAT TO THE PUBLIC IF RELEASED ON PAROLE.

On September 21, 2006, the record demonstrates how the Board of Parole Hearings ("Board") merely went through the motions without "actually" considering all the information. This consideration should really go beyond just stating that the Board did so. The Board abused its discretion in claiming that the committing offense and prior non-criminal prison conduct and prior to the incarceration conduct, which are all unchangeable factors, that would outweigh all of the factors supporting parole: e.g., Mental Health and Counselor Evaluations and Risk Assessments, work assignment performance, self-help groups, parole plans, etc... The weighing process, not standardized, is an Equal Protection violation. Even though the Board acknowledged the positive, it is just as obvious they were not "actually" considering them as factors of suitability. The Board did not "Actually" consider Petitioner's eligible for parole and that parole (according to the intent and spirit of the process described in Cal. Penal Code § 3041(b)) should be granted unless Petitioner is a current unreasonable risk to public safety. The Board instead substituted their "boiler-plate" grounds for denial for an "Actual" determination that is supported by the record and within the intent and spirit of the process. (See. e.g., Penal Code § 3041(a) and (b); § 190.2, § 190.4; Cal. Codes of Regs. tit. 15; Cunningham v. California 549 U.S. ___ (2007); Superintendent v. Hill, 472 U.S. 455; In re Scott (2005) 133 Cal.App.4th 573; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 915; In re Elkins (2006)

3.

144 Cal.App.4th 475; and In re Weider (2006) 145 Cal.App.4th 579; Fourteenth

Amendment of the United States Constitution Equal Protection and Due Process

Clause.)

   For the foregoing reasons, the Court should grant the petition and

order the Board to set a parole date that conforms with the above stated

law. In the event that Petitioner has gone beyond what the Matrix guidelines

provides for his case, Petitioner should receive credit for his parole term.

In the alternative, the Court should appoint counsel, hold an evidentiary

hearing, while order the Board to produce records of all "Seven Years to

Life" prisoners' decisions. This discovery will show that the Board uses

"boiler-plate" language that is unconstitutionally vague, were not present

or found true by a jury, and represent a "No-Parole Policy" for those

convicted of murder.

INSERT C

### Ground 3

THE BOARD OF PAROLE HEARINGS ("BOARD") VIOLATED PETITIONER'S
STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS IN
ITS RELIANCE ON THE "SOME EVIDENCE" QUANTUM OF EVIDENCE
DOCTRINE WHEN IT USED THE COMMITTING OFFENSE, PRIOR-CONDUCT
(TO INCARCERATION) AND PRIOR NON-CRIMINAL CONDUCT TO MAKE
A FINDING THAT PETITIONER WAS AN UNREASONABLE RISK TO PUBLIC
SAFETY IF RELEASED ON PAROLE.

When all the evidence is examined, it will show that on September
21, 2006, the record demonstrates how the Board of Parole Hearings ("Board")
used the above as the sole evidence, factors to make a finding of
unsuitability. Although the authority to do so has been upheld under
California Supreme Court's Rosenkrantz decision, it also violates the Liberty
Interest ruling in the Ninth Circuit Biggs v. Terhune decision. The "Some
Evidence" Doctrine therefore violates Petitioner's Liberty Interest and the
Quantum of Evidence must be increased to at least "substantive-evidence"
(defined as enough to convince a reasonable person). The "Some Evidence"
(under Superintendent v. Hill, 472 U.S. 455 ("Hill"), that was introduced
for the first time during "In re Powell" parole hearing having been used
ever since) Doctrine should not apply in a parole suitability hearing because
the argument posed during Hill is not the same in a parole hearing as it
was in a disciplinary hearing: the Superintendent had a violent prison to
control and Hill's Liberty Interest was very small.

In Hill, the Court held that due process requires a prison disciplinary
decision be supported by some evidence. "In a variety of contexts, the Court
has recognized that a governmental decision resulting in the loss of any
important liberty interest violates due process if the decision is no supported
by any evidence." Id. at 455. Indeed, the general rule is that review of agency
decisions, including those made by a quasi-judicial officers, is for
substantial evidence. (See e.g., Evans v. Charter, 110 F.3d 1480, 1483 (9th
Cir. 1997) (review of ALJ findings); Young v. Sullivan, 911 F.2d 180, 183

5.

(9th Cir. 1990) (same.).

The state and federal courts have tended to assume that the "some evidence" standard in Hill is the standard that applies to parole decisions. Petitioner contends that is wrong. The usual standard is substantial evidence. Hill developed an exception for prison disciplinary hearings, and exception premised on the unique circumstances of prison discipline. No U.S. Supreme Court case, and certainly nothing in Hill, suggest that the "some evidence" standard is appropriate for, or would satisfy due process in, parole matters.

The requirements of due process are flexible and depends on balancing of the interest affected by the relevant government actions. (See, e.g., Cafeteria Workers v. McElroy, 367 U.S. 866, 895 (1961).) In Hill, the Supreme Court balanced a prisoner's interest in good time credit against "the distinctive setting of a prison, where disciplinary proceeding 'take place in a closed, tightly controlled environment.'" 472 U.S. at 454. The Court rejected the prison's argument that no particular quantum of evidence should be required in disciplinary proceedings. Nevertheless, the Court held that because "[p]rison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances," a less, rather than more, stringent quantum of evidence satisfied due process. Id. at 455-56.

The Due process analysis called for, however, weighs substantially differently, on both ends, in the parole setting context. First, the prisoner's interest is greater. In the prison disciplinary context, the prisoner stands to lose some days of good time credit. Because that will delay his release by that many days, his interest is great; but the decision will not control whether he ever regains his liberty. Parole Board Hearing denials are

6.

significantly different. A denial of a parole date does not just delay a prisoner's release by a set number of years; it takes away all the good time credit earned toward a set prison term, leaving the very real possibility that the prisoner will spend many years in prison way beyond his Minimum Eligible Parole Date and the terms set forth in the Board's own Matrix guidelines, and perhaps being release only after age has made it almost impossible for him to gain a quality life, or dying in prison. Thus, the prisoner's side of the due process balancing is substantially weightier than it is in a disciplinary hearing.

"The 'some evidence' standard sends a message to prison inmates as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation. This message runs contrary to fundamental principles of criminal law in the United States." Carrillo v. Fabian 701 N.W.2d, 763; 2005 Minn. LEXIS 424.

In the final analysis, it may not be necessary for this Court to determine the quantum of evidence necessary to reverse a parole date, for even under the "some evidence" standard, the evidence before the Board does not support the Board's finding that Petitioner is a current threat to public safety. It is important to note, however, that even under the "some evidence" rule, the evidence must bear "some indicia of reliability." Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904.

Under California law, a parole date must be set unless the panel determines that the "gravity of the current or convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offense is such that consideration of public safety requires a more lengthy period of incarceration...." Cal. Penal Code § 3041(b). The panel must determine "whether the life prisoner is suitable for release on parole," and whether

7.

"the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15 ("CCR-15") § 2402(a). The panel must consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole. Id. as § 2402(b)-(d).

There is no question that the only basis for finding a life prisoner unsuitable for parole under California law is that he presents a current threat to public safety. There is no evidence that supports such a finding.

For the foregoing reasons, the Court should grant the petition and order the Board to use the proper standard set forth n its own regulation which calls for a "preponderance of the evidence," or "substantial evidence."

8.

# EXHIBIT H

S154843

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re RICKY A. CARPENTER on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

JAN 1 6 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
Chief Justice

ORIGINAL

MC-275

Name _Ricky A. Carpenter_

Address _B95921 / 2N14ᴸ_

_San Quentin, CA 94974_

SUPREME COURT
F I L E D

JUN 3 0 2007

Frederick K. Ohlrich Clerk

DEPUTY

CDC or ID Number _B95921_

Supreme Court
_Inq For the State of California_
(Court)

_Ricky A. Carpenter_
Petitioner

vs.

_San Quentin State Prison Warden ORNOSKI_
Respondent

PETITION FOR Review

No. **S154843**

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

PETITION FOR Review

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

☐ A conviction                      ☒ Parole

☐ A sentence                        ☐ Credits

☐ Jail or prison conditions         ☐ Prison discipline

☒ Other (specify): Parole Hearing Denial

1. Your name: Ricki A. Carpenter

2. Where are you incarcerated? San Quentin State Prison

3. Why are you in custody? ☒ Criminal Conviction  ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reasons for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, robbery with use of a deadly weapon).

1st Degree Murder

b. Penal or other code sections: PC 187

c. Name and location of sentencing or committing court: Santa Clara County Superior Court San Jose CA

d. Case number: #68207

e. Date convicted or committed: 8/10/1978

f. Date sentenced: 8/17/1978

g. Length of sentence: 7 years to Life

h. When do you expect to be released? Unknown; Lifer

i. Were you represented by counsel in the trial court? ☒ Yes  ☐ No. If yes, state the attorney's name and address:

Paul Mansfield, San Jose, CA

What was the LAST plea you entered? *(check one)*

☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

If you pleaded not guilty, what kind of trial did you have?

☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

See Attached pages 1 through 8 for Grounds: 1, 2, and 3
INSERT A through INSERT C

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Did you appeal from the conviction, sentence, or commitment? ☒ Yes. ☐ No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

_Court of Appeal_

b. Result: _Denied_                    c. Date of decision: _1979_

d. Case number or citation of opinion, if known: _Unknown_

e. Issues raised: (1) _Ineffectiveness of Counsel_

(2) _Circumstances of case_

(3) _Evidence presented_

f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

_State Defender's Office_

Did you seek review in the California Supreme Court? ☒ Yes. ☐ No. If yes, give the following information:

a. Result: _Denied_                    b. Date of decision: _1979_

c. Case number or citation of opinion, if known: _Unknown_

d. Issues raised: (1) _Same as Above_

(2) _Same as above_

(3) _Same as above_

If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

_This appeal concerns the denial of parole at a suitability hearing_

Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See In re Muszalski (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

_BPT Administrative Review Process Repealed on 5/1/2004_

Did you seek the highest level of administrative review available? ☒ Yes. ☐ No.
Attach documents that show you have exhausted your administrative remedies.

12. Other than those appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

     (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

           (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

           (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

n/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

N/A

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

not on this petition.

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

N/A

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

n/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3/6/07    7/19/07    ▶ _Riko Carpenter_
                                (SIGNATURE OF PETITIONER)
                             _Riko Carpenter_

INSERT A

## Ground 1

IN VIOLATION OF STATE AND FEDERAL DUE PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") IS CONTINUING TO DENY PAROLE THROUGH THE SOLE USE OF THE COMMITTING OFFENSE AND PRIOR NON-CRIMINAL/PRISON CONDUCT WITHOUT REAL EVIDENCE THAT PETITIONER IS A CURRENT "UNREASONABLE THREAT TO PUBLIC SAFETY," THAT IS SUPPORTED BY THE RECORD, MANIPULATING THE FACTS OF THE HEARING THROUGH RUMORS, WHIM, AND CAPRICE, DISTORTION, AND OMISSION OF EVIDENCE, RESULTING IN A FINDING OF UNSUITABILITY.

Ricky A. Carpenter ("Petitioner") is serving a seven to life for a conviction of first-degree murder committed on January 15, 1978. Petitioner appeared before the Board of Parole Hearings on September 21, 2006, and received a three year denial for parole. Petitioner's Minimum Eligible Parole Date is set at November 30, 1985. That decision is the basis for this petition for writ of habeas corpus.

The record will show that the Board abused their discretion in making findings that are not supported by the record. Petitioner did not get a fair and impartial hearing. By the actions, stated in the grounds above, the Board manipulated all the evidence supporting a finding of suitability (See record), while their manipulations are not because they are relying solely on the committing offense and prior non-criminal conduct. These factors violate Petitioner's constitutional protected Due Process and Liberty Interest rights and illustrate that the Board has abused their discretion and did not conduct a fair hearing. The Board is using "boiler-plate" issues, elements, and language, which were either not found true by the jury, unconstitutionally vague, not supported by the evidence and law, and that are clouding the real issue. The Board wants to rely solely on the controlling offense and prior non-criminal conduct as allowed under the California Supreme Court in the In re Rosenkrantz, 29 Cal.4th 616, but is having a difficult time getting around the Liberty Interest Rights granted under the Ninth Circuit, so they have to cloud the issue and record. (See e.g., Cal. Penal Code § 3041(a)

1.

INSERT A (Ground 1 cont.)

and (b); S 190.2, S 190.4; Cal. Codes of Regs. tit. 15; <u>Cunningham v. California</u> 549 U.S. ___ (2007); <u>Superintendent v. Hill</u>, 472 U.S. 455; <u>In re Scott</u> (2005) 133 Cal.App.4th 573; <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910, 915; <u>In re Elkins</u> (2006) 144 Cal.App.4th 475; and <u>In re Weider</u> (2006) 145 Cal.App.4th 579; Fourteenth Amendment of the United States Constitution.)

For the foregoing reasons, the Court should grant the petition and order the Board to set a parole date that conforms with the above stated law. In the event that Petitioner has gone beyond what the Matrix guidelines provides for his case, Petitioner should receive credit for his parole term.

2.

INSERT B

## Ground 2

IN VIOLATION OF STATE AND FEDERAL EQUAL PROTECTION AND DUE PROCESS, THE BOARD OF PAROLE HEARINGS ("BOARD") FAILED TO "ACTUALLY" CONSIDER ALL OF THE RELEVANT RELIABLE INFORMATION IN THE PROPER MANNER PURSUANT TO CAL. CODE OF REG. TIT. 15 ("CCR-15") § 2402(b); MENTAL HEALTH AND COUNSELOR REPORTS OF RISK ASSESSMENT, CAL. PENAL CODE § 3402 NOTICE SUPPORTING OR NOT OPPOSING PAROLE, PRISON CONDUCT AND REHABILITATION, ETC.. BEYOND THE COMMITTING OFFENSE (AND PRIORS) NON-CRIMINAL CONDUCT, THERE IS NO SUPPORT BY THE RECORD THAT PETITIONER IS A **CURRENT** UNREASONABLE THREAT TO THE PUBLIC IF RELEASED ON PAROLE.

On September 21, 2006, the record demonstrates how the Board of Parole Hearings ("Board") merely went through the motions without "actually" considering all the information. This consideration should really go beyond just stating that the Board did so. The Board abused its discretion in claiming that the committing offense and prior non-criminal prison conduct and prior to the incarceration conduct, which are all unchangeable factors, that would outweigh all of the factors supporting parole: e.g., Mental Health and Counselor Evaluations and Risk Assessments, work assignment performance, self-help groups, parole plans, etc... The weighing process, not standardized, is an Equal Protection violation. Even though the Board acknowledged the positive, it is just as obvious they were not "actually" considering them as factors of suitability. The Board did not "Actually" consider Petitioner's eligible for parole and that parole (according to the intent and spirit of the process described in Cal. Penal Code § 3041(b)) should be granted unless Petitioner is a **current** unreasonable risk to public safety. The Board instead substituted their "boiler-plate" grounds for denial for an "Actual" determination that is supported by the record and within the intent and spirit of the process. (See. e.g., Penal Code § 3041(a) and (b); § 190.2, § 190.4; Cal. Codes of Regs. tit. 15; Cunningham v. California 549 U.S. ___(2007); Superintendent v. Hill, 472 U.S. 455; In re Scott (2005) 133 Cal.App.4th 573; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 915; In re Elkins (2006)

3.

144 Cal.App.4th 475; and In re Weider (2006) 145 Cal.App.4th 579; Fourteenth Amendment of the United States Constitution Equal Protection and Due Process Clause.)

For the foregoing reasons, the Court should grant the petition and order the Board to set a parole date that conforms with the above stated law. In the event that Petitioner has gone beyond what the Matrix guidelines provides for his case, Petitioner should receive credit for his parole term. In the alternative, the Court should appoint counsel, hold an evidentiary hearing, while order the Board to produce records of all "Seven Years to Life" prisoners' decisions. This discovery will show that the Board uses "boiler-plate" language that is unconstitutionally vague, were not present or found true by a jury, and represent a "No-Parole Policy" for those convicted of murder.

INSERT C

## Ground 3

THE BOARD OF PAROLE HEARINGS ("BOARD") VIOLATED PETITIONER'S
STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS IN
ITS RELIANCE ON THE "SOME EVIDENCE" QUANTUM OF EVIDENCE
DOCTRINE WHEN IT USED THE COMMITTING OFFENSE, PRIOR-CONDUCT
(TO INCARCERATION) AND PRIOR NON-CRIMINAL CONDUCT TO MAKE
A FINDING THAT PETITIONER WAS AN UNREASONABLE RISK TO PUBLIC
SAFETY IF RELEASED ON PAROLE.

When all the evidence is examined, it will show that on September
21, 2006, the record demonstrates how the Board of Parole Hearings ("Board")
used the above as the sole evidence, factors to make a finding of
unsuitability. Although the authority to do so has been upheld under
California Supreme Court's Rosenkrantz decision, it also violates the Liberty
Interest ruling in the Ninth Circuit Biggs v. Terhune decision. The "Some
Evidence" Doctrine therefore violates Petitioner's Liberty Interest and the
Quantum of Evidence must be increased to at least "substantive-evidence"
(defined as enough to convince a reasonable person). The "Some Evidence"
(under Superintendent v. Hill, 472 U.S. 455 ("Hill"), that was introduced
for the first time during "In re Powell" parole hearing having been used
ever since) Doctrine should not apply in a parole suitability hearing because
the argument posed during Hill is not the same in a parole hearing as it
was in a disciplinary hearing: the Superintendent had a violent prison to
control and Hill's Liberty Interest was very small.

In Hill, the Court held that due process requires a prison disciplinary
decision be supported by some evidence. "In a variety of contexts, the Court
has recognized that a governmental decision resulting in the loss of any
important liberty interest violates due process if the decision is no supported
by any evidence." Id. at 455. Indeed, the general rule is that review of agency
decisions, including those made by a quasi-judicial officers, is for
substantial evidence. (See e.g., Evans v. Charter, 110 F.3d 1480, 1483 (9th
Cir. 1997) (review of ALJ findings); Young v. Sullivan, 911 F.2d 180, 183

5.

(9th Cir. 1990) (same.).

The state and federal courts have tended to assume that the "some evidence" standard in Hill is the standard that applies to parole decisions. Petitioner contends that is wrong. The usual standard is substantial evidence. Hill developed an exception for prison disciplinary hearings, and exception premised on the unique circumstances of prison discipline. No U.S. Supreme Court case, and certainly nothing in Hill, suggest that the "some evidence" standard is appropriate for, or would satisfy due process in, parole matters.

The requirements of due process are flexible and depends on balancing of the interest affected by the relevant government actions. (See, e.g., Cafeteria Workers v. McElroy, 367 U.S. 866, 895 (1961).) In Hill, the Supreme Court balanced a prisoner's interest in good time credit against "the distinctive setting of a prison, where disciplinary proceeding 'take place in a closed, tightly controlled environment.'" 472 U.S. at 454. The Court rejected the prison's argument that no particular quantum of evidence should be required in disciplinary proceedings. Nevertheless, the Court held that because "[p]rison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances," a less, rather than more, stringent quantum of evidence satisfied due process. Id. at 455-56.

The Due process analysis called for, however, weighs substantially differently, on both ends, in the parole setting context. First, the prisoner's interest is greater. In the prison disciplinary context, the prisoner stands to lose some days of good time credit. Because that will delay his release by that many days, his interest is great; but the decision will not control whether he ever regains his liberty. Parole Board Hearing denials are

6.

INSERT C (Ground 3 cont.)

significantly different. A denial of a parole date does not just delay a prisoner's release by a set number of years; it takes away all the good time credit earned toward a set prison term, leaving the very real possibility that the prisoner will spend many years in prison way beyond his Minimum Eligible Parole Date and the terms set forth in the Board's own Matrix guidelines, and perhaps being release only after age has made it almost impossible for him to gain a quality life, or dying in prison. Thus, the prisoner's side of the due process balancing is substantially weightier than it is in a disciplinary hearing.

"The 'some evidence' standard sends a message to prison inmates as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation. This message runs contrary to fundamental principles of criminal law in the United States." Carrillo v. Fabian 701 N.W.2d, 763; 2005 Minn. LEXIS 424.

In the final analysis, it may not be necessary for this Court to determine the quantum of evidence necessary to reverse a parole date, for even under the "some evidence" standard, the evidence before the Board does not support the Board's finding that Petitioner is a current threat to public safety. It is important to note, however, that even under the "some evidence" rule, the evidence must bear "some indicia of reliability." Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904.

Under California law, a parole date must be set unless the panel determines that the "gravity of the current or convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offense is such that consideration of public safety requires a more lengthy period of incarceration...." Cal. Penal Code § 3041(b). The panel must determine "whether the life prisoner is suitable for release on parole," and whether

7.

INSERT C (Ground 3 cont.)

"the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15 ("CCR-15") § 2402(a). The panel must consider "all relevant, reliable information," and is guided by circumstances tending to show suitability and unsuitability for parole. Id. as § 2402(b)-(d).

There is no question that the only basis for finding a life prisoner unsuitable for parole under California law is that he presents a current threat to public safety. There is no evidence that supports such a finding.

For the foregoing reasons, the Court should grant the petition and order the Board to use the proper standard set forth n its own regulation which calls for a "preponderance of the evidence," or "substantial evidence."

8.